## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NAVAJO NATION, a federally recognized Indian tribe, et al.,<br><br><br>      Plaintiffs,<br><br>v.<br><br>SAN JUAN COUNTY, a Utah governmental subdivision,<br><br><br>      Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:12-cv-00039<br><br>Judge Robert J. Shelby |

Plaintiffs Navajo Nation and several individual tribe members (collectively Navajo Nation) bring suit against Defendant San Juan County claiming voting-related violations of the Equal Protection Clause of the Fourteenth Amendment, the Fifteenth Amendment, and Section 2 of the Voting Rights Act, 42 U.S.C. § 1973.  (Dkt. 75.)

Navajo Nation contends in its Fourth Claim for Relief that San Juan County's School Board districts violate the one-person, one-vote guarantee of the Equal Protection Clause.  *Reynolds v. Sims*, 377 U.S. 533 (1964).  Navajo Nation and San Juan County filed cross-motions for summary judgment on this claim.  (Dkt. Nos. 173, 221.)

For the reasons stated below, the court grants Navajo Nation's motion for summary judgment and denies San Juan County's motion for summary judgment.

## BACKGROUND

### A.  The San Juan County School Board

San Juan County covers approximately 8,100 miles in southeastern Utah.  According to the 2010 census, it has 14,746 citizens.  (Dkt. 198, p. 31.)  Among those citizens are some 3,000 children who attend San Juan County schools: six elementary schools, one middle school, and five high schools.  (Dkt. 221, p. 3.); (Dkt. 221-1.)[1]  The education of those children is the ultimate responsibility of the San Juan County School Board.  Among other duties, the Board sets students' curricula, administers required state tests, tracks the progress of students and teachers, and cares for school buildings.  UTAH CODE ANN. § 53A-3-402; *see* Dkt. 221, pp. 24-25.

Like other school boards within Utah, the San Juan County School Board operates subject to state law requirements, set forth by statute.  Three of these requirements are most relevant to the present motions.  First, by law, the board of education for a school district of San Juan County's student population must consist of five members, each elected from a single member district.  UTAH CODE ANN. § 20A-14-202(1)(a), (h).  Members must be registered voters who are residents of the districts they will represent, and must have lived in that district for at least one year.  UTAH CODE ANN. § 20A-14-202(2)-(3).  Second, counties are required to "divide the school district so that the local school board districts are substantially equal in population and are as contiguous and compact as practicable."  UTAH CODE ANN. § 20A-14-201(1)(b).  Finally, a county "shall reapportion district boundaries to meet the population, compactness, and

---

[1] Some students within San Juan County do not attend its public schools.  One group of children in Spanish Valley, along the northern border, attends schools in Grand County, Utah, closer to their homes.  Other groups of children attend schools across the state border in Colorado and Arizona.  Finally, some children attend Bureau of Indian Education grant schools, which, though located in the southern part of San Juan County, are not schools within the San Juan County School District.  (Dkt. 221, ¶ 67-71.)

contiguity requirements" set forth above "at least once every 10 years."[2] UTAH CODE ANN. § 20A-14-201(2)(a)(i).

The San Juan County School Board has five school board members, each elected from one single-member district.  (Dkt. 221, p. 24.)  Each of the districts contains two or three schools of the twelve public schools in the County.  (Dkt. 221-1.)  The County Commission established these districts in 1992, and has not redrawn them since that time.  (Dkt. 260, p. 25.)

At present, based on the results of the 2010 census, the districts have the following characteristics:

District 1, which includes La Sal Elementary, Monticello Elementary, and Monticello High, and is located in the northern part of the County, has a population of 3,285;

District 2, which includes Albert R. Lyman Middle and San Juan High, and is located in the center of the County, including a portion of Blanding, has a population of 2,820;

District 3, which includes Blanding Elementary and Bluff Elementary, and is located in the center and southeast portion of the County, including a portion of Blanding, has a population of 2,899;

District 4, which includes Montezuma Creek Elementary and Whitehorse High, and is located in the southeastern part of the County, has a population of 3,060; and

District 5, which includes Tse'bii'nidzisgai Elementary, Monument Valley High, and Navajo Mountain High, and is located in the south and southwestern part of the County, has a population of 2,195.  (Dkt. Nos. 221, pp. 29-31; 221-1.)[3]

---

[2] Redistricting may also be required more frequently when other events occur.  *See* UTAH CODE ANN. § 20A-14-201(2)(a)(ii)-(vii), (b).

[3] Calculation of the total number of persons in the School Board districts reflects a subtraction of certain San Juan County citizens who are not subject to the School Board's jurisdiction.  *See* Dkt. 221, pp. 29-30.

The districts are of unequal population, and have been since the time they were first drawn. To assess how unequal the districts' populations are, the benchmark is an ideal population distribution. If, for instance, 10,000 persons reside in a county with five school board districts, and each district contains 2,000 persons, then the population is distributed ideally within those districts. In the case of San Juan County, adjusting for those citizens within and without the School Board's jurisdiction (see above, p. 2, n.1), the ideal population distribution would be 2,852 persons per election district. (Dkt. 260, p. 21.) To calculate the total deviation from an ideal population distribution, experts typically look to the sum of two values: (1) the percentage deviation above the ideal distribution of the district with the largest population size; and (2) the absolute value of the percentage deviation below the ideal distribution of the district with the smallest population size. If the ideal population is thought of as sea level, this is the distance from the highest population peak to the lowest population valley.

Both parties agree that the San Juan County School Board districts deviate substantially from an ideal population distribution, where districts would be of equal size. Navajo Nation's expert, William Cooper, found a deviation of 37.69% from an "ideal"; San Juan County's expert, Kimball William Brace, found a deviation of 38.22%. (Dkt. 221, p. 31.) In either calculation, this percentage represents the combined deviations of District 1, which has the most members, and District 5, which has the least. District 3 and 4 have greater populations than an ideal distribution, while District 2 has a lesser population. In these three districts, the deviations are more moderate, and are less than 10% above or below an ideal population distribution.

## B. Litigation Context

Navajo Nation brings four voting-related claims in this case, the first and second concerning the San Juan County Commission, and the third and fourth concerning the San Juan

County School Board.  The first three claims rest on allegations that election districts within the County are racially discriminatory, in violation of the Fifteenth Amendment (for the Commission) and Section 2 of the Voting Rights Act (for the Commission and the Board). Navajo Nation has made clear that it seeks in this lawsuit to redress an alleged historical pattern of racial discrimination in the County.

The Fourth Claim for Relief stands apart from the broader allegations of the litigation. Where the first three claims are based on alleged racial discrimination, the fourth rests only on the unequal distribution of population in the School Board election districts drawn by the County.  Here, Navajo Nation need only prove that the election districts violate the one-person, one-vote demand of the Equal Protection Clause, recognized by the Supreme Court in *Reynolds v. Sims*.  377 U.S. 533 (1964).  Though *Reynolds* and its progeny are not blind to the issue of race, and bear the unmistakable historical imprint of struggles to secure voting rights for racial minorities, the one-person, one-vote rule has no direct relation to the racial composition of election districts.[4]

Both parties move for summary judgment on this Fourth Claim for Relief.  (Dkt. Nos. 173, 221.)  In support of its motion, Navajo Nation argues that districts deviating in population as significantly as those here constitute a prima facie Equal Protection Clause violation, and that San Juan County has failed to establish that the deviation is "based on legitimate considerations incident to the effectuation of a rational state policy."  *Mahan v. Howell*, 410 U.S. 315, 325, *modified*, 411 U.S. 922 (1973) (quoting *Reynolds v. Sims*, 377 U.S. 533, 579 (1964)); *see* Dkt.

---

[4] Considerations of racial discrimination might weigh more heavily in determining whether voting districts deviating at a "de minimis" level violate the Equal Protection Clause.  *E.g.*, *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 362 (S.D.N.Y.) *aff'd*, 543 U.S. 997 (2004); *Marylanders for Fair Representation, Inc. v. Schaefer*, 849 F. Supp. 1022, 1032 (D. Md. 1994).  Where a one-person, one-vote claim involves severe population deviations (greater than 10%), allegations of racial discrimination are potentially less significant because even non-discriminatory justifications may fail to satisfy constitutional requirements.

No. 231, p. 3.  San Juan County concedes the prima facie violation, but argues that it has legitimate reasons for the deviation from an equal population distribution in the districts.  (Dkt. 198, p. 56-59; Dkt. 221, pp. 37-40); *see* Dkt. 260, p. 27.  San Juan County also argues that Plaintiffs lack standing to pursue the Fourth Claim for Relief.  (Dkt. 198, pp. 63-66; Dkt. 221, pp. 43-46.)

## ANALYSIS

### A.  Summary Judgment Standard

A party is entitled to summary judgment only when it can show there is no genuine dispute as to any material fact, and that the party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A "genuine" dispute is one where a reasonable jury could find in favor of the non-moving party.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  To the extent that the court can draw reasonable inferences from the record, it does so in the light most favorable to the non-moving party.  *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir. 2009).

Where the parties file cross-motions for summary judgment, it may suggest agreement between the parties that no issue of material fact remains, and that judgment as a matter of law is appropriate in favor of one party or the other.  Here, neither party argues that a genuine issue of material fact remains for trial.  They instead dispute whether the Fourth Claim either succeeds or fails as a matter of law.

The court agrees that no genuine disputes remain over any fact material to the Fourth Claim.  The court will therefore resolve the legal issues presented.

**B. Standing**

San Juan County raises several arguments in support of its motion for summary judgment, and in opposition to Navajo Nation's motion.  One argument is directed toward whether Navajo Nation has standing to assert the Fourth Claim for Relief.  Because "the core component of standing is an essential and unchanging part of the case-or-controversy requirement" of Article III, the court addresses standing before reaching the merits of the cross-motions for summary judgment. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Where standing is challenged on a summary judgment motion, the burden is on the plaintiff, who must "set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken as true." *Id.* at 561 (citations omitted) (internal quotation marks omitted).

In the case of a one-person, one-vote claim under the Equal Protection Clause, only voters residing in an "under-represented" district have standing to bring a claim. *See Fairley v. Patterson*, 493 F.2d 598, 603 (5th Cir. 1974) (holding that "injury results only to those persons domiciled in the under-represented voting districts.").  San Juan County argues that Navajo Nation cannot clear this threshold requirement because none of the individual Plaintiffs reside in District 1, the most "under-represented" district within the County.  (Dkt. 221, p. 43.)  Instead, the individual Plaintiffs reside only within Districts 3, 4, and 5.

Navajo Nation offers two arguments in support of standing.  First, some individual Plaintiffs live in Districts 3 and 4, and these two districts are "under-represented"—just not to the extent of District 1.  Second, Navajo Nation as a sovereign entity claims associational standing, or standing on a "parens patriae" basis, to assert claims on behalf of its individual members, including members who live in District 1.

7

Navajo Nation's first argument is sufficient to establish standing for Plaintiffs in this case. Contrary to San Juan County's assertion, Navajo Nation's claim is not merely that District 1 is malapportioned. (Dkt. 221, p. 43.) Navajo Nation is challenging the constitutionality of the School Board election district scheme as a whole. San Juan County is incorrect that only those voters in the *most* underrepresented district have standing. *See* Dkt. 260, p. 31.

Districts 3 and 4 deviate from an ideal distribution by less than 10%. But the fact that those specific districts deviate by less than 10% from an ideal distribution is not a barrier to asserting claims. Though districts deviating by less than 10% enjoy a presumption of constitutionality with respect to a one-person, one-vote claim, they may still be found to violate the Equal Protection Clause. *Marylanders for Fair Representation, Inc. v. Schaefer*, 849 F. Supp. 1022, 1032 (D. Md. 1994) (holding that "a plaintiff could, with appropriate proof, successfully challenge a redistricting plan with a maximum deviation below ten percent."). For this reason, a plaintiff who lives in a district that is "under-represented" but that deviates from an ideal population by less than ten percent may still suffer an injury. *See Wright v. N. Carolina*, 787 F.3d 256, 267 (4th Cir. 2015) (noting that "the Supreme Court has not created a 10% maximum population deviation threshold, below which all redistricting decisions are inherently constitutional."). It is not in dispute that certain individual Plaintiffs here reside in both Districts 3 and 4, and this is all that is required for standing on these claims. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977) (finding standing where there is "at least one individual plaintiff who has demonstrated standing to assert these rights as his own").[5]

---

[5] Navajo Nation separately argues that it has associational or "parens patriae" standing to bring the suit on behalf of individual members, including those located in District 1. The court finds no serious rebuttal to this argument in San Juan County's papers, and the force of the supplemental authority submitted on this point is not explained by the County. Dkt. 260, p. 31, n.101; Dkt. 265; *see S. Utah Wilderness All. v. Palma*, 707 F.3d 1143,

Finally, San Juan County appears to suggest that Navajo Nation, or individual Plaintiffs, lack standing because they do not have children in the San Juan County schools. *E.g.*, Dkt. 221, p. 11. This argument runs against clear precedent. Voters in an underrepresented district have standing to bring claims based on a violation of their rights. *See Fairley v. Patterson*, 493 F.2d 598 (5th Cir. 1974). State and local governments may not infringe on the right to vote merely because the voters in question do not appear to have a direct interest in the elected body. A person does not need to have children attending public schools to have a right to vote in School Board elections. In *Kramer v. Union Free Sch. Dist. No. 15*, the Supreme Court heard the claim of an adult male with no children in school who was denied the right to vote in a school district election. 395 U.S. 621, 628 (1969). The individual Plaintiffs need only allege an impaired ability to have their voice heard. Plaintiffs satisfy this requirement.

### C. One-Person, One-Vote

#### 1. Background of the Doctrine

The Equal Protection Clause requires that election districts afford voters equal weight in their representation. Describing the basis for this right, the Supreme Court held that "[t]he conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing— one person, one vote." *Reynolds v. Sims*, 377 U.S. 533, 558 (1964) (quoting *Gray v. Sanders*, 372 U.S. 368, 381 (1963)). *Reynolds* has, since the time of its decision, stood for the proposition that election districts must be of substantially equal population, to avoid over-representing members of one district (whose votes count proportionally more) or under-representing members of another (whose votes count proportionally less). The notion that "citizens have a fundamental

---

1153 (10th Cir. 2013). Associational standing likely would provide a separate and independent basis for standing. But the court does not reach the issue because individual Plaintiffs in Districts 3 and 4 have standing to pursue the claim, which is sufficient for the purposes of this suit.

right to vote for public officials on equal terms with one another is uncontroversial." *Dool v. Burke*, 497 F. App'x 782, 786 (10th Cir. Sept. 13, 2012) (O'Brien, J., concurring) (unpublished decision).  Further, "the right is comprehensive, extending beyond statewide legislative bodies to county and municipal offices, and even to smaller entities such as school boards and college trustees."  *Id.* (noting that both propositions are "beyond dispute.").

The one-person, one-vote requirement applies both to states and to their political subdivisions.[6]  Local governments are not excused from the rule, for the "actions of local government are the actions of the State.  A city, town, or county may no more deny the equal protection of the laws than it may abridge freedom of speech, establish an official religion, arrest without probable cause, or deny due process of law."  *Avery v. Midland Cnty., Tex.*, 390 U.S. 474, 480 (1968).  Though the Equal Protection Clause does not require elections for all offices, "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."  *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 629 (1969) (quoting *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 665 (1966)).[7]

State and local governments have some flexibility under one-person, one-vote to fashion districts that deviate from exact population equality without triggering a searching judicial review, at least when the inequality remains within a permissible range.  For instance, in the

---

[6] The districts for a state's federal congressional delegation are also required to be equal in population. *Karcher v. Daggett*, 462 U.S. 725 (1983).  See below, p. 10, n.7.

[7] San Juan County suggests that because the Supreme Court has allowed more flexibility in drawing state election districts than in federal election districts, "[i]t stands to reason that even greater flexibility must be accorded to units of local government."  (Dkt. 198, p. 53.)  No authority is cited for this proposition, and binding precedent suggests the opposite.  *Avery v. Midland Cnty., Tex.*, 390 U.S. 474, 48045 (1968) ("Although the forms and functions of local government and the relationships among the various units are matters of state concern, it is now beyond question that a State's political subdivisions must comply with the Fourteenth Amendment.").  The difference in treatment between federal election districts, on the one hand, and state and local election districts, on the other, is attributable in part to specific requirements of the federal Constitution.  U.S. CONST., ART. I, § 2; *Karcher v. Daggett*, 462 U.S. 725 (1983).

context of state legislative districts, "minor deviations from mathematical equality… are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification" by a government defendant. *Gaffney v. Cummings*, 412 U.S. 735, 745 (1973). The Supreme Court has clarified that "as a general matter… an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations[,]" but that a "plan with larger disparities in population… creates a prima facie case of discrimination and therefore must be justified." *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983). *Brown* has since been read to set a constitutional "safe harbor" at the 10% mark. Population deviations below that amount require plaintiffs to provide additional evidence to prevail on their claim, while deviations above that amount establish a prima facie case of a one-person, one-vote violation. *Daly v. Hunt*, 93 F.3d 1212, 1217-18 (4th Cir. 1996).

Once a prima facie violation is established, the districting governmental entity must show that the deviation from one-person, one-vote is necessary because of "legitimate considerations incident to the effectuation of a rational state policy." *Reynolds*, 377 U.S. at 579. The parties disagree about the level of scrutiny this court is required to apply in evaluating the sufficiency of San Juan County's offered justifications under this standard. (Dkt. Nos. 264, 267.)

### 2. Level of Scrutiny

Uncertainty about what level of scrutiny to apply in evaluating offered justifications for deviations from one-person, one-vote results from a tension *Reynolds* itself embodies. As Navajo Nation notes, in this landmark case "the Supreme Court articulated … the standard for judicial scrutiny of deviations from equal population in multiple ways." (Dkt. 267, p. 2.) *Reynolds* points in two conflicting directions, and subsequent Supreme Court jurisprudence appears to as well.

On the one hand, the *Reynolds* Court emphasized that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government," meaning that "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds*, 377 U.S. at 555, 562. The right to vote is fundamental. *City of Herriman v. Bell*, 590 F.3d 1176, 1184 (10th Cir. 2010) (citing *Reynolds*, 377 U.S. at 533); *cf. Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (discussing Supreme Court precedent establishing the right to vote as a "precious" and "fundamental" right). Consistent with this, "the Court has repeatedly expressed its concern with equalizing the voting power of citizens as an ultimate constitutional imperative—akin to protecting freedom of speech or freedom of religion." *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 783 (9th Cir. 1990) (Kozinski, J., concurring).

Generally, when evaluating Equal Protection claims involving infringement on a fundamental right, courts apply a strict level of scrutiny and look for a compelling state interest. *E.g.*, *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) ("equal protection analysis requires strict scrutiny of a legislative classification … when the classification impermissibly interferes with the exercise of a fundamental right"); *Mixon v. State of Ohio*, 193 F.3d 389, 402 (6th Cir. 1999); *see Benner v. Oswald*, 592 F.2d 174, 180-81 (3d Cir. 1979) ("In all equal protection cases some classification has occurred, but the standard of judicial scrutiny is usually dependent upon the subject matter of the classification."). Because a one-person, one-vote claim represents an Equal Protection Clause challenge to a violation of a fundamental right, the Supreme Court's fundamental rights jurisprudence seems to dictate a strict scrutiny review when considering offered justifications for population deviations. *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966) ("where fundamental rights and liberties are asserted under

12

the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined.").

On the other hand, the language employed by the Supreme Court in the *Reynolds* "test" allows divergences from a strict population standard when the deviations "are based on legitimate considerations incident to the effectuation of a rational state policy." *Reynolds*, 377 U.S. at 579; *e.g.*, *Gaffney v. Cummings*, 412 U.S. 735, 742 (1973). Pointing to that language, San Juan County suggested at oral argument that the court read the *Reynolds* standard as a version of rational basis review, an approach the court will not adopt.[8] But without question, the language of the *Reynolds* test suggests a standard of review incorporating some level of deference to the districting governmental entity.

Indeed, even amid the expansive constitutional vision of *Reynolds*, the Court there observed that state and local governments must retain some flexibility in achieving the demands of the Equal Protection Clause. 377 U.S. 533, 578 (1964). Recognizing this tension, the Supreme Court later held the *Reynolds* "legitimate considerations" test to be a less "stringent" standard than the maximum possible constitutional scrutiny. *Gaffney v. Cummings*, 412 U.S. 735, 741-42 (1973). Elsewhere, the Court has held that for one-person, one-vote "the proper equal protection test is not framed in terms of 'governmental necessity,'"—associated with strict scrutiny—but "instead in terms of a claim that a State may 'rationally consider.'" *Mahan v.*

---

[8] In a supplemental filing (Dkt. 264) San Juan County cites to a Supreme Court holding that "[s]trict scrutiny would not be appropriate if race-neutral, traditional districting considerations predominated over racial ones." *Bush v. Vera*, 517 U.S. 952, 964 (1996). But *Bush v. Vera* involved a challenge to gerrymandering, and plaintiffs did not allege a one-person, one-vote violation. The Court's observation that strict scrutiny would not be appropriate in the circumstances of that case is inapplicable here.

In this case, it is beyond doubt that rational basis review urged by San Juan County is inappropriate. *English v. Bd. of Educ. of Town of Boonton*, 301 F.3d 69, 76 (3d Cir. 2002) (noting that in a one-person, one-vote case "the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a 'rational basis' for the distinctions made are not applicable") (quoting *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627-28 (1969)).

*Howell*, 410 U.S. 315, 326, *modified*, 411 U.S. 922 (1973) (quoting *Reynolds*, 377 U.S. at 580-81).

Considering these decisions in view of traditional equal protection jurisprudence, it seems scrutiny in one-person, one-vote cases has been applied in varied ways.  In practice, it appears that judicial respect for the political systems of states and their subdivisions has softened the typical force of strict scrutiny review in vindicating a fundamental voting right in one-person, one-vote cases.  Though outright denial of the franchise is clearly subject to strict scrutiny, *Kramer*, 395 U.S. at 627, and though "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise," *Reynolds v. Sims*, 377 U.S. 533, 555 (1964), the scrutiny imposed when a government defendant violates one-person, one-vote does not present an insurmountable burden.  *See Swann v. Adams*, 385 U.S. 440, 444 (1967) ("variations from a pure population standard might be justified by such … policy considerations as the integrity of political subdivisions, the maintenance of compactness and contiguity in legislative districts or the recognition of natural or historical boundary lines.").  Indeed, the Court has upheld several deviations from one-person, one-vote at the state and local level.  *See* Mark A. Packman, *Reapportionment: The Supreme Court Searches for Standards*, 21 URB. LAW. 925, 936 (1989) (collecting cases).

Within this Circuit, precedent suggests, but does not hold, that strict scrutiny might apply to one-person, one-vote cases.  In *City of Herriman v. Bell*, which did not involve a one-person, one-vote challenge, the Tenth Circuit Court of Appeals described *Reynolds* and its successors as one of "two key limitations on the expansive articulation of state power over political subdivisions."  590 F.3d 1176, 1185 (10th Cir. 2010).  The Court of Appeals drew from

*Reynolds* and other voting rights cases the principle that "[a]s long as the state treats voters within the same electoral district or governmental unit equally, the right to vote is not compromised … [but] [w]hen a state law discriminates among eligible voters *within the same electoral district*, strict scrutiny review applies, and compelling government interests must justify restrictions of the franchise." *Id.* at 1185-86 (emphasis added).  In an unpublished decision, a member of the Tenth Circuit further suggested that strict scrutiny may be appropriate in elections where the one-person, one-vote rule was implicated (as opposed to elections for bodies that did not exercise general governmental powers).  *Dool v. Burke*, 497 F. App'x 782, 788 (Sept. 13, 2012) (O'Brien, J., concurring) (unpublished decision).

Other circuits have addressed the issue more directly.  Several of them adopt the language of strict scrutiny when analyzing one-person, one-vote claims.  *Carlson v. Wiggins*, 675 F.3d 1134, 1139 (8th Cir. 2012) ("When the 'one-person, one-vote' principle applies, deviations from it are subject to strict scrutiny."); *Angle v. Miller*, 673 F.3d 1122, 1128-29 (9th Cir. 2012) (discussing circuit precedent finding strict scrutiny applicable where equal political power was allocated to units of unequal population); *English v. Bd. of Educ. of Town of Boonton*, 301 F.3d 69, 76 (3d Cir. 2002) ("[w]hen a challenged elective system denies an equal voice to each resident, the scheme is reviewed under strict scrutiny").  Other circuits apply a close equivalent. *Kessler v. Grand Cent. Dist. Mgmt. Ass'n, Inc.*, 158 F.3d 92, 100 (2d Cir. 1998) ("When the one-person-one-vote rule applies, deviations from that rule are subject to 'close scrutiny.'"); *see Ripon Soc., Inc. v. Nat'l Republican Party*, 525 F.2d 567, 588 (D.C. Cir. 1975) (finding voting rights asserted in the context of a one-person, one-vote challenge to warrant "close judicial scrutiny").

15

For its part, the Fourth Circuit has not read Supreme Court precedent to require applying strict scrutiny to one-person, one-vote challenges.  In a careful review of existing case law, the court observed that "[t]he one person, one vote principle is apparently not subject to strict scrutiny, which the Supreme Court traditionally applies to equal protection cases involving fundamental rights."  *Daly v. Hunt*, 93 F.3d 1212, 1218 n.8 (4th Cir. 1996).  Though the Fourth Circuit noted that the Supreme Court's "refusal to apply strict scrutiny is puzzling" in light of its clear recognition that the right to vote is "fundamental," the *Daly* court speculated that "[p]erhaps the Court's decision not to employ strict scrutiny in these cases is based on the deference it consistently affords to the states in performing the inherently political and legislative function of apportionment."  *Id.*  The reasoning of the *Daly* decision is highly persuasive.  The decision also accurately reflects the history of one-person, one-vote rulings, where outcomes seem difficult to harmonize with traditional strict scrutiny review.

At a minimum, in view of the seemingly varied approaches courts have applied in one-person, one-vote cases, the label "strict scrutiny" is largely unhelpful to this court when attempting to determine how closely to scrutinize the justifications here offered by San Juan County for the population deviations in its school board districts.

Notably, though not yet expressly applied in one-person, one-vote cases, an intermediate approach has emerged and gained acceptance in the context of most other voting rights cases.  In recent years the Supreme Court has endorsed a unique standard of scrutiny to apply to burdens on the right to vote.  This approach, the "*Anderson-Burdick*" test, supplies an intermediate balancing analysis. *Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983).  Under *Anderson-Burdick*, a "court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the …

16

Fourteenth Amendment[] that the plaintiff seeks to vindicate against the precise interests put forward by the [government] as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789) (internal quotation marks omitted). In *Crawford v. Marion Cty. Election Bd.*, the Court—including justices in concurrence and dissent—prominently applied the *Anderson-Burdick* test to a burden on individuals' right to vote. 553 U.S. 181 (2008). In concurrence, Justice Scalia stated plainly that the test applies to any law implicating the right. *Id.* at 204 ("To evaluate a law respecting the right to vote— whether it governs voter qualifications, candidate selection, or the voting process—we use the approach set out in *Burdick*."). Persuasive authority on voting rights jurisprudence further suggests that *Anderson-Burdick* applies to any Equal Protection Clause challenge to a government action burdening the right to vote, "creating a single standard for evaluating challenges to voting restrictions." *Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012).

*Anderson-Burdick* provides a standard "sufficiently flexible to accommodate the complexities" of state and local political arrangements "while also protecting the fundamental importance of the right to vote." *Husted*, 697 F.3d at 429. Its "sliding scale" allows the severity of a deviation from an ideal population to raise proportionally the weight of the justifications a government must offer, offsetting legitimate concerns about an overly formulaic application of one-person, one-vote beyond a 10% deviation. *See Frank v. Forest Cty.*, 336 F.3d 570, 572-73 (7th Cir. 2003) (questioning the logic of precise mathematical benchmarks in evaluating justifications for deviations from one-person, one-vote). It allows for the vindication of *Reynolds* via "something resembling an administrable rule." *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring). Finally, and perhaps most

importantly, it avoids the need for the court to invoke the language of strict scrutiny when applying a level of scrutiny that is, in practice, far less than strict.

Of course, this court has a solemn duty to faithfully identify and apply binding precedent from the Supreme Court and the Tenth Circuit Court of Appeals. But the court is unable to draw from Supreme Court jurisprudence the specific level of scrutiny the court is required to apply when reviewing under the *Reynolds* test San Juan County's offered justifications for the population deviations here presented. As noted, the circuits appear similarly unable to reach agreement on this issue. And while the Tenth Circuit has suggested in dicta that strict scrutiny may apply, it has not so held. Finding in the binding precedent no clear articulation of the controlling standard, and in view of the various approaches employed by many different courts, this court concludes the *Anderson-Burdick* approach is consistent with and best represents the careful analysis here required under *Reynolds*.[9]

Whether it is the appropriate level of scrutiny for all voting rights claims in all contexts, or merely a responsible approximation of the level of scrutiny actually applied in practice to one-person, one-vote cases, the court will apply the *Anderson-Burdick* framework in this case.[10] Therefore, in evaluating whether San Juan County has deviated from one-person, one-vote because of "legitimate considerations incident to the effectuation of a rational state policy," *Reynolds*, 377 U.S. at 579, the court will weigh "the character and magnitude of the asserted injury" against the "precise interests put forward" by the County, "taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Obama for*

---

[9] The court notes one endorsement of this approach. *Pub. Integrity All., Inc. v. City of Tucson*, 805 F.3d 876, 883-84 (9th Cir. 2015) (Tallman, J., dissenting on other grounds) (endorsing the use of *Burdick* to evaluate the election system used by a city council).

[10] Because *Anderson-Burdick* represents a lower level of scrutiny than strict scrutiny, the same result would yield in this case even if the court applied strict scrutiny review of the County's justifications. Navajo Nation would be entitled to summary judgment, and San Juan County's motion for summary judgment would be denied.

*Am. v. Husted*, 697 F.3d 423, 433 (6th Cir. 2012) (quoting *Burdick*, 504 U.S. at 434)).  Here, the weight of the injury will be the extent to which the districts in question deviate from an ideal distribution.  This provides a measure of the infringement on voting rights by the districts as drawn.

Following these precedents, the court first evaluates whether Navajo Nation has established a prima facie violation of the Equal Protection Clause.  Because the court finds a prima facie violation, San Juan County bears the burden to articulate legitimate governmental interests supporting its deviation from an equal distribution.  In evaluating those interests, the court will consider the magnitude of the asserted injury and the relationship of the justifications offered to the necessity of burdening Plaintiffs' rights.

### 3.  Prima Facie Violation

Both parties agree that the San Juan County School Board election districts do not have equally distributed populations.  The precise degree of deviation is a minor point of dispute. Navajo Nation contends that the deviation is 37.69%.  (Dkt. 173, p. 3.)  San Juan County finds a slightly higher deviation at 38.22%.  (Dkt. 198, p. 23.)  Both estimates far exceed the 10% deviation beyond which a prima facie violation is established.

Though its argument is at times oblique, San Juan County effectively concedes that a prima facie violation has occurred.  Dkt. 260, p. 27.  There is no genuine dispute over this issue, and Navajo Nation has made out a prima facie case that San Juan County's School Board districts violate the Equal Protection Clause.

### 4.  Legitimate Governmental Interests

Having found a prima facie violation of the Equal Protection Clause, the burden now shifts to San Juan County to establish that the deviations are necessary because of "legitimate

considerations incident to the effectuation of a rational state policy." *Reynolds v. Sims*, 377 U.S. 533, 579 (1964). In evaluating these considerations, the court will analyze "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)).

In scrutinizing these interests, two general principles guide the court. First, persuasive authority suggests that "there is a level of population disparity beyond which a state"—or in this case, a county—"can offer no possible justification." *Daly v. Hunt*, 93 F.3d 1212, 1217-18 (4th Cir. 1996). Writing for a majority of the Supreme Court, Justice Rehnquist observed that a deviation of as much as 16.4% "may well approach tolerable limits." *Mahan v. Howell*, 410 U.S. 315, 329 *modified*, 411 U.S. 922 (1973). In the present case, the stark and dramatic population deviation increases "the character and magnitude of the asserted injury," rendering the apportionment more constitutionally suspect than a deviation closer to the 10% safe harbor. *See Burdick*, 504 U.S. at 434 (internal quotation marks omitted).

Second, the districts in this case have existed for over twenty years, but have never complied with the constitutional one-person, one-vote requirement. As San Juan County admits, based on the 1990 census, the districts deviated by 18.70% when they were first drawn in 1992. (Dkt. 198, p. 20.) San Juan County has made no discernible effort to bring the districts into compliance with the Equal Protection Clause. The failure to redistrict for this period is probative of a constitutional violation. Redistricting is necessary "not only to protect the voting power of citizens; a coequal goal is to ensure 'equal representation for equal numbers of people.'" *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 775 (9th Cir. 1990) (quoting *Kirkpatrick v. Preisler*, 394 U.S. 526, 531 (1969)). It is of particular importance for political equality. *Clark v. Putnam Cty.*, 293 F.3d 1261, 1264 (11th Cir. 2002) ("Reapportionment every ten years ensures that electoral

districts contain approximately equal populations, thus ensuring one-person, one-vote, as the Constitution requires.") (citing *Reynolds*, 377 U.S. at 583–84). Two decades of significant non-compliance with the one-person, one-vote principle on its own strongly suggests an arbitrary abdication of constitutional responsibilities.

San Juan County nonetheless identifies in its briefing five justifications it maintains excuse the infringement on voting rights in the School Board districts. (Dkt. 198, pp. 57-58; Dkt. 221, pp. 38-39.)[11] The court will address each interest in turn.

### i. San Juan County's Geographic Profile

San Juan County first asserts as a basis for the population deviation "[t]he large size and uneven geographic topology of San Juan County and its small population, coupled with the fact that only about 25% of the County's registered voters have a physical address (the rest using only Post Office Box addresses), making it difficult (and expensive) to move such persons from one district or precinct to another[.]" (Dkt. 221, p. 38.)

In the court's view, San Juan County's first asserted interest reads less like a justification for the districts as currently drawn and more as a request for exemption from the requirements of the Equal Protection Clause. Invoking its unique geographic profile and small population, and arguing that to change the districts would not be easy, the County seeks to have the court find that the districts as currently drawn are good enough.

This argument is not convincing. The Supreme Court has clearly held that "sparse population is not a legitimate basis for a departure from the goal of equality." *Chapman v. Meier*, 420 U.S. 1, 24 (1975). A governing body "with a sparse population may face problems

---

[11] By contrast, Navajo Nation has identified six or seven possible interests it believes have been raised by San Juan County. *Compare* Dkt. 231, p. 4 *with* Dkt. 250, pp. 18-19. Because the burden is on San Juan County to articulate these interests, the court will follow the County's organization. To the extent that Navajo Nation has better identified the interests asserted than either San Juan County or the court, the court would follow Navajo Nation's reasoning for why these additional interests would nonetheless fail to rebut the prima facie violation.

different from those faced by one with a concentrated population, but that, without more, does not permit a substantial deviation from the average." *Id.* at 24-25. *Chapman* involved North Dakota, a state of relatively small population, and held that in states of its size "each individual vote may be more important to the result of an election than in a highly populated" governing body. *Id.* at 25. If anything, San Juan County's interest cuts in favor of a more equal population distribution, rather than against. As the Supreme Court has noted, in such situations, "particular emphasis should be placed on establishing districts with as exact population equality as possible." *Id.* Like sparse population, geographic features also do not exempt a county or other governing body from the requirements of the Equal Protection Clause. *E.g.*, *Reynolds v. Sims*, 377 U.S. 533, 580 (1964) (holding that "[c]onsiderations of area alone provide an insufficient justification for deviations from the equal-population principle"); *see id.* (further finding that "[m]odern developments and improvements in transportation and communications make rather hollow… most claims that deviations from population-based representation can validly be based solely on geographical considerations.").

Further, San Juan County has recently overcome these barriers in drawing election districts for the San Juan County Commission. In 2011, in part to address an unequal distribution of voting populations, lines for the Commission's three districts were redrawn. As Navajo Nation argues, "[t]he County faced the very same difficulties as those claimed to prevent School Board redistricting and yet … created a 2011 Commission Plan that reduced the overall population deviation from 16.48% to only 3.60%." (Dkt. 250, p. 22.) Establishing election districts inevitably involves challenge and imposes expense. But the alleged difficulty of complying with the demands of the Equal Protection Clause does not excuse the attempt, especially where no such effort was made in the first instance.

22

Finally, in arguing that it cannot easily redraw districts—and seeking by this argument to have the effort excused—San Juan County is asserting a governmental interest that also violates Utah state law, which imposes specific requirements on school board districts without exceptions for counties of a certain size.  UTAH CODE ANN. § 20A-14-201, -202.  A county or other local governing body cannot have a legitimate governmental interest in violating state law.[12]  For this reason, to the extent that San Juan County offers interests that would require violating or continuing to violate the statutory school board requirements enacted by the Utah Legislature, they are illegitimate and bear no weight in this court's assessment.

### ii.  San Juan County's Survey Section Lines and Polling Places

San Juan County next asserts that "San Juan County's voting precincts have been established along survey section lines, and in some areas of the County, there are limited locations where polling places may be housed and voters have access to them[.]"  (Dkt. 221, p. 38.)  This interest appears to be two-fold: first, to maintain existing boundaries; and second, to provide voters easy access to places where they may cast their vote.  Neither interest provides a justification for deviation under the circumstances of this case.

First, San Juan County's establishment of voting precincts along survey section lines does not support maintaining them in their present state in the face of a long-standing and significant constitutional violation.  Survey section lines are not relevant political subdivisions, but are merely markers in aid of other governmental functions.  They do not resemble the types of political boundaries that the Supreme Court has recognized may provide a legitimate governmental interest.  *E.g.*, *Reynolds v. Sims*, 377 U.S. 533, 578 (1964).  Voting precincts, too, are typically units of organization rather than meaningful democratic boundaries.

---

[12] Exceptions may exist—for instance, where a county or local governing body refuses to comply with a state law requirement that is itself unconstitutional.  But no such exception would apply in this case.

Second, assuming that the location of polling places could be a legitimate governmental interest, it is not relevant to this case.  The County has conducted its elections since 2014 using a vote-by-mail system.  (Dkt. 250, p. 13.)  A vote-by-mail system makes the location of polling places—and their proximity to members of an election district—largely irrelevant to the drawing of district lines.  San Juan County offers no persuasive argument on this point, claiming only that there are practical difficulties to drawing election districts that organization around polling places may alleviate.  *See* Dkt. 260, pp. 28-29, n.94.  But as noted above, the difficulty of complying with the Equal Protection Clause does not justify failing to do so.  See above, pp. 21-23.

### iii.  San Juan County's Consistent Belief and Objective

San Juan County next asserts, and notes that it is "[m]ost significant of all," that

> since 1992 it has been the consistent belief and objective of the San
> Juan School Board, which has been respected by the San Juan
> County Commission in the consideration of School Board Election
> Districts, that each school within the San Juan District have
> specific representation on the School Board in a manner that, to the
> extent possible, voters who are within the school boundaries of the
> same District schools voting for the same member of the School
> Board to increase both accountability of Board members and a
> sense of *School Community*[.]  (Dkt. 198, pp. 57-58.)

Navajo Nation doubts the credibility of this rationale, suggesting that it is not the policy of San Juan County or that it is at best a recent invention.  (Dkt. 231, pp. 5-6.)  Unlike Navajo Nation, the court accepts that San Juan County offers this rationale in good faith.  But it is not a convincing justification for the deviations evident in the Board's election districts, for at least three reasons.

First, as noted above, there is no legitimate governmental interest in the violation of state law.  Utah mandates that San Juan County "divide the school district so that the local school board districts are substantially equal in population and are as contiguous and compact as

practicable." UTAH CODE ANN. § 20A-14-201(1)(b).  San Juan County cannot justify defying the statutory requirements established by the Utah Legislature for the structure, responsibilities, and composition of local school boards.  Assuming there are sound and prudent reasons for the County's "School Community" philosophy, those goals must be achieved in a manner that is complementary with, not in conflict with, the Utah statute by which the Board was created.

Second, ensuring that the twelve schools within the County each have a "representative" on the School Board does not justify a deviation from equally-sized election districts.  Families with children in the San Juan County schools are not entitled to a greater voice in School Board decisions than other County voters.  *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621 (1969).  Nor can enhancing the responsiveness of their representatives on the Board support infringing on the constitutional rights of other voters, for "neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation."  *Reynolds v. Sims*, 377 U.S. 533, 579-80 (1964).

Finally, the County's objectives may be realized in new election districts of equal population.  Critically, the County has not indicated otherwise.  Absent this demonstration, there is no showing of the "extent to which those interests make it necessary to burden the plaintiff's rights."  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).  The County is highly critical of the proposed election districts offered by Navajo Nation, and raises legitimate questions about whether those districting schemes would be appropriate.  *E.g.*, Dkt. 260, pp. 31-33.  But the County has candidly acknowledged that "if the [c]ourt determines that the School Board Election Districts need to be re-drawn," then a redistricting plan should "compl[y] with and further[] the School Board's *Community School*

policy." *Id.*, pp. 32-33.  If the County expects that the court can meet this goal, then it can hardly contend that the County cannot.

### iv.  San Juan County's Ability to Draw Lines within a 10% Limit

Fourth, San Juan County argues that "[b]ecause of the School Community objective, combined with the fact that there are only approximately 3,000 students in the San Juan District schools, adjusting boundaries to come within a 10% maximum deviation would not be possible[.]"  (Dkt. 198, p. 58.)

Here, the justification is unconvincing for the same reasons as San Juan County's first asserted interest.  See above, pp. 21-23.  San Juan County's redistricting of its Commission election districts suggests the effort is not impossible, and, at any rate, the difficulty of complying with the Equal Protection Clause does not excuse an effort to do so.  Of course, if a substantially higher number of School Board election districts were at issue than the number of Commission seats, then the court's analysis might change.  *E.g.*, *Frank v. Forest Cnty.*, 336 F.3d 570, 574 (7th Cir. 2003) ("If there are four districts in the electoral unit, and the largest and the smallest have very different populations, the unit itself is seriously malapportioned.  If there are a hundred, the malapportionment created by two outliers is apt to be at once trivial and unavoidable.").  In the present circumstances, the five School Board districts are not substantially different than the three Commission districts successfully redrawn in 2011.  Moreover, Utah state law limits the number of School Board districts in counties of smaller size, like San Juan County, suggesting considered attention to practicality.

Further, the argument that the relevant population for the court's analysis is the school-aged population of the County ignores the interest of all citizens in the action of a body exercising general governmental powers.  The County must draw districts that protect the voting

rights of all citizens, whether or not they have a perceived direct interest in the County schools. *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621 (1969).  The feasibility of doing so must be evaluated in light of that overall population, and not a more narrow set of stakeholders.

### v.  The Nature of San Juan County's Deviation

Finally, San Juan County asserts that the deviation from an ideal population distribution is in excess of 10% solely because of two districts, District 1 and District 5; that District 1, the "under-represented" district, is majority white; and that District 5, the "over-represented" district, is majority Native American.

Here, San Juan County is simply describing the characteristics of two election districts, which is not easy to construe as a legitimate governmental interest.  For this reason, the asserted interest probably fails on its face.  Yet to the extent that San Juan County believes that these facts, in combination, rebut an Equal Protection Clause violation, two observations are necessary.

First, the fact that two districts are responsible for the magnitude of the population deviation in question is not remarkable.  Indeed, comparing the most over-represented district with the most under-represented district is the standard method by which population deviation is typically calculated.  *E.g.*, *Frank*, 336 F.3d at 574.  That three other districts more closely approximate an ideal population distribution does not safeguard the election district scheme as a whole.  *Id.*

Second, the demographic composition of the districts that are "over-represented" or "under-represented" is mostly irrelevant to a one-person, one-vote claim.  See above, p. 5.  It is not necessary to violate the Equal Protection Clause to preserve "majority-minority" districts. Even in a County of San Juan's size, the safeguards of the Equal Protection Clause and Section 2

of the Voting Rights Act can be satisfied at the same time.  Voters in San Juan County are not forced to choose the set of rights they would most prefer to secure.[13]

San Juan County has failed to offer legitimate interests for denying the political representation afforded by one person, one vote, or to demonstrate that its interests are necessary to impair the rights of its voters.  The County has not met its burden to justify its ongoing failure to comply with the Equal Protection Clause.

### 5.  Conclusion

Navajo Nation has established a prima facie violation of the Equal Protection Clause in the population distribution of the San Juan County School Board election districts, and San Juan County has not carried its burden to demonstrate that this unequal distribution serves legitimate governmental interests.  The court therefore concludes that the current San Juan County School Board election districts violate the Equal Protection Clause.  To secure the right to vote, which is "preservative of all rights," new election districts must be established.  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

---

[13] Undoubtedly, the fact that a majority Native American district has a disproportionately high influence in elections to the San Juan County School Board may be relevant to, though not dispositive of, the merits of a Section 2 claim concerned with those same districts, such as Navajo Nation's Third Claim for Relief.  But the implications of this "over-representation" for the Third Claim are not relevant to consideration of the Fourth Claim that is the subject of the instant cross-motions for summary judgment.

## CONCLUSION

For the reasons given above, Navajo Nation's Motion for Summary Judgment is

**GRANTED**.  (Dkt. 173.)  San Juan County's Motion for Summary Judgment is **DENIED**.  (Dkt.

221.)

SO ORDERED this 9th day of December, 2015.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge