# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NAVAJO NATION, a federally recognized Indian tribe, et al., | **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | Case No. 2:12-cv-00039-RJS-DPB |
| v. | Judge Robert J. Shelby |
| SAN JUAN COUNTY, a Utah governmental subdivision, | Magistrate Judge Dustin B. Pead |
| Defendant. | |

This case is about voting rights and the election districts in San Juan County, Utah. Plaintiffs are Navajo Nation—a federally recognized Indian tribe—and several individual Tribe members.[1] Navajo Nation sued the County shortly after the County Commission redistricted in 2011, and directs two of its four claims for relief to the County's three Commission election districts.[2] Navajo Nation alleges in its first claim for relief that the County Commission's 2011 redistricting and its present three districts violate the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment to the United States Constitution.[3] It asserts in its second claim for relief that the same election districts violate § 2 of the Voting Rights Act.

---

[1] The court refers to Plaintiffs collectively as Navajo Nation.

[2] The third and fourth claims for relief concern the School Board election districts. The court granted summary judgment to Navajo Nation on its fourth claim for relief. (Dkt. 280.)

[3] Dkt. 75, p. 7.

Before the court are the parties' cross-motions for summary judgment on Navajo Nation's first claim.[4]  The court heard argument on these motions on January 7, 2016.

In its motion, the County argues that both the Fourteenth Amendment Equal Protection and Fifteenth Amendment theories Navajo Nation sets forth in its first claim for relief fail.[5] Navajo Nation limits its cross-motion for summary judgment to its Equal Protection theory, contending that the County's Commission districts are unconstitutionally drawn based on race.[6] Navajo Nation points specifically to the Commission's District Three, which the County established in 1986 to be majority Native American in the wake of a lawsuit brought against it by the United States Department of Justice.  The District Three boundaries remain unchanged since they were drawn three decades ago.  Navajo Nation claims that the County Commission relied on race in its decision to maintain the District Three boundaries as part of the County's redistricting in 2011.  Navajo Nation urges the court to conclude under the strict scrutiny analysis that must follow that the County's race-based decision-making was not narrowly tailored to further a compelling governmental interest, and is thus unconstitutional in violation of the Equal Protection Clause of the Fourteenth Amendment.

San Juan County responds that it had a compelling government interest in maintaining the decades-old District Three boundaries when it redistricted in 2011.  It contends that it was legally required to do so to comply with the terms of a Consent Decree and a Settlement and Order entered when the County resolved the Department of Justice lawsuit against it in the 1980s.

---

[4] Dkts. 207, 248.

[5] Dkt. 207.

[6] Dkt. 248.

As discussed below, the court finds that the County's position is unsupported by the language of the Consent Decree and Settlement and Order. These documents did not require the County to draw and maintain—in perpetuity—the 1986 District Three boundaries. The court concludes that the County lacks a compelling government interest in its racially-motivated districting decisions. As drawn in 1986 and maintained in 2011, the County's Commission Districts violate the Equal Protection Clause and are unconstitutional. The court therefore grants summary judgment in favor of Navajo Nation, and denies the County's cross-motion.

## BACKGROUND

To provide context for Navajo Nation's claim, the court traces in two parts the development of the County's current Commission election districts. First, the court discusses the 1980s litigation that transitioned the County Commission elections from an at-large system to single-member districts. Next, the court discusses the developments in the County since the 1980s, including the 2011 redistricting that created the current election districts at issue in this case.

## I.      The Establishment of San Juan County's Single-Member Districts

San Juan County is geographically Utah's largest county, occupying a "tremendous area" in the southeastern portion of the State.[7] For most of the County's history, voters elected each of the three commissioners through an at-large system of voting. Since 1986, however, the County's voters have selected their commissioners from three single-member election districts. San Juan County is the only county in Utah with a commission elected by this method.[8] The County transitioned from an at-large system to single-member districts because of the

---

[7] *Yanito v. Barber*, 348 F. Supp. 587, 589 (D. Utah 1972).

[8] Dkt. 166, p. 6; *see* Dkt. 80, p. 8.

3

Department of Justice litigation that occurred in the 1980s.  The court discusses this litigation now because San Juan County asserts that it has a compelling government interest in complying with the Consent Decree and Settlement and Order resulting from this litigation.  The County contends that these documents require it to maintain the boundaries established in 1986 for one of its districts, District Three.

In the early 1980s, San Juan County used an at-large voting system, as many state and local governments have done throughout American history.[9]  The County also had a substantial Native American population, but seemed never to elect Native American representatives.[10]  In 1983, the Department of Justice sued the County in this court, arguing that the existing system of at-large elections denied Native American citizens in the County "an equal opportunity to participate in the County political process and to elect candidates of their choice to the San Juan County Board of Commissioners."[11]  The Department of Justice pursued its claim under § 2 of the Voting Rights Act.[12]  Section 2, as amended in 1982, prohibits "legislation that result[s] in the dilution of a minority group's voting strength, regardless of the legislature's intent."[13]

The Department of Justice's claim that San Juan County's at-large system violated § 2 of the Voting Rights Act was not unique.  As amended,[14] § 2 of the Voting Rights Act "spawned a

---

[9] SAMUEL ISAACHAROFF ET AL., THE LAW OF DEMOCRACY: LEGAL STRUCTURE OF THE POLITICAL PROCESS, 758 (4th ed. 2012) (noting that "[a]s late as 1982, a sizeable majority of municipal elections were conducted at large" and that many states "elected at least some legislators from multimember districts").

[10] See Dkt. 272-1.

[11] Id. ¶ 31.

[12] Id.

[13] Shaw v. Reno, 509 U.S. 630, 652 (1993) [hereinafter Shaw I] (recognizing that the "essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives").

[14] In 1982, Congress made § 2 claims easier to pursue when it amended the legislation to so that plaintiffs no longer had to prove discriminatory intent. Id. at 641.

4

torrent of litigation that has dramatically reshaped the American electoral landscape."[15] Typically, plaintiffs bringing § 2 claims challenging at-large systems sought to have future elections conducted with single-member seats.  Indeed, "single-member districts were historically chosen over at-large schemes precisely to afford electoral minorities a chance to affect the political process."[16]  For this reason, successful vote dilution claims were remedied by replacing at-large districts "with a single-member districting plan that gave minority voters a majority in one or more districts."[17]

In addition to its § 2 claim, the Department of Justice brought claims against the County under the Fourteenth and Fifteenth Amendments.  In arguing that the County's system of at-large voting impaired the ability of a Native American minority population to elect representatives of their choosing, the Department's apparent goal was to compel the County to move away from at-large voting and toward the establishment of single-member districts—the classic § 2 remedy.[18]

The court did not adjudicate these claims on their merits.  Instead, the Department of Justice and the County settled their dispute in a Consent Decree.  Under the Consent Decree, the County was permanently enjoined from "[a]ny action or conduct which abridges or denies the right to vote of the Indian citizens of San Juan County" or "[a]pplying a voting standard, practice, or procedure which abridges the right of the Indian citizens of San Juan County to vote on the basis of race or color."[19]

---

[15] ISAACHAROFF ET AL., *supra* note 9, at 758.

[16] Heather K. Gerken, *Understanding the Right to an Undiluted Vote*, 114 HARV. L. REV. 1663, 1680 (2001).

[17] *Id.* at 1672–73.

[18] *See* Dkt. 272-1, pp. 6–7.

[19] *Id.*, p. 2.

In the Consent Decree, the County also agreed to devise a plan to elect its Commission from single-member districts.[20]  The Consent Decree placed initial responsibility for redistricting in a special advisory committee.  The committee was tasked with submitting one or more plans to the County Commission with districts drawn along existing precinct or census boundaries.  The districts were to be "compact, contiguous, as equal in population as possible . . . [and which] shall not split or fragment geographic concentration of minorities."[21]  The Consent Decree did not set the number of districts to be established in these plans.  It did, however, provide that the redistricting plans the advisory committee submitted to the Commission could involve either "three or five single-member county commissioner districts."[22]  In keeping with this guidance, the Consent Decree itself did not establish any districts.  The parties then jointly petitioned this court to endorse the Consent Decree.

In response to the parties' request, Judge David Winder entered an Agreed Settlement and Order.[23]  This stipulated Settlement and Order stated that "the "process leading to the selection of County Commissioners"—the existing at-large system—"fails to comply fully with the requirements of Section 2 of the Voting Rights Act."[24]  It then established how the County would proceed in its attempted transition to a government based on single-member election districts.  The Settlement and Order embodied a clear expectation that the County would move to single-member districts, but provided that if the County could not or would not do so, then a

---

[20] *Id.*, pp. 2–3.

[21] *Id.*, p. 3.

[22] *Id.*

[23] *Id.*, pp. 12–14.

[24] *Id.*, p. 13.

remedial hearing would be held where the County could argue in favor of retaining its at-large system or adopting some alternate remedy.[25]

The Settlement and Order further instructed that "should an alternative form of government consisting of single member districts be approved […] any stagger or overlap in the terms of County Commission seats shall not delay beyond November 1986 an election in the district containing the largest number of minorities."[26]  More than any other aspect of the Settlement and Order, this sentence looked ahead to what single-member districts might look like and suggested that one district would have the most Native American members.  As was true of the Consent Decree, the court's Settlement and Order established no district lines, nor specific requirements for the contemplated districts, other than that they be "fairly drawn single member districts as authorized by state law."[27]  Having entered the Settlement and Order, the United States District Court for the District of Utah retained jurisdiction over its enforcement.[28]

On November 6, 1984, voters in the County approved a "Final Adopted Optional Plan of General County (Modified) Form of County Government" (the Plan).[29]  On November 26 that same year, the three incumbent San Juan County Commissioners approved the Plan.[30]  The Plan set proposed lines for three election districts, and stated that "[t]he Governing body of the County shall be a County Commission and shall be composed of three members, who shall be elected from individual districts."[31]  Among the geographic lines specifically discussed in the

---

[25] *Id.*

[26] *Id.*, pp. 13–14.

[27] *Id.*, p. 13.

[28] *Id.*, p. 14.

[29] *Id.*, pp. 6–9.

[30] *Id.*

[31] *Id.*

boundaries of Districts Two and Three were those of the Navajo Indian Reservation.[32]  Though not expressed in the Plan, Native Americans at the time composed 88.77 percent of the population of District Three.[33]  The Department of Justice appears to have received and approved the districting plan.[34]

Elections in 1986 were held based on these districts, and voters in District Three voted into office the first ever Native American member of the San Juan County Commission.[35]  Since that time, the commissioner elected from District Three has always been Native American.[36]  In this way, the County moved from a system that historically denied representation to a minority group to one that allowed that group greater participation in the political process.

## II.   Development of San Juan County's County Commission Districts Since the 1980s

Having engaged in a process now familiar across the country,[37] San Juan County's system of government settled into a stable equilibrium.  District Three invariably returned a Native American commissioner, and Districts One and Two invariably returned a white commissioner.[38]  Longstanding concerns about ballot access and election administration were

---

[32] *Id.*, p. 7.

[33] Dkt. 272, p. 12; Dkt. 278-1, p. 18.

[34] Dkt. 272, p. 13.  The County claims that "a map of the 1986 Commission Election Districts about which Plaintiffs complain [was] presented to the Department of Justice for its approval as part of the final settlement between the parties, which was accepted by the Department of Justice and thereafter implemented[.]" (Dkt. 272, p. 13.)  Navajo Nation disputes this statement for, among other reasons, lacking evidentiary foundation. (Dkt. 278-1, p. 9.)  In the court's view, it is reasonable to infer from the record that the County presented a final plan to the Department of Justice before enacting it.

[35] *See* Dkt. 272-1, p. 4.

[36] Dkt. 166, p. 2.

[37] The County's transition to single-member districts took place amid a national wave of transitions away from at-large voting schemes.  With § 2 prompting reforms, "by the mid-1990's, most jurisdictions with substantial minority populations had switched to using at least some single-member districts."  ISAACHAROFF ET AL., *supra* note 9, at 758.

[38] Dkt. 166, p. 2.

addressed in part by federal monitors, who appear to have been involved in the County's elections as late as 2002.[39]

During a period of roughly twenty-five years after the County changed its election system, a wealth of case law developed exploring and defining the limits of § 2—including instruction on what to do after governments move from at-large to single-member districts. As the country and the courts worked through these issues, with implications for the County, its commission election districts remained fixed in place. And although there is a default expectation of redistricting after every decennial census,[40] the exact Commission district lines drawn and adopted in the 1986 Plan[41] were unchanged after the 1990 census, after the 2000 census, and even initially after the 2010 census.[42]

So matters stood, until 2011. It is unclear why the County did not redistrict before this time.[43] But one former County official has testified that Commission members believed they were required to leave the 1986 election districts in place in perpetuity. Gail Johnson purportedly helped draft the 1986 Commission Plan in her capacity as Clerk and Auditor for the

---

[39] *See* Dkt. 278-5, pp. 27–28.

[40] *See Fairley v. Forrest County*, 814 F. Supp. 1327, 1338 (S.D. Miss. 1993) (discussing the expectations now set by the one-person, one-vote rule, and noting that "[m]ost counties now start redistricting shortly after new census data is available").

[41] Despite the 1984 dates in the Plan documents, the briefing and other parts of the record suggest that the districts were finally adopted in 1986. *See, e.g,*. Dkt. 272, *passim*. The court refers to these districts as the 1986 districts or the 1986 Plan.

[42] San Juan County asserts that though the election districts were not redrawn between 1986 and 2011, the "boundaries of those Districts were reviewed after every Census." (Dkt. 272, p. 30.) As Navajo Nation points out, San Juan County offers no citation to the record in support. (Dkt. 278-1, pp. 20–21.) Though the failure to redistrict (or the decision not to redistrict) after these censuses is not the subject of the motion, the County's argument, discussed below, that it could not redistrict because of the 1980s litigation is in tension with its assertion that it continually considered doing so.

[43] Though the parties do not brief this issue in any detail, it is possible that because most county commissions in Utah do not have single-member election districts, the expectations under state law for county commission seat redistricting may be unclear.

County, and her signature appears on the face of the Plan.[44]  Ms. Johnson, now retired, testified that she understood that District Three "was to be heavily loaded with Navajo voters."[45]  Ms. Johnson further testified that she believed she could not alter the district lines drawn and adopted in the 1986 Plan.[46]  The County maintains that it has operated since entering into the Consent Decree with the understanding that it could not change the 1986 Plan district lines without court approval.

Notwithstanding any belief that the 1986 Plan election district lines were permanent, two events placed pressure on the County to revisit them after the 2010 census.  First, in October 2011, a Navajo Nation representative urged the County to explore redistricting based on demographic shifts in the County since the lines were first drawn twenty-five years earlier.[47]  Second, on review, County officials came to believe that the Commission election districts had now become malapportioned in population.[48]  Specifically, Districts One and Two appeared to present an unacceptable deviation from an ideal population distribution, jeopardizing compliance with the Supreme Court's one-person, one-vote rule.[49]  A process soon began that had been dormant for a quarter century.

In considering new districts, County officials did not entertain any suggestion of adjusting the lines of District Three.  Compliance with one-person, one-vote appeared to be the only justification recognized for altering the 1986 districts, and to the extent that population malapportionment was an issue within the County, District Three was not the obvious culprit.

---

[44] Dkt. 272, p. 21; Dkt. 210-3, p. 9.

[45] Dkt. 248, p. 9.

[46] *Id.*, p. 10.

[47] Dkt. 272-3, p. 2.

[48] Dkt. 207, pp. 19–20.

[49] *Id.*; *see Reynolds v. Sims*, 377 U.S. 533 (1964).

Rather, when redistricting was discussed beginning in 2011, Commissioner and then-Chairman Bruce Adams stated with regard to District Three "that the County is bound by a 1983 Consent Decree from the United Stated District Court for Utah and that the County would not change the basic Commission District configuration without the Judge's agreement."[50]  In later testimony, Commissioner Adams said that he thought the Consent Decree "[g]uaranteed that there would be one Native American that would absolutely be elected," with another seat safe for a white candidate.[51]  County Clerk and Auditor Norman Johnson testified that in redistricting efforts, one focus was to ensure relatively equal population and contiguity.  And another focus was "protecting that third commission district, because [he] knew it had to stay involved in the reservation[,]" based on his understanding that the Settlement and Order required that District Three "be a Native American population district."[52]

The County officials who supported and were responsible for the 2011 redistricting, however, were not aware of the details of the 1980s litigation.  Commissioner Adams testified that he "assumed the decree itself set up the . . . districts."  As explained above, the Consent Decree did not.[53]  Commissioner Phil Lyman expressed a similar lack of familiarity with the Consent Decree, noting that he did not "know what the consent decree was addressing."[54]

---

[50] Dkt. 278-1, pp. 26–27.

[51] Dkt. 248, p. 9.

[52] *Id.*

[53] *Id.*, p. 13.

[54] *Id.*

County Clerk Norman Johnson said that he did not "remember the consent decree" when asked about its requirements.[55]

On November 14, 2011, San Juan County altered its election districts for the first time since the 1986 elections.[56]  The 2011 redistricting plan moved two voting precincts from District One to District Two, but otherwise left the boundaries of those districts undisturbed.[57]  The County made no changes to the boundaries of District Three, which remain identical to those drawn in 1986.[58]

The election districts established in 2011 are the subject of Navajo Nation's challenge. The parties disagree about the exact demographics of the County, in part because of a dispute over how to determine which County residents should be considered Native American.[59]  These disputes also extend to the composition of each County election district, though the overall proportions are not in significant dispute.[60]  Undoubtedly, however, the County is roughly half Native American.[61]  District One and District Two both have an approximately thirty percent

---

[55] Dkt. 249-15, p. 16.  The County notably submits no evidence that the County officials charged with redistricting decisions in 2011 made any effort to locate, review, or familiarize themselves with the content of the Consent Decree or the court's Settlement and Order.  Nor does the record contain evidence that the County communicated with the Department of Justice concerning any limitations the 1980s litigation imposed in connection with the 2011 redistricting.  And to the extent County officials believed the Consent Decree or the Settlement and Order impaired the County's ability to redistrict in 2011, the County's counsel acknowledged during oral argument that the County has never requested any relief from the Department of Justice or the court.

[56] Dkt. 272, p. 13.  The two commissioners elected from Districts One and Two supported the plan, and the commissioner elected from District Three voted against it.  (Dkt. 248, p. 16.)  Though the issue is not directly relevant, San Juan County disputes that Commissioner Kenneth Maryboy voted against the redistricting plan. (Dkt. 272, p. 17.)  But in its Answer to Navajo Nation's Amended Complaint, the County admits that two commissioners voted in favor of the redistricting, and one voted against, (Dkt. 80, p. 9), and the votes of the other two commissioners are not in dispute.

[57] Dkt. 272, p. 13.

[58] Id.

[59] See, e.g., Dkt. 278-1, pp. 29–30.

[60] It is not necessary to resolve these disputes to rule on Navajo Nation's motion for summary judgment.

[61] Dkt. 237-1, p. 6.

Native American population.[62]  District Three has a 92.81 percent Native American population.[63]
Based on this pattern, roughly sixty percent of Native Americans in the County live in District
Three.  The remaining forty percent live in Districts One and Two, along with approximately
ninety-five percent of the non-Native American population.

Shortly after the 2011 redistricting, Navajo Nation filed this lawsuit.

## ANALYSIS

Navajo Nation alleges in its first claim for relief that the County's 2011 redistricting and
its present election district scheme "constitute intentional racial discrimination in violation of the
Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment to the
United States Constitution."[64]  It asserts in its second claim for relief that the same election
districts violate § 2 of the Voting Rights Act.

San Juan County moves for summary judgment on both theories set forth in Navajo
Nation's first claim for relief.[65]  Navajo Nation limits its cross-motion for summary judgment on
the same claim to its Equal Protection theory.[66]  Navajo Nation argues that San Juan County has
predominantly relied on race in its districting decisions, and that it did not narrowly tailor its
actions to further a compelling governmental interest.  Because Navajo Nation's cross-motion
for summary judgment is narrower than San Juan County's, and because, if granted, most
remaining issues involving the first two claims would be resolved or rendered moot, the court
first addresses Navajo Nation's cross-motion.

---

[62] Dkt. 237-1, p. 5.

[63] Dkt. 272, p. 29; Dkt. 237-1, pp. 5–6.

[64] Dkt. 75, p. 7.

[65] Dkt. 207.

[66] Dkt. 248.

Below, the court first provides the summary judgment standard.  Second, the court discusses the appropriate level of scrutiny to apply to Navajo Nation's challenge, concluding that strict scrutiny is appropriate because Navajo Nation has shown that the County's decisions regarding District Three were racially motivated.  Finally, the court applies strict scrutiny and concludes that County's asserted compelling government interest fails.  Accordingly, Navajo Nation is entitled to summary judgment.

## I.      Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure instructs the court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[67]  When presented with a summary judgment motion, the court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[68]  The "evidence of the non-movant is to be believed[,]" whatever weight or credibility a trier of fact might actually assign it.[69]  With this standard in mind, the court turns to assessing the appropriate level of scrutiny to apply to Navajo Nation's Equal Protection claim.

## II.     Appropriate Level of Scrutiny

The court concludes that strict scrutiny is appropriate here where Navajo Nation brings an Equal Protection claim against San Juan County's race-based decisions regarding its County Commission redistricting in 2011, including its inaction with regard to District Three.  The court below first clarifies the nature of Navajo Nation's claim, as it seems to have caused the County

---

[67] FED. R. CIV. P. 56(a).

[68] *Anderson v. Dep't of Health & Human Servs.*, 907 F.2d 936, 946–47 (10th Cir. 1990).

[69] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

some confusion.  Second, the court discusses why strict scrutiny is the required standard applicable to Navajo Nation's Equal Protection challenge.

   A.  *Navajo Nation Asserts a Traditional Equal Protection Claim, Not a Vote Dilution Claim*

   Under the Equal Protection Clause, a plaintiff may assert either a vote dilution claim or a traditional Equal Protection claim.  These different types of Equal Protection challenges seem to have created confusion for San Juan County about the nature of Navajo Nation's claim.  The County has consistently misapprehended the Equal Protection challenge in Navajo Nation's first claim for relief as one for vote dilution.  But Navajo Nation is instead asserting a traditional Equal Protection claim.  Some discussion and clarification of these differing types of claims may be helpful.

   There are at least two types of vote dilution claims available under the Equal Protection Clause.  First, a plaintiff may bring an Equal Protection Clause challenge to election districts that involves the principle of one-person, one-vote.[70]  This challenge is directed towards a specific form of vote dilution, following the Supreme Court's recognition that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."[71]  When election districts have substantially unequal populations, some individuals' votes carry less weight than they deserve.  Though Navajo Nation successfully brought such a claim in this case against the County School Board election districts, Navajo Nation is not asserting such a claim against the County Commission election districts.[72]

---

[70] *Reynolds v. Sims*, 377 U.S. 533 (1964).

[71] *Id.* at 555.

[72] Dkt. 248, p. 17 n.68; Dkt. 280.

A second type of vote dilution claim under the Equal Protection Clause is the early form of vote dilution challenge the Supreme Court began to entertain in the second half of the twentieth century.[73]  These claims involved challenges to at-large or multimember districts, where the Court recognized that the potential impairment of minority voting strength could rise to the level of a constitutional injury.  This type of vote dilution claim requires proof of a discriminatory purpose.[74]  These claims have become rare, however, following Congressional amendment of § 2 because the Voting Rights Act as amended now allows plaintiffs to prove vote dilution claims through evidence of discriminatory effects, without the need to prove discriminatory intent.[75]  Thus, while Equal Protection vote dilution claims of this kind remain cognizable, they are less significant—especially after the dramatic shift away from the historical at-large and multimember election schemes that were vulnerable to such challenges.  Navajo Nation is not bringing this type of claim.

Both of these types of Equal Protection challenges involve forms of vote dilution: one of an individual's vote, and the other of a group's voice.  Vote dilution is also the theory for most § 2 claims, including both the challenge that drove San Juan County's shift in election system in the 1980s, and Navajo Nation's second claim for relief in the present litigation (which is not at issue in the instant motions).  When assessing the voting strength of the County's Native American population, and determining whether that group has a fair and equal opportunity to participate in County government, vote dilution is the appropriate frame of reference.

---

[73] *E.g.*, *Whitcomb v. Chavis*, 403 U.S. 124, 143 (1971).

[74] *Rogers v. Lodge*, 458 U.S. 613, 617 (1982).

[75] *See Johnson v. Governor of Fla.*, 405 F.3d 1214, 1241 (11th Cir. 2005) (Wilson, J., concurring in part and dissenting in part) (describing how the Voting Rights Act "reaches conduct for which it may not always be possible to prove purposeful discrimination" by accepting that "discriminatory effects are probative of race bias in electoral schemes and practices").

16

Navajo Nation's Equal Protection challenge, however, has no direct relationship to vote dilution.  It is based solely on a traditional Equal Protection theory.  This is a straightforward claim, recognizable from a wide variety of non-voting contexts: that San Juan County has taken actions based on race, and that these actions cannot withstand strict scrutiny.  Specifically, Navajo Nation argues that District Three is drawn based on a racial classification.[76]

The County seems to misapprehend the nature of the claim Navajo Nation asserts in its first claim for relief.[77]  The County appears to have read Navajo Nation's first claim for relief as a vote dilution challenge, and mostly proceeds as if it is responding to such a claim.  For instance, San Juan County emphasizes that it created District Three with a "supermajority" of Native Americans

> at the instance and insistence of the United States Justice Department and for the express purpose of remedying alleged past racial discrimination against the County's Native American population, so as to assure that the composition of District 3 would ensure that the Native Americans in the County would have the ability to elect at least one Commissioner of their choice.[78]

San Juan County argues that "to now characterize this remedial purpose by virtue of which a Navajo Commissioner has been elected in each succeeding election, as 'racial Discrimination' would expose virtually every remedial plan implemented pursuant to the Constitution or the Voting Rights Act subject to attack as 'racial discrimination.'"[79]

---

[76] *See* Dkt. 248, pp. 16–23.  Navajo Nation also argues that the 2011 redistricting as a whole is a pretext for racial discrimination. The court does not rely on Navajo Nation's pretext theory.  *See infra* note 102.

[77] To take one example, San Juan County states that "a claim that an apportionment plan violates the Fourteenth Amendment requires a showing that the plan was adopted as the result of intentional discrimination as 'a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities.'"  (Dkt. 272, p. 42) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).  This language from *Miller* describes a vote dilution claim.  As explained in the same paragraph of *Miller*, while a vote dilution claim challenges "an action disadvantaging voters of a particular race, the essence" of the Equal Protection challenge asserted here by Navajo Nation is that the County "has used race as a basis for separating voters into districts."  *Id.*

[78] Dkt. 272, p. 4.

[79] *Id.*  (emphasis removed).

At root, San Juan County argues that its efforts to remedy vote dilution have taken the significant issue off the table, and that collateral attacks on this remedy are inappropriate. At times, the County seems to view the universe of potential violations in the redistricting context to consist only of vote dilution claims—read broadly to include one-person, one-vote—and claims based on egregious violations implicating the Fifteenth Amendment of the Constitution.[80] To the extent that the County objects to the idea that districts drawn to remedy past vote dilution might now be vulnerable to an Equal Protection challenge, it has ignored controlling case law. The County's obligations to address vote dilution do not permit it to disregard other constitutional considerations unrelated to vote dilution.

B.  *Strict Scrutiny Applies to Navajo Nation's Equal Protection Claim Because the County's Districting Decisions Concerning District Three Were Racially-Based*

Having clarified that Navajo Nation is asserting a traditional Equal Protection challenge directed to San Juan County's 2011 Commission redistricting, the court now addresses the appropriate level of scrutiny that applies to this claim. Under clearly-established Supreme Court precedent, "a racially gerrymandered districting scheme, like all laws that classify citizens on the basis of race, is constitutionally suspect" under the Equal Protection Clause; and this is true "whether or not the reason for racial classification is benign or the purpose remedial."[81] But, recognizing that "[a]pplying equal protection principles in the voting-rights context is 'a most

---

[80] *See* Dkt. 207.

[81] *Shaw v. Hunt*, 517 U.S. 899, 904 (1996) [hereinafter *Shaw II*]; *see also Shaw I*, 509 U.S. 630, 649 (1993) (first recognizing that "a plaintiff challenging a reapportionment statute under the Equal Protection Clause may state a claim by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification"); *Sanchez v. State of Colo.*, 97 F.3d 1303, 1328 (10th Cir. 1996).

delicate task,'"[82] the Court first requires a plaintiff to "prove[] the race-based motive" of the government body before applying strict scrutiny.[83]

Accordingly, the court must first address whether Navajo Nation has proven that the County had a race-based motive for maintaining the boundaries of District Three.  Navajo Nation bears the burden to prove that racial gerrymandering actually occurred.  Here, the Supreme Court emphasized, mere consciousness of voters' races is not enough.[84]  Instead, plaintiffs must demonstrate that race was the "dominant and controlling consideration."[85]  "The plaintiff's burden is to show . . . that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district."[86] Whether race predominates over legitimate districting considerations is a district-by-district inquiry, and a "racial gerrymandering claim . . . applies to the boundaries of individual districts."[87]

The Supreme Court accepts that such evidence need not be apparent on the face of the districts,  since redistricting by its nature "typically does not classify persons at all; it classifies tracts of land, or addresses."[88]  For this reason, plaintiffs may prove their case "either through 'circumstantial evidence of a district's shape and demographics' or through 'more direct

---

[82] *Miller*, 515 U.S. at 905.

[83] *Shaw II*, 517 U.S. at 905.

[84] *Shaw I*, 509 U.S. at 646 (observing that "the legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors").

[85] *Shaw II*, 517 U.S. at 904–05 (internal quotation marks omitted).

[86] *Miller*, 515 U.S. at 916.

[87] *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015); *see Bush v. Vera*, 517 U.S. 952, 965–76 (1996).

[88] *See Shaw I*, 509 U.S. at 646.

evidence going to legislative purpose.'"[89]  If plaintiffs meet that burden through appropriate

proof, then strict scrutiny applies.[90]

Here, Navajo Nation must show that racial classifications were the predominant

motivation for County Commission District Three.  Navajo Nation has put forth both direct and

circumstantial evidence of the County's race-based legislative purpose.  First, the County has

directly acknowledged that race was central to its decisions regarding the boundaries of District

Three.  San Juan County expressly admits that "District Three 'was intentionally created' by the

Commission to have 'a heavy concentration of American Indians.'"[91]  This is direct, probative

evidence of legislative purpose.[92]  Second, Navajo Nation points to probative circumstantial

evidence.[93]  Demographic evidence further supports that the County realized its goal of

concentrating Native American voters: roughly three-fifths of the Native American population of

the County lies within District Three, and its composition is over ninety percent Native

American.  Indeed, District Three is difficult to explain with reference to any consideration other

than race.  Crucially, District One and District Two do not bear the same characteristics: neither

has a concentration of Native American or white voters approaching such a proportion.[94]

Despite this proof of the County's race-based motive, under Tenth Circuit precedent,

"states may intentionally create majority-minority districts and otherwise take race into

consideration without coming under strict scrutiny so long as traditional districting criteria are

---

[89] *Shaw II*, 517 U.S. at 905 (quoting *Miller*, 515 U.S. at 916).

[90] *See Sanchez*, 97 F.3d at 1328.

[91] Dkt. 272, p. 13.

[92] *Shaw II*, 517 U.S. at 905.

[93] *Id.*

[94] Dkt. 237-1, pp. 5–6.

not subordinated."[95]  And though these traditional criteria are not a constitutional requirement for governments to consider in redistricting, "they are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines."[96]

But here, San Juan County has not argued that traditional districting criteria controlled its decision-making.  Instead, the County has consistently argued that maintaining the lines of District Three was necessary to comply with requirements of the Consent Decree and Settlement and Order that resulted from the 1983 Department of Justice lawsuit.[97]  Outside of compliance with the purported binding effect of the resulting Consent Decree and the court's Settlement and Order, San Juan County has nowhere argued or suggested that traditional districting criteria have predominated for District Three.  And this makes sense.  The County's purported compliance concerns are far from traditional—they are extraordinary.  Apportionment and districting decisions rest in the first instance with state and local governments, and the intervention of the courts and other arms of the federal government is the exception, not the rule, reserved only for violations of federal law.[98]  Actions taken according to (supposed) federal mandates, absent some additional consideration, are not traditional districting criteria, and San Juan County cites no authority to the contrary.

Traditional districting criteria could conceivably have had some secondary impact on the County's districting decisions, including District Three.  Concerns of contiguity may have affected the drawing of the districts, evident in their shape and supported by the testimony of

---

[95] *Sanchez*, 97 F.3d at 1328*; but see Bush*, 517 U.S. at 1000 (Thomas, J., concurring) (concluding that when a government admits that it has intentionally created majority-minority districts this is "sufficient to show that race was a predominant, motivating factor in its redistricting").

[96] *Shaw I*, 509 U.S. at 647.

[97] Dkt. 272, p. 13.

[98] *See Voinovich v. Quilter*, 507 U.S. 146, 156 (1993).

County Clerk and Auditor Norman Johnson.[99] But strict scrutiny applies even where "[t]raditional districting criteria were not entirely neglected" if those criteria nonetheless were subordinated to race.[100] Here, District Three was admittedly drawn based on racial considerations, and the County's evidence confirms that the overriding consideration in the 2011 redistricting (and in previous decisions not to redistrict) was to preserve District Three without any modification. Traditional districting criteria were therefore not "dominant" in the drawing of District Three. The dramatic concentration of Native Americans in District Three is not an accident–it is the County Commission's direct intention. Because racial considerations predominated for District Three, the court must apply strict scrutiny.[101]

## III.   San Juan County Fails to Provide a Compelling State Interest

For District Three to survive constitutional review under strict scrutiny San Juan County must show both that its district plan was in pursuit of a compelling government interest and "that its districting legislation [was] narrowly tailored to achieve [that] compelling

---

[99] *E.g.*, Dkt. 278-5, p. 64.

Meeting the requirements of one-person, one-vote through reallocation of voters between Districts One and Two was also an apparent consideration in the 2011 redistricting. (*E.g.*, Dkt. 278-5, p. 60.) Even taking reasonable inferences in favor of the County, the court is skeptical that this consideration was ever a traditional basis for districting decisions in County government. The County admits that even at the time of adoption, the 1986 election districts had over a ten percent population deviation, meaning a prima facie one-person, one-vote violation existed in the districts from the outset, but was nevertheless unaddressed for roughly twenty-five years. (Dkt. 278-1, p. 19); *see Daly v. Hunt*, 93 F.3d 1212, 1217–18 (4th Cir. 1996). Far more severe issues of malapportionment involving the County School Board districts were never addressed. (Dkt. 280.)

Further, the Supreme Court has recently held that "an equal population goal" is "part of the redistricting background" and not a factor to be weighed in determining whether racial or other factors predominated in government decision-making. *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1270–71 (2015). Because complying with one-person, one-vote is "taken as a given," the focus should be on "a legislator's determination as to how equal population objectives will be met" and the reasons for that determination. *Id.*

[100] *See Bush*, 517 U.S. at 963.

[101] *Shaw II*, 517 U.S. at 907.

interest."[102] The court concludes that San Juan County has not shown that its districting decisions in 2011, including its maintenance of the 1986 District Three boundaries, was in pursuit of a compelling government interest.  For this reason, the court does not assess whether the plan was narrowly tailored.

San Juan County offers only one interest in support of its redistricting scheme: "the binding nature of the *Consent Decree*"—which the court takes to mean compliance with the Consent Decree the County entered with the Department of Justice in 1983, and the Settlement

---

[102] *Id.* at 908 (internal quotation marks omitted) (first alteration in original); *see also Miller v. Johnson*, 515 U.S. 900, 920 (1995); *see Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979).

As it has explained, the court does not address an alternate theory Navajo Nation advances: that the stated motivations for the 2011 redistricting plan were a pretext for racial discrimination (Dkt. 248, pp. 21–23). *See United States v. Thurmond*, 7 F.3d 947, 952 (10th Cir. 1993).  The statements of County officials are not necessary to find that District Three was drawn predominantly based on racial classifications.  On its own, circumstantial evidence of the demographic composition of District Three establishes the use of racial classifications.  Put another way, if the court considered no other evidence but the map of the County election districts and evidence of the demographic composition of those districts, it would conclude that County officials drew District Three based on race, triggering strict scrutiny.  Further, to the extent the pretext argument is directed to the 2011 redistricting as a whole, it would not correspond to the district-by-district inquiry the Supreme Court requires.  *See supra* note 76.

and Order entered by Judge Winder in 1984.[103]  The court now considers whether compliance with the Consent Decree and the Settlement and Order is a compelling governmental interest. The court concludes that, while complying with a consent decree could arguably be a compelling interest in some circumstances, it is not in this case because nothing in the language of the consent decree required the County to lock in place the boundaries of District Three.

## A.  Preliminary Observations

To begin, the court notes that San Juan County offered similar arguments about the effect of the 1980s litigation in support of its motion to dismiss Navajo Nation's Amended Complaint, which the court denied.[104]  The County's repetition of these arguments throughout the briefing is unnecessary and duplicative, and in a separate motion, Navajo Nation has urged the court to "lay

---

[103] Dkt. 272, p. 4.  San Juan County's interest might alternately be construed as attempted compliance with § 2 of the Voting Rights Act.  This construction would require several interpretive leaps, given that it is never expressly asserted by the County, but might conceivably be drawn from certain language in the County's briefing, including that the districting "was done at the instance and insistence of the United States Justice Department" (Dkt. 272, p. 4)—in other words, out of a fear that failure to take certain actions would subject the County to § 2 liability.  Out of an abundance of caution, the court recognizes that the County may be attempting to assert this interest.

The Supreme Court has expressly left open whether compliance with § 2 of the Voting Rights Act could be a compelling state interest.  *Shaw II*, 517 U.S. at 911; *Miller*, 515 U.S. at 921; *see Hunter ex rel. Brandt v. Regents of Univ. of Cal.*, 190 F.3d 1061, 1064 (9th Cir. 1999).  In the absence of binding Supreme Court authority, the court looks to Tenth Circuit precedent, which holds that "compliance with § 2 of the VRA constitutes a compelling governmental interest."  *Sanchez v. State of Colo.*, 97 F.3d 1303, 1328 (10th Cir. 1996). For purposes of this motion, the court recognizes that San Juan County, if it asserted § 2 compliance, would be invoking a compelling governmental interest.  But District Three as drawn would still have to be narrowly tailored, "creating a district that substantially addresses the potential liability" without "deviat[ing] substantially from a hypothetical court-drawn § 2 district for predominantly racial reasons."  *Bush v. Vera*, 517 U.S. 952, 994 (1996) (O'Connor, J., concurring); *see* David M. Guinn et al., *Redistricting in 2001 and Beyond: Navigating the Narrow Channel Between the Equal Protection Clause and the Voting Rights Act*, 51 BAYLOR L. REV. 225, 251 (1999).

San Juan County has neither argued nor attempted to show that it narrowly tailored its districting decisions to achieving a § 2 compliance interest.  Lines drawn twenty-five years earlier do not narrowly address potential present-day § 2 liability, especially in light of decades of intervening case law.  Further, it is indisputable that a majority-minority district within the County could include a less overwhelming proportion of Native American voters.  Indeed, if the Native American population of the County is over fifty percent, which most models suggest, then at least one election district must mathematically be majority-minority.  Thus, even if the County asserted compliance with § 2 as a compelling governmental interest, its actions would not overcome strict scrutiny.

[104] *See* Dkt. 166.

24

this defense to rest."[105]  If any doubt remains after the court's prior decision, two points are now made clear.

First, the Consent Decree entered into between San Juan County and the Department of Justice must be "accorded the weight of a final judgment."[106]  Whatever else, "it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees."[107]  This court will not modify the Consent Decree by reading into it terms, conditions, or restrictions nowhere found in the document itself.

Second, Judge Winder (and by extension, the United States District Court for the District of Utah) retained jurisdiction over the implementation of the Settlement and Order.  This court likely has no authority to modify its terms in this separate action, or to hear in this lawsuit petitions for relief that would have to be brought in the original case.  No relief will be forthcoming that would require modification of the Consent Decree or that would conflict with the Settlement and Order.[108]  These two documents, however, can only preclude actions on matters they concern.  Because the Consent Decree and the Settlement and Order do not concern the subject matter of Navajo Nation's present challenge, they are not obstacles to the court's consideration and resolution of the claims presented.

---

[105] Dkt. 234, pp. 13–15.

[106] *Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d 1464, 1468 (10th Cir. 1993).

[107] *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 378 (1992).

[108] The County also occasionally asserts that the Voting Rights Act precludes the court from modifying a court-imposed election plan implemented after a court's findings of constitutional liability.  (*E.g.*, Dkt. 272, p. 12.)  This proposition, too, is uncontroversial.  52 U.S.C. § 10302(c).  But the court did not find constitutional liability in the 1980s litigation.  Judge Winder found only that the County's then-existing system "fails to comply fully with the requirements of Section 2."  (Dkt. 270-2, p. 2.)  Even when plaintiffs bring suit under the Voting Rights Act, retention of jurisdiction is triggered only when "the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred."  52 U.S.C. § 10302(c).

Another threshold issue is whether compliance with a consent decree can constitute a compelling governmental interest in a strict scrutiny analysis. The court is skeptical that such compliance is compelling. In the context of Equal Protection challenges to racially gerrymandered districting schemes, the Supreme Court has expressed serious concerns about recognizing the Department of Justice's determinations as binding on judicial constitutional analysis.

In *Miller*, the Court expressly held that where a state government "relies on the Department's determination that race-based districting is necessary to comply with the Act," then "to accept the Justice Department's objection itself as a compelling interest adequate to insulate racial districting from constitutional review . . . would be surrendering to the Executive Branch [the courts'] role in enforcing the constitutional limits on race-based official action."[109] In that case, the Department of Justice's requirements were imposed under the preclearance regime of § 5 of the Voting Rights Act, which has more strict requirements than any conceivably placed on the County because of the 1980s litigation.[110] Because the Supreme Court has expressly rejected the "contention that the State has a compelling interest in complying with whatever preclearance mandates the Justice Department issues," *id.*, it is doubtful that a consent

---

[109] *Miller*, 515 U.S. at 922.

[110] Section 5 of the Voting Rights Act is currently inoperative because its coverage formula, contained in § 4, is unconstitutional. *See Shelby County. v. Holder*, 133 S. Ct. 2612 (2013).

decree with the same Justice Department would be treated more deferentially, at least on a categorical basis.[111]

The court will nonetheless accept the proposition that compliance with a consent decree or court order could, in some cases, constitute a compelling interest.  But for purposes of this cross-motion, that compelling government interest must be found in the terms of the Consent Decree and the Settlement and Order, specifically, and not merely in their general existence or in the County's stated subjective understanding of the requirements of each.  To assess whether the Consent Decree and the Settlement and Order can provide a compelling government interest in support of the County's actions, it is first necessary to construe the effect of both documents on the County's discretion to draw its election districts.

B.  *The Consent Decree and Settlement and Order Do Not Provide the County With a Compelling Government Interest*

Having addressed preliminary issues, the court now addresses whether compliance with the Consent Decree and Settlement and Order is a compelling government interest in this case, justifying the County's consideration of race in drawing and maintaining District Three boundaries.  The County claims the "Consent Decree dictated the American Indian population of District 3."[112]  In short, the County submits that the Consent Decree permanently set the lines of District Three.  According to the County, the Consent Decree allowed it to redraw Districts One and Two, but only permitted modification of District Three with the prior consent of the

---

[111] As a general matter outside the specific context of voting rights, the consent of a federal government agency to unconstitutional or otherwise illegal conduct on the part of a state, county, or local government would likely not shield that government from liability to a constitutional claim brought in a federal court.  Agencies exercise only that authority delegated by Congress, and "Congress lacks the ability independently to define or expand the scope of constitutional rights by statute."  *City of Boerne v. Flores*, 521 U.S. 507, 545 (1997), *superseded on other grounds by statute as stated in Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761 (2014).

[112] Dkt. 272, p. 14 (emphasis removed).

Department of Justice, and even then only with an order from this court.  And the logical end of the County's position is that the boundaries of District Three must remain fixed even if subsequent demographic changes or evolution in voting rights law cause the County's election districts to become constitutionally infirm.

In evaluating the sufficiency of the County's stated compelling governmental interest, the court constrains its review to the text of the Consent Decree and the Settlement and Order.  The court's construction of these documents is essentially an act of contract interpretation, meaning "preclusive effects should be measured by the intent of the parties."[113]  "And the best indication of the parties' intent is the ordinary meaning of the contract's terms.  Accordingly, [i]f the language within the four corners of the document is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language."[114] Upon a careful review, the court concludes that the County's stated subjective beliefs about the requirements imposed on it by the 1980s litigation find no support in the unambiguous language of either the Consent Decree or the court's Settlement and Order ratifying and implementing the Consent Decree.  Compliance with these documents cannot provide the County with a compelling government interest.

First, no language in the Consent Decree established district lines—much less dictated that the boundaries of District Three were to remain in place in perpetuity.[115]  The Consent Decree (as well as the Settlement and Order) had a clear legal effect, but as explained above and in an earlier opinion, it was primarily a procedural vehicle, initiating the transition from an at-

---

[113] *Satsky*, 7 F.3d at 1468 (internal quotation marks omitted).

[114] *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24 (internal quotation marks omitted) (alterations in original).

[115] To say nothing of the County's position that the Consent Decree nevertheless permitted changes to Districts One and Two.

large system to single-member election districts.[116]  The Consent Decree does not mention

district lines, nor is there any evidence in the record that district lines were proposed (let alone

adopted) at the time the parties entered into the Consent Decree.  Indeed, the number of single-

member election districts to result from the transition was not yet determined at the time.[117]  The

County later established the number and boundaries for the single-member districts well after the

Consent Decree was finalized and adopted by the court.

      Similarly, the Settlement and Order did not propose or fix district lines in the County.  To

the contrary, the plain language of the Settlement and Order reveals that it contemplated at least

the possibility that single-member election districts might not even be adopted.[118]  At most, it

anticipated, but did not mandate, that at least one election district might have a majority Native

American population.  But the district did not exist at the time, and its characteristics (if it later

was created) were unknown.  The Settlement and Order did not set the boundaries of District

Three, nor did it restrict the County's ability to modify single-member district boundaries in the

future.

      Simply put, the restriction the County relies on as its compelling governmental interest is

not found in the language of the Consent Decree or the Settlement and Order.  And though the

County supplies evidence of the subjective beliefs of County officials, experts, and others in an

effort to show a different interpretation concerning what the Consent Decree requires, these

subjective beliefs cannot supply legal requirements for the Consent Decree or the Settlement and

Order that are not found in the documents themselves.[119]

---

[116] *See* Dkt. 166.

[117] Dkt. 210-3, p. 3.

[118] *Id.*, pp. 12–14.

[119] *See* Dkt. 292, p. 30 (noting the County's understanding of the "purpose" of the documents).

Concluding that the County's asserted basis for its racial classification is not a compelling governmental interest does not require the court to ascribe any bad faith to County officials. Taking all reasonable inferences in favor of San Juan County, County officials may have ensured that one election district was packed with an overwhelming majority of Native American voters because they mistakenly thought they must. Further, though the Consent Decree and the Settlement and Order did not require preserving any specific district, the County may have feared that modifying District Three would lead to liability under § 2.

But any such precaution or confusion does not mitigate the constitutional injury the County has inflicted. Under these circumstances, the County's incorrect interpretations of what § 2 demanded and what the 1980s litigation resolution required do not supply a compelling interest. Once strict scrutiny is imposed, the County must offer more than it has; innocent or "good intentions alone are not enough to sustain a supposedly benign racial classification."[120]

And if the County thought that the Consent Decree and Settlement and Order constrained its ability to modify the boundaries of District Three, it could have taken action to confirm this understanding or to modify these documents. The County has pointed to no evidence that it ever sought relief from the Consent Decree or the Settlement and Order. After the court's ruling this past year on the effect of the Consent Decree and Settlement and Order, the County did not revisit or restart its redistricting process, or seek to address Navajo Nation's claims.[121] Moreover, even if the County disagrees with that earlier ruling, it has simply ignored it.[122] And despite its arguments about proper jurisdiction remaining in Judge Winder's case, the County did

---

[120] *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 228–29 (1995) (internal quotation marks omitted).

[121] Dkt. 166, pp. 7–8.

[122] Dkt. 272, p. 7, n.18.

30

not seek to reopen or consolidate the 1983 litigation until after the court inquired about the issue during oral argument on the instant motions.[123]

San Juan County mistakenly argues that the very notion that it may be liable to Navajo Nation in this case illustrates a conundrum governmental entities face when addressing problems with underlying issues of race:

> Indeed, Plaintiffs' position makes abundantly clear the extent to which governmental units face being whip-sawed by claims and remedies that require intense focus on racial and ethnic components of a given population, [while] being open to subsequent challenges asserting that the actions taken [were] racially based.[124]

The court disagrees.

The goals of the Voting Rights Act and the demands of the Equal Protection Clause need not be in tension.  The County is liable not because meeting both is impossible, but because it failed to attend to minimal redistricting obligations for over twenty-five years, and then incorrectly treated the racially-based District Three as a permanent fixture of its politics.

Keeping an election district in place for decades without regular reconsideration is unusual in any context.  But when the asserted justification for this inertia is a racial classification, it offends basic democratic principles.  Self-governance, even in a County with a unique geographic character and a small population, is not a project completed in one fell swoop. San Juan County is not frozen in time, and neither are the interests and attitudes of its citizens. Even if the two largest voting groups within the County may find their political interests at cross-purposes, voters within the County may pursue those interests on an ongoing basis, and should not have to do so within unnecessary racial lines.

---

[123] Dkt. 289.

[124] Dkt. 272, p. 4.

In this case, binding precedent, common sense, and the interests of justice all point toward the same result. Extraordinary racial classifications require recurrent reevaluation, and representative government needs active attention. Facing the strict scrutiny imposed when a government draws lines based on race, San Juan County has shown no compelling interest for its actions. Nor has it convinced the court that it is otherwise free from the liability that follows.[125]

Because Navajo Nation has successfully shown that the County had race-based motives in maintaining the boundaries of District Three, and the County has failed to show that its plan for District Three was in pursuit of a compelling government interest, the court concludes that District Three is unconstitutional under the Equal Protection Clause and the boundary lines for the San Juan County Commission Districts must be redrawn.[126]

---

[125] The court remains uncertain whether compliance with a consent decree, or with a prior court order, both of which involved a suit brought under a federal statute, could ever offer an affirmative defense to liability for a separate constitutional violation. San Juan County relies on variations on this theme throughout its papers, arguing, for instance, that "a Court-ordered election plan 'insulates' the governmental entity from future claims that it was racially based in violation of the Constitution and the Voting Rights Act." (Dkt. 272, p. 9.) The County offers no binding authority on this point, and only one decision. *Turner v. State of Ark.*, 784 F. Supp. 553 (E.D. Ark. 1991) *aff'd sub nom. Turner v. Arkansas*, 504 U.S. 952 (1992). *Turner* was decided two years before *Shaw I* and *Miller* and is clearly distinguishable on the facts. For one, that case involved a court-ordered set of election districts, where in this case Judge Winder never ordered the drawing of specific election districts.

In this case, the court does not accept that there is an affirmative defense available. The County is effectively arguing that it is immune from suit, a conclusion that the court has rejected (in a different posture) earlier in this case. (Dkt. 166.) Absent any binding authority on this point, the court concludes that events in the 1980s are relevant to opposing Navajo Nation's motion only insofar as they might provide a compelling governmental interest—which they do not.

[126] This court cannot conclude that San Juan County's election districting scheme as a whole was based on predominantly racial considerations without a finding that such considerations also predominated in the drawing of Districts One and Two. *See Ala. Legislative Black Caucus v. Alabama.*, 135 S. Ct. 1257, 1265–68 (2015). But in *Alabama Legislative Black Caucus*, as well as in its earlier *Vera* decision, the Supreme Court looked to statewide districting schemes involving a great number of districts. The County Commission in this case is composed of only three election districts, and District Three borders both Districts One and Two. Under these circumstances, unlike in statewide schemes, racially gerrymandering a single district is functionally equivalent to racially gerrymandering the scheme as a whole. Indeed, District Three cannot be redrawn without necessarily impacting at least one, and more likely both, of Districts One or Two. Therefore, though the court does not expressly find that racial classifications predominated in the drawing of Districts One and Two, the predominant consideration of race in drawing the boundaries of District Three requires a remedy directed to the entire districting scheme.

32

**CONCLUSION**

The County's redistricting decisions predominated by racial classifications violate the Equal Protection Clause because they are not narrowly tailored to serve a compelling governmental interest and cannot survive strict scrutiny.[127]  On this basis, Navajo Nation is entitled to summary judgment on its first claim for relief.  San Juan County's motion for summary judgment is denied on the merits to the extent that it addresses the Equal Protection claim asserted in the first claim for relief, and denied as moot to the extent it addresses any other theory that could support Navajo Nation's first claim.  Because San Juan County Commission District Three violates the Equal Protection Clause, the districts in the County must be redrawn.

For the reasons given above, Navajo Nation's Motion for Summary Judgment is **GRANTED**.  (Dkt. 248.)  San Juan County's Motion for Summary Judgment is **DENIED**.  (Dkt. 207.)

SO ORDERED this 19th day of February, 2016.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

---

[127] *See Shaw II*, 517 U.S. 899, 915 (1996).