**EXHIBIT 6**

REPORT ON DEFENDANT'S REMEDIAL PROPOSALS
for
NAVAJO NATION V. SAN JUAN COUNTY
by

Richard L. Engstrom

Social Science Research Institute
Duke University

## EXPERT REPORT OF RICHARD L. ENGSTROM, Ph.D.

RICHARD L. ENGSTROM, acting in accordance with 28 U.S.C. § 1746, Fed. R. Civ. P. 26(a)(2)(B), and Fed. R. Evid. 702 and 703, does hereby declare and say:

1. My name is Richard L. Engstrom and I am a resident of Chapel Hill, North Carolina. I previously prepared a Report for the liability phase of this case, *Expert Witness Report of Richard L. Engstrom, Ph.D,* Dkt. 188, dated August 31, 2015 (hereinafter *Previous Report*).

2. My curriculum vitae was attached to my Report for that phase. Since then, I have made the following invited presentations:

> "Alternative Election Systems," priming presentation 1/28/16,
> Roundtable on Voting Rights and Fair Representation Systems,
> Joyce Foundation, Rockefeller Brothers Fund, and State Infrastructure
> Fund, January 28-29, 2016, Airlie Conference Center, Airlie, VA.

> "Can We Get the Politics Out of Redistricting? Different Approaches
> to Minimizing Gerrymandering, with Lessons from Australia." Speakers
> Series 2015-2016. Southern University Law Center, April 9, 2016.

> "Racially Polarized Voting Analyses in Section 2 Cases," Conference call
> introducing NAACP Legal Defense Fund attorneys in the New York and
> Washington, D.C. offices to racially polarized voting analyses in Section 2
> Voting Rights Act cases. October 7, 2016.

And the following article co-authored by me has been published:

"Preclearance Politics in Mississippi: State Legislative Redistricting," <u>Cumberland Law Review</u>, 46 (No. 2, 2015-2016), 349-376 (with Tommie S. Cardin).

And I have been deposed in *Patino v. City of Pasadena* (S.D. Tex. 2016).

3. Lawyers for the Plaintiffs in this matter have requested that I examine the single member districting plans the Defendant has proposed for the San Juan County Commission and the San Juan County School Board for the purpose of assessing the opportunities that Native American voters will have in these districts to elect representatives of their choice, including representatives from within their own group when that is their preference.

4. My Previous Report documented that Native Americans voters in San Juan County share a cohesive preference to be represented by other Native Americans when provided with a choice between or among Native American and non-Native American candidates, and that this preference is not shared by the non-Native American voters in the county.

THE DEFENDANT'S PROPOSED PLAN FOR THE COUNTY COMMISSION

5. The Defendant has proposed a plan for the County Commission created by Kimball Brace. This Commission consists of three members, each elected in a partisan election from a single member district. Mr. Brace reports that the Native American percentages of the voting age population (hereinafter, VAP) in the three districts the County proposes are as follows: District 1 is 26.75, District 2 is 50.60, and District 3 is 73.86.[1]

---

[1] These percentages are taken from *Declaration of Kimball William Brace*, dated July 14, 2016, at 17-18 (hereinafter *Brace Declaration 2016*). That declaration does not state whether these percentages are based on people indicating that they are single race Native Americans or any part

6. Mr. Brace declares, without doing an analysis,[2] that his plan provides "an opportunity for Native American voters to elect a candidate of their choice in two of the three Districts" (*Brace Declaration 2016*, at 18). These districts are District 2 and District 3. Mr. Brace identifies District 3 as "an overwhelmingly majority Native American district," and identifies District 1, in which 73.25 percent of the VAP is non-

---

Native American in the Census. The voting age population percentages that I provide below in this Report are for single race individuals.

[2] In his *Deposition* testimony given in this case on August 2, 2016, Mr. Brace's testified as follows, at 94 (hereinafter *Brace Deposition*):

> Q. What analysis did you do to make that determination, that your proposed plan gave Indians an opportunity to elect candidates of their choice?
>
> A. The analysis I did at that time was simply taking a look at the voting age population and the racial mix in voting age population.

And he testified further, at 107-108:

> Q. The question is, you weren't able to complete the analysis that you said is called for in your academic paper. So you have no actual way of knowing whether Indians have the ability to elect candidates of their choice under your plan; isn't that right?
> A. That kind of an evaluation is still there to be done.
> …
> Q My question is, based on the academic paper you wrote and the factors you identified as being critical to analyzing whether this statement is true, that Indians under your plan have the ability to elect candidates of [their] choice, that is, as you said, still there to be done; correct?
> A. Correct.

Native Americans, as "an overwhelmingly majority non-Native American" district (*Brace Deposition*, at 167).

7.   He states that District 3, with 73.86 percent Native American VAP, "would be a safe bet" for Native Americans to elect a candidate of their choice (*Brace Deposition*, at 161).  District 1, in which 73.25 percent of the VAP is non-Native Americans, is apparently also a "safe bet" for non-Native Americans to elect a candidate of their choice, given the difference in the non-Native American VAP percentage in that district is only 0.61 percentage points lower than the Native American VAP percentage in District 3.  The 73 percent figure is no accident, as this is the voting age percentage that Mr. Brace cites as the level needed "in order to create a district that Native Americans could have – definitely have an ability to elect candidates of their choice" (*Brace Deposition*, at 168).  There is nothing in Mr. Brace's analysis that would indicate that the non-Native Americans in District 1 would not likewise "definitely have an ability to elect candidates of their choice."

8.   In my opinion, District 3 in the County's Proposed Plan for the Commission will provide the Native Americans in that district with a meaningful opportunity to elect candidates of their choice.  The same cannot be said however for those in District 2.  Mr. Brace reports that Native Americans constitute 50.6 percent, just over the majority, of the VAP in that proposed district (*Brace Declaration 2016*, at 17). He states that the district "leans slightly towards Native American" (*Brace Deposition*, at 167).  What he means by "leans slightly" must refer to nothing other than the fact that Native American VAP is 0.6 percentage points above a majority, because he references nothing that indicates that this is sufficient to elect the candidates preferred by Native

American voters. When asked in his deposition the basis for his conclusion that Native Americans would have the ability to elect candidates of their choice in that district, he answered, "It's based upon trying to make sure that there was a majority of Native Americans" (*Brace Deposition*, at 166), albeit only slightly. When asked whether the Native American population in District 2 "was sufficient for them to elect candidates of their choice," as he claimed, he answered "It – it was sufficient for them … to be able to *have a say* in that election" (*Brace Deposition*, at 163-164, emphasis added).

9. Mr. Brace identifies nothing from the history of elections to county offices in San Juan County that would indicate that a district in which Native Americans constitute only a slight majority of the VAP would provide Native Americans with the ability to elect candidates of their choice. The election history in fact indicates the opposite. In the 1990 general election in San Juan County five Native Americans ran for five separate countywide offices. These were partisan elections, like those for seats on the county Commission. Each Native American candidate had a non-Native American opponent. Native Americans constituted 51.68 percent of the VAP in the county at that time, according to the Census of that year.[3] The vote in each of these elections was racially polarized. In my *Previous Report* in this case, I concluded that "In each of the five elections, Native American voters displayed a preference through their voting behavior for the Native American candidate. Non-Native American voters vetoed the Native American candidate in each of these elections" (at 11-12). The Native American candidates were defeated in all five elections.

---

[3] This figure is reported in *Declaration of William S. Cooper,* dated February 14, 2016, in Figure 2, at 21 (hereinafter, *Cooper Declaration*).

5

10. Not surprisingly, only one Native American candidate has run for a countywide office in a biracial election since that 1990 election. This was Henry Lee, who sought the Sheriff's office in the 2002 general election. The 2000 Census reported that the VAP in the county was 52.10 percent.[4] The vote in this biracial election was, like those in 1990, racially polarized. Mr. Lee was the choice of the Native American voters, receiving an estimated 78.0 percent of their vote in the EI analysis and 80.5 percent in the homogeneous precinct analysis. His support among the non-Native American votes was estimated to be only 10.5 percent in the EI analysis, and 16.9 percent in the homogeneous precinct analysis (*Previous Report*, at 10-11). Mr. Lee was defeated.

11. One thing that can be done in an assessment of a group's opportunity to elect in a proposed single member district is to reaggregate the votes that were cast for candidates in a previous election into the precincts within the proposed district. This analysis takes into account both participation differences and candidate preference differences between groups. This is not a definitive test of the opportunity of course, but it does provide an indication of how well a known candidate of choice would do in the new district. Mr. Cooper prepared a reaggregation analysis, at my request, of the 2002 general election for Sheriff using the votes reported in the San Juan County website and the County's proposed redistricting plan for the County Commission.[5]

12. Mr. Lee is already documented to have been the preferred candidate, by far, of the Native American voters in that Sheriff's election. When his vote and his opponent's vote within the precincts in the Defendant's proposed District 2 are examined, Mr. Lee is revealed to have received 23.5 percent of the total vote in the district, which is

---

[4] *Ibid*.

6

26.5 percentage points less than the majority he would need to win in District 2. Turnout differences between Native Americans and non-Native Americans could be contributing to this result. This certainly does not support Mr. Brace's assertion that District 2 will provide Native American with an ability to elect a candidate of their choice in that district.

13. Mr. Brace testified in his deposition that he had tried to *"beef up* District 2 to make sure that [it] was over 50 percent" in Native American VAP *(Brace Deposition*, at 161, emphasis added). But District 2 could have been configured to create a meaningful opportunity for Native Americans to elect a candidate of their choice, which it does not do now. This is demonstrated by the Plaintiffs' proposed districting plan for the County Commission. This plan, unlike the Defendant's, does provide Native Americans with two meaningful opportunities to elect candidates of their choice. It was prepared by Mr. Cooper, and provides such opportunities in both District 2 and District 3.

14. In District 3 of the Plaintiffs' proposed plan Native Americans constitute 73.98 percent of the VAP. I also requested that Mr. Cooper reaggregate the vote in the 2002 Sheriff's election in this proposed district. That reaggregation revealed that Mr. Lee won that area with 63.66 percent of the votes. The Native American percentage of the VAP in District 2 is 65.97, almost 15 percentage points higher than District 2 in the Defendant's plan.[6] I also requested that Mr. Cooper provide the results of the vote for Sheriff in 2002 within this proposed district. The reaggregation of the vote shows Mr.

---

[5] See http://sanjuancounty.org/elections-voting.hmt.

[6] The figure for District 2 in the Plaintiff's proposed plan is reported in Exhibit A-1 to the Eighth Supplemental Declaration of William Cooper, dated July 14, 2016.

Lee received 44.2 percent of the votes for Sheriff in the district, almost twice what he received in the Defendant's version of District 2.

15.     The higher percentage of Native American VAP in the Plaintiffs' District 2 will create a different context for elections in that district.  It clearly provides a much better opportunity for Native Americans to elect candidates of their choice over the previous versions of that district,[7] and therefore creates an increase in the incentive that Native Americans have to organize and mobilize for elections within it.  Given this, I think this district will provide a meaningful opportunity for Native Americans within it to elect a candidate of their choice.[8]

THE DEFENDANT'S PROPOSED PLAN FOR THE COUNTY SCHOOL BOARD

16.     Mr. Brace also created the Defendant's remedial proposal for the San Juan County School Board, which consists of five members, each elected from a single member district.[9]  These elections are nonpartisan.  There is great similarity in the approach Mr. Brace had taken toward providing Native Americans with opportunities to elect candidates of their choices in this plan to the one he took for the County Commission plan.

---

[7]     The highest Native American VAP for District 2 in the plan adopted in 1986 was 30.05 percent, the figure based on the 1990 Census.  The figure for District 2 in the plan adopted in 2011 is 27.64. These figures are taken from Exhibits F and H3 to *Cooper Declaration*.

[8]     In one case the court noted that "both Plaintiffs' and Defendant's experts recognize that the opportunity to elect a candidate of choice tends to dramatically increase voter registration and turnout in the minority community." *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 451 (S.D.N.Y 2010).  Another court has likewise stated, in a Section 2 of the Voting Rights Act context, that "registration and turnout rates often improve once a court finds and remedies the Section 2 violation." *Missouri State Conference of the National Association for the Advancement of Colored People v. Ferguson-Florissant School District,* 2016 U.S. Dist LEXUS 111177, at 68.

[9]     The School Board plan that is examined below is the one that was submitted to this court by the Defendant in January of this year.

17. Given that this plan contains two more districts than a plan for the Commission, Mr. Brace created four districts instead of two in which either Native Americans or non-Native Americans constitute overwhelming majorities of the VAP. Districts 1 and 2 are the overwhelming non-Native American districts and Districts 4 and 5 are the overwhelming Native American districts. The Native American percentages of the VAP in Districts 1, 2, 4, and 5 are 4.40, 18.36, 97.43, and 85.33 respectively. The remaining district, District 3, similar to District 2 in his Commission plan, has a majority Native American VAP, but one not far over a majority. This district has a VAP that is 53.51 percent (*Seventh Supplemental Declaration of William S. Cooper*, Exhibit 11, Dkt 313-11, February 22, 2016).

18. In my opinion, this plan creates two meaningful opportunities for Native Americans to elect candidates of their choice. These opportunities are in Districts 4 and 5. District 3 does not provide such an opportunity for the same reasons that District 2 did not do so in the Defendant's plan for the County Commission.

19. District 3 in the Defendant's proposed School Board plan is a little over a majority in Native American VAP, 53.51 percent, just 2.9 percentage points over that for District 2 in the Defendant's proposed plan for the County Commission. The review of the election history in San Juan County in paragraphs eight and nine above is applicable therefore to the issue of whether Native Americans will be provided with a meaningful opportunity to elect candidates of their choice in this District 3, given that it is only a little over a majority. This election history provides no support for that being the case.

20. I also requested that Mr. Cooper reaggregate the vote for the 2002 Sheriff's election in the Defendant's proposed School Board District 3. When Mr. Lee's

9

vote in that election is counted in that area, it constitutes only 26.9 percent of the total vote, only 3.4 percentage points above that which he received in the Defendant's proposed Commission District 2. This is 23.1 percentage points below the majority he would need to be elected in that two-person contest.

21. If Mr. Brace thought he had "beefed up" District 3 to the point where the Native Americans will have the ability to elect candidates of their choice in it, he failed. It is only a little more than a majority in VAP, and to my knowledge no Native American has won a seat to the Commission or the School Board in a district with a similar Native American percentage in VAP. Mr. Lee himself was beaten badly in the geographical area of this proposed district. In my opinion this district does not provide Native Americans with a meaningful opportunity to elect a candidate of their choice.

22. Such an opportunity can be provided if the district is configured differently. This is demonstrated by the Plaintiffs' proposed districting plan for the School Board. This plan, unlike the Defendant's, does provide Native Americans with three meaningful opportunities to elect candidates of their choice. It was prepared by Mr. Cooper, and provides such opportunities in Districts 3, District 4, and District 5.

23. In Districts 4 and 5 Native Americans constitute 89.42 percent and 77.94 percent of the VAP respectively,[10] and when Mr. Cooper examines the vote for Mr. Lee within those proposed districts, again at my request, Mr. Lee wins 76.6 percent of the votes in District 4 and 59.4 in District 5.[11] The Native American percentage of the VAP

---

[10] See *Fifth Supplemental Declaration of William S. Cooper, Population Summary Report*, Dkt. 297-2.

[11] District 4 was 97.5 percent Native American in VAP when it was contested by three Native American candidates and one non-Native American candidate in a nonpartisan primary in 2010. The

in District 3 is 68.48, almost 15 percentage points higher than District 3 in the Defendant's plan.[12] Based on Mr. Cooper's examination, again at my request, Mr. Lee received 48.6 percent of the votes in the 2002 Sheriff's contest in that district, only 1.4 percentage points below a majority.

24. The higher percentage of Native American VAP in the Plaintiffs' District 3 also will create a different context for elections in that district. It clearly provides a better opportunity for Native Americans to elect candidates of their choice in that district, and therefore creates an increase in the incentive that Native Americans have to organize and mobilize for elections within it.

## CONCLUSION

25. It is my opinion that the Defendant has proposed plans that provide only one meaningful opportunity for Native Americans to elect a candidate of their choice to the County Commission and only two such opportunities to do the same to the School Board. The Plaintiffs however have proposed plans that provide Native Americans with two such opportunities to the County Commission, and three to the School Board.

Executed on the 12th of October, 2016.

Richard L. Engstrom, Ph.D.

---

Native American candidates are estimated to have received 84.4 percent of the votes cast by Native American voters. Two of the Native American candidates advanced to a runoff in which the winner was decided. See my *Previous Report*, at 8, 9, and 15.

[12] Dkt. 297-2.

11