IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NAVAJO NATION, a federally recognized Indian tribe, et al., | **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | |
| v. | Case No. 2:12-cv-00039 |
| SAN JUAN COUNTY, a Utah governmental subdivision, | Judge Robert J. Shelby |
| | Magistrate Judge Dustin B. Pead |
| Defendant. | |

Plaintiffs, Navajo Nation and several individual tribe members (Navajo Nation), sued Defendant San Juan County, claiming the County Commission and School Board election districts violated the Equal Protection Clause of the Fourteenth Amendment, the Fifteenth Amendment, and Section 2 of the Voting Rights Act, 42 U.S.C. § 1973.[1] The court previously found both sets of districts unconstitutional under the Equal Protection Clause.[2] The court did not decide whether the School Board or County Commission districts violated Section 2 of the Voting Rights Act.

The court then outlined a process for adopting legally sound remedial districts.[3] The court suggested it would adopt San Juan County's proposed remedial plans if they cured the

---

[1] Dkt. 75.

[2] Dkt. 312.

[3] *See* dkt. 281; dkt. 343.

identified violations and were otherwise legally sound.[4] Navajo Nation and the County then both submitted competing remedial plans for the School Board and County Commission, with supporting declarations by their respective experts.[5] Following an opportunity for discovery, Navajo Nation and the County filed objections to each other's remedial plans. On December 8, 2016, the court received argument on the proposed plans.

For the reasons below, San Juan County's remedial plans fail to pass constitutional muster. Specifically, the court concludes race was the predominant factor in the development of District 3 of the School Board plan and Districts 1 and 2 of the County Commission plan. The County's consideration of race requires strict scrutiny analysis of these districts. The court concludes the County has failed to satisfy strict scrutiny and, therefore, these districts are unconstitutional. The court will not adopt the County's plans.

## BACKGROUND

The background relevant to Navajo Nation's challenge generally is set forth in the court's previous Memorandum Decisions and Orders.[6] The court recounts below the facts relevant only to the issue currently before it—the legality of San Juan County's proposed remedial districts. The court focuses largely on San Juan County's plans because, as noted above, the court indicated it likely would adopt them if legally sound.

Though limited in scope, the factual recitation that follows is lengthy and detailed. This is a product of the legal analysis the court is required to perform. The court must evaluate whether the County's proposed plans constitute an unconstitutional racial gerrymander under the Equal Protection Clause. To do this, the court must first make a factual finding about whether

---

[4] *See* dkt. 281 at 3.

[5] *See* dkt. 286; dkt. 294; dkt. 297; dkt. 345; dkt. 346.

[6] *See* dkt. 280; dkt. 312.

race was the predominant factor in the County's decision to place a significant number of voters within or without any specific election district. To be the predominant factor, race must have subverted traditional race-neutral redistricting principles. Traditional redistricting principles include compactness, respect for political boundaries, incumbency protection, and contiguity, among others.

Because the court concludes race was the predominant factor, it must determine whether the County has narrowly tailored its race-based decisions to meet a compelling government interest. The Supreme Court has long assumed compliance with the Voting Rights Act is a compelling government interest. If the County invokes compliance with the Voting Rights Act as its compelling government interest, it must show it had a strong basis in the evidence for concluding its actions were necessary to comply with the Act.

With this framework in mind, the court first provides a brief procedural background, then discusses the County's overall approach to redistricting, and finally discusses the County's development of the proposed School Board and County Commission election districts.

## I.    Procedural Background

Navajo Nation filed the original Complaint in this case more than five years ago, in January 2012.[7]  The Complaint, as subsequently amended, includes allegations that San Juan County's election districts were legally deficient under three distinct legal theories. First, Navajo Nation alleged the County Commission election districts were illegally racially gerrymandered under the Equal Protection Clause.[8]  Second, Navajo Nation alleged both the County Commission election districts and the School Board election districts violated Section 2 of the

---

[7] Dkt. 2.

[8] Dkt. 75 at 4–7 (First Claim for Relief).

Voting Rights Act.[9]  Finally, Navajo Nation alleged the School Board election districts violated the one-person, one-vote requirement of the Equal Protection Clause.[10]

Extensive motion practice ensued, including motions for partial summary judgment under each legal theory.[11]  The court issued two Memorandum Decisions and Orders, one addressing each of Navajo Nation's two Equal Protection theories.  The first Memorandum Decision and Order concluded the County's School Board election districts violated the one-person, one-vote requirement of the Equal Protection Clause.[12]  The second Memorandum Decision and Order concluded the County had unconstitutionally racially gerrymandered County Commission election District 3.[13]  The court, finding both the County Commission and School Board districts legally infirm, outlined a remedial process.

The court did not reach Navajo Nation's claims under Section 2 of the Voting Rights Act. A brief discussion of the parties' positions on Section 2 issues is necessary, however, because Voting Rights Act considerations significantly affected the County's redistricting process; and because the County's position on the existence of a Section 2 violation is important to the court's legal analysis below.

Section 2 of the Voting Rights Act prohibits State and local governments from restricting the right to vote based on race.[14]  To prove a Section 2 violation, a plaintiff must establish three

---

[9] Dkt. 75 at 7–10 (Second Claim for Relief as to the County Commission election districts and Third Claim for Relief as to the School Board).

[10] Dkt. 75 at 10 (Fourth Claim for Relief).

[11] *See* dkt. 173, dkt. 182, dkt. 202, dkt. 207, dkt. 221, dkt. 222, dkt. 234, dkt. 248, dkt. 298.

[12] Dkt. 280.

[13] Dkt. 312.

[14] Specifically, the government cannot impose or apply a "voting qualification or prerequisite to voting or standard, practice or procedure" that "results in the denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  52 U.S.C. § 103101 (a).  The Supreme Court has applied Section 2 to redistricting. *See Thornburg v. Gingles*, 478 U.S. 30 (1986); *Growe v. Emison*, 507 U.S. 25, 40–41 (1993).

necessary preconditions, known as the *Gingles* factors: "(1) the minority group [is] sufficiently large and geographically compact to constitute a majority in a single-member district, (2) the minority group [is] politically cohesive, and (3) the majority . . . vote[s] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."[15] If the plaintiff successfully establishes the *Gingles* factors, the court analyzes whether a Section 2 violation has occurred under a totality of the circumstances test, determining whether the protected voters have less opportunity to elect a representative of their choice than other members of the electorate.[16]

Navajo Nation filed three motions for partial summary judgment relating to Section 2, specifically as to the County Commission election districts. First, Navajo Nation filed a motion arguing it had established the first *Gingles* factor—proving that San Juan County's Native American population is sufficiently large and geographically compact to constitute a majority in two single-member County Commission districts.[17] To make this showing, Navajo Nation was required to submit hypothetical County Commission election districts that are reasonably compact where Native Americans constituted a majority in two Commission districts.[18] The County argued in opposition that Navajo Nation's hypothetical plans failed to establish the first *Gingles* factor because the proposed districts did not abide by traditional redistricting factors.[19]

---

[15] *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (internal quotation marks omitted).

[16] *Id.* at 11–12; 52 U.S.C. § 10301(b) ("A violation . . . is established if, based on the totality of the circumstances, it is shown that the political process leading to the nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.").

[17] Dkt. 182.

[18] *See Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994); *cf. Bush v. Vera*, 517 U.S. 952, 979 (1996).

[19] Dkt. 216 at 66–69.

Specifically, the County argued the hypothetical districts did not respect communities of interest and did not preserve precinct boundaries.[20]

In a second motion, Navajo Nation argued it had established the second and third *Gingles* factors—proving that Native Americans in the County are politically cohesive and that White voters in the County vote sufficiently as a bloc to defeat the Native American's preferred candidates.[21]  In response, the County argued, "the absence of political cohesion among American Indian voters is shown by the fact that in San Juan County American Indians vote along party lines."[22]  Further, the County argued Plaintiffs had failed to show White voters voted sufficiently as a bloc to defeat the Native American's preferred candidates.  Again, the County pointed to political affiliation, stating Native American candidates lost because of their political affiliation (Democratic) and not because of their race.[23]

In its third motion for partial summary judgment, Navajo Nation argued it had established a Section 2 violation as to the County Commission election districts under the totality of the circumstances test.[24]  Before the County could respond to this third Motion, the court denied all three Section 2 Motions as moot in view of its rulings striking down the districts on other grounds.  The court never made a finding concerning the alleged Section 2 violations, nor did it weigh the evidence submitted by the parties.

---

[20] *Id.*

[21] Dkt. 202.

[22] Dkt. 255 at 49.

[23] *Id.* at 50–53.

[24] Dkt. 298.

## II.     General Approach to Redistricting

With this procedural background in mind, the court turns to the County's redistricting process. The County took the same general approach to redistricting both the School Board and County Commission election districts.[25] Kimball William Brace, the County's expert, described his three main considerations in drawing the remedial districts as (1) compliance with the United States Constitution, (2) compliance with Section 2 of the Voting Rights Act, and (3) traditional redistricting principles.

Brace's first, and most important, consideration when developing the remedial districts was compliance with the Constitution, specifically the one-person, one-vote requirement of the Equal Protection Clause.[26] As Navajo Nation concedes, the County appears to have successfully ameliorated any previous one-person, one-vote issues with new districts that are within the ten-percent safe harbor for legislatively drawn plans.[27]

Brace's second consideration, which he prioritized after one-person, one-vote but before traditional redistricting principles, was compliance with Section 2 of the Voting Rights Act. To ensure the newly drawn districts complied with the Voting Rights Act, Brace aimed to achieve "proportional representation"—where each racial group has the opportunity to elect representatives in proportion to its population.[28]

---

[25] The court notes that in some of the deposition testimony included in this section, Brace responded to questions about the development of the School Board election districts, not the County Commission election districts. But he did not indicate that his approach to redistricting varied between the plans—and none of the material submitted indicates separate approaches. Therefore, the court applies his general discussion of methodology to the development of both plans.

[26] *See, e.g.*, dkt. 366-1 at 96–97.

[27] *See* dkt. 389 at 58–67.

[28] Dkt. 366-1 at 85–89. He "was cognizant of the racial makeup, and [his] process was to depict as closely as possible the overarching county composition . . . to the degree possible." *Id.* at 84.

Proportional representation presented a challenge in San Juan County, which is roughly half Native American and half White but with an odd number of voting districts—five for the School Board and three for the County Commission. Brace's goal, therefore, was to create two safe Native American School Board districts, two safe White School Board districts, and a district where the racial mix reflected the County's overall demographics—approximately 52% Native American and 48% White.[29] Similarly, his goal was to create one safe White County Commission district, one safe Native American County Commission district, and a third district that reflected the racial composition of the County generally.

Brace stated that under the County's plans, Native Americans had an opportunity to elect candidates of their choice—effectively asserting compliance with Section 2. The analysis he performed to support this statement involved "simply taking a look at the voting age population and the racial mix in voting age population."[30] He did not complete any analysis of racially polarized voting.[31] Nor did Brace consider the racial polarization analysis performed by Navajo Nation's expert, Dr. Engstrom.[32]

After addressing one-person, one-vote and the Voting Rights Act, Brace then considered what he described as "the kitchen sink."[33] The kitchen sink included—"anything else that might be a factor, be it political, be it other types of demographics, be it geography, be it communities

---

[29] *Id.* at 84 (discussing the goal of creating "two overwhelmingly non-Indian populated districts, . . . two overwhelmingly Indian populated districts, and . . . one that was pretty evenly split"); *id.* at 89 ("Q: So you apply those same racial percentages to how you draw the fifth district so that 51 percent of the Indian VAP in that district is Indian and 48 percent is non-Hispanic white; correct? A: That could be one way that you do it, yeah. Q: But is that the way you did it? A: Yes, I did approach it that way.").

[30] *Id.* at 95.

[31] *Id.* at 99–100.

[32] *Id.* at 101.

[33] *Id.* at 96–97.

of interest, be it any of those other kinds of things that people talk about in terms of redistricting."[34]  Many traditional redistricting principles appear to fall into this third category.

Brace described the plans as "the careful result of a process of refinement involving multiple attempts to create as little deviation as possible among the districts [one-person,one-vote], while reflecting the overall makeup of the County [Voting Rights Act] as well as respecting traditional communities of interest as much as possible [the 'kitchen sink']."[35]  Brace stated, "the line-drawing exercise turned into a search along district boundaries for just the right number of people to move out of one district or put into another district.  At the same time, there was constant checking on what impact a change would have on the racial mix of the appropriate districts so as to reflect the overall makeup of the county.  In all, the development of the Plan entailed a process of shifting and re-shifting portions of the County from one district to another, reviewing the result, and trying again."[36]  The Commissioners deferred greatly to Brace in developing the remedial plans, and further deferred to Brace and their attorneys regarding the plans' legality.[37]

---

[34] *Id.* at 97.

[35] Dkt. 347 at 14.

[36] *Id.* at 16.

[37] *See, e.g.*, dkt. 366-19 at 28 ("A: My only priority is compliance with the - - with the judgment handed down by the federal judge. Q: And what do you understand compliance to encompass? A: That's why we hired some experts, legal, and everything to advise us, because that's not my - - that's not my area. . . ."); *id.* at 16 ("It . . . was an exercise in compliance, and we took our expert's advice on it."); *id.* at 32 ("Q: Why did you think this proposal's reasonable? A: Because it was given to us by the experts that we hired to counsel us along those lines."); dkt. 366-20 at 8 (Commissioner Benally stated regarding the school board districts that "we do have an expert that . . . is their realm of work; so as far as I'm concerned as a commissioner, just at a recommendation level, but leaving it to the experts to determine. . . what the formula or - - or what needs to be done."); dkt. 366-20 at 15 ("So any specifics, I don't recall, just that experts were hired to do – to do that, to do what needed to be done."); *id.* at 34 ("I don't know the methodology that was used, the formula that was used.  That was up to the experts.  So I can only tell you an opinion is that the information that was given to us, the 48/52 as you mentioned and the deviation of ten or less.").

### III.    Development of San Juan County's Remedial School Board Plans

Having described the County's overall approach to redistricting, the court now discusses each set of districts in turn, starting with the School Board districts.  San Juan County submitted its proposed remedial School Board election districts in the form of a Status Report[38] supported by a declaration from Brace.[39]  The County Commission adopted the proposed School Board election districts on January 19, 2016,[40] and these districts were in place for the November 2016 elections.[41]  The County's proposed School Board election districts, depicted in Exhibit A, divide the County's 14,259 residents into five single-member districts.  The County also provided the population's racial breakdown by district as reflected in Exhibit A.

### A. One-Person, One-Vote

As the court ordered, Brace focused on achieving compliance with the Equal Protection Clause's one-person, one-vote requirement.  Brace worked to create School Board election districts that were as nearly of equal population as practical.  The population deviation of his proposed plan was only 0.35%[42]—just ten people.  In Brace's opinion, "[g]iven the error factor within the federal census, all the districts in the County Proposal, are, essentially, equal."[43]  The County Commissioners testified that compliance with one-person, one-vote was an important consideration in the redistricting process.[44]

---

[38] Dkt. 286.

[39] Dkt. 294.

[40] Dkt. 286 at 2.

[41] *See* dkt. 389 at 12.

[42] Dkt. 294 at 4.  This percent deviation was "based on an ideal population division of 2,852 (based on the 2010 Census total population for San Juan County of 14,259 divided by five)."  *Id.*

[43] *Id.* at 5.

[44] See dkt. 366-19 at 13; dkt. 366-20 at 36.

## B. Compliance with the Voting Rights Act

Brace also discussed the racial composition of the districts and his use of proportionality. He asserted compliance with Section 2 of the Voting Rights Act, which requires protected voters have the same opportunity as other members of the electorate to elect representatives of their choice. In his initial declaration, Brace stated, "the County [School Board] Proposal provides all voters in San Juan County, including Native American voters, the opportunity to elect candidates of their choice from Districts that reflect the nearly equal division of the population in the County between non-Hispanic Whites and Native Americans."[45] He also testified that "[t]he County Proposal includes two School Board election districts, Districts 1 and 2, with majorities of non-Hispanic Whites, and three districts, Districts 3, 4, and 5 that have majorities of Native American voters."[46] He further stated that "[t]he make-up of these districts reflects the geographic distribution of people within San Juan County . . . and is not an attempt to draw district boundaries on racial or ethnic lines."[47]

In Navajo Nation's objection to the County's School Board plan, its expert William S. Cooper argued the County's plan improperly packs Native Americans, in violation of Section 2 of the Voting Rights Act.[48] Brace disagreed, stating in a second declaration that Navajo Nation's packing argument was based on the improper "assumption that a bare majority of Native American voting-age population requires race-conscious construction of districts intended to substantially increase the likelihood that Native Americans will elect a Native-American

---

[45] Dkt. 294 at 13.

[46] *Id.* at 12.

[47] *Id.* at 12–13.

[48] Dkt. 297-1 at 14.

majority School Board, even if it must be done at the expense of the non-Native American voting population that Plaintiffs assert are in the minority in San Juan County."[49]

Brace stressed the School Districts were racially proportional—noting the County's plan "creates two districts with substantial non-Native American majorities, two districts with substantial Native American majorities, and a swing district that is more nearly evenly split (but still having a Native American majority that is greater than the bare Native-American majority for the County as a whole claimed by Plaintiffs)."[50]

In their depositions, the San Juan County Commissioners recalled discussions of race and the concept of proportionality to varying degrees. Commissioner Phil Lyman testified that the process of adopting new School Board districts in accordance with the court's mandate "was an exercise in compliance, and we took our expert's advice on it."[51] He recalled Brace presented the racial composition of the districts. While not discussing the term "proportionality," Commissioner Lyman recalled Brace's efforts to achieve racial balance—or "the same proportion in each of these districts, was roughly equivalent to the proportion of the county overall."[52] Commissioner Lyman testified he agreed with Brace's proportionality approach when he voted to adopt the remedial plans.[53] He also rejected the notion that racially polarized voting exists in the County.[54]

---

[49] Dkt. 308 at 16.

[50] *Id.* at 16–17.

[51] Dkt. 366-19 at 16.

[52] *Id.* at 34.

[53] *Id.* at 34–35.

[54] *Id.* at 38 ("I don't believe that there is a major racial division in San Juan County. I don't believe that Navajos vote only for Navajos or whites vote only for whites. I have hundreds of friends who are married to white people and they've got half Navajo children, and I think I understand the demographics of the county enough to say that's a silly . . . politically motivated mandate. But it is a mandate, and we hire experts to figure out how to comply with that.").

Commissioner Rebecca Benally testified that Brace discussed proportionality with the Commissioners. She described the concept as resulting in a map "that represented the people whether it was Native Americans, Hispanic, the white population, that was fair and equitable."[55] Commissioner Benally recognized it was a priority to "achieve and propose a map that was . . . fair and equitable."[56] When asked what "fair and equitable" meant, Commissioner Benally said equal representation—or representation equal to the demographics of the county.[57] Specifically, the Commission's top priority was ensuring the plan was "fair and equitable for the Native American population."[58] Commissioner Benally mentioned the racial target of 48/52 and stated that hitting this target was one of the primary factors considered.[59] Commissioner Bruce Adams did not recall discussing the proportionality concept with Brace.[60]

### C. Traditional Redistricting Principles

Brace also considered several traditional redistricting principles while drawing the remedial School Board election districts.

#### i. Limiting precinct splits & administrative burden

Brace stressed the potential administrative burden on the County in implementing the new election districts—and his resulting decision to minimize precinct splits.[61] The County's final School Board plan splits only eight of the County's precincts or sub-precincts.[62]

---

[55] Dkt. 366-20 at 13.

[56] *Id.* at 29.

[57] *Id.* at 30.

[58] *Id.* at 33.

[59] *Id.* at 34–35.

[60] Dkt. 366-21 at 13.

[61] *See, e.g.*, dkt. 294 at 6–8.

[62] Dkt. 308 at 18–19.

*ii. Community school concept*

Brace discussed the importance of instituting the County's "community school" concept in the new districts. The community school concept requires establishing districts "around the four high schools and their feeder schools establishing a situation in which an individual Board member represents his/her community and the schools in that community."[63] Brace met with the San Juan School District Superintendent to determine how to best meet this goal.[64] The San Juan County Commissioners testified about the importance of the community school concept to the Commissioners and the School Board members.[65]

*iii. Incumbent protection, compactness, & contiguity*

Brace also submitted a declaration in response to Navajo Nation's proposed remedial plans.[66] In it, he discussed how the County's plan complies with several traditional redistricting factors not discussed in his initial declaration. He stated each incumbent School Board member remained in the same district under the County's plan.[67] Brace also presented the compactness

---

[63] Dkt. 309 at 9.

[64] Dkt. 294 at 9.

[65] *See, e.g.,* dkt. 366-21 at 9–11.

[66] Dkt. 308.

[67] *Id.* at 9.

scores for the County's proposed districts,[68] and stated that the County's plan is contiguous.[69]

## IV. Development of San Juan County's Remedial County Commission Plans

The court now turns to the County's proposed County Commission election districts. The County submitted with its proposed remedial plan for the Commission districts[70] a supporting declaration from Brace.[71] Unlike the School Board plans, the San Juan County Commission did not vote to adopt the proposed County Commission districts and the County did not use these districts in an election. Instead, the Commission discussed and approved the proposal for submission to the court as the County's proposed remedial plan.[72] As depicted in Exhibit B, the proposed County Commission districts divide the County into three single-member districts.

---

[68] *Id.* at 15.

| District | Reock | Polsby-Popper |
|----------|-------|---------------|
| 1 | 0.63 | 0.36 |
| 2 | 0.52 | 0.26 |
| 3 | 0.40 | 0.15 |
| 4 | 0.74 | 0.54 |
| 5 | 0.59 | 0.30 |
| Mean Average | 0.58 | 0.32 |

[69] *Id.*

[70] Dkt. 346.

[71] Dkt. 347.

[72] *Id.* at 3.

### A. One-Person, One-Vote

In his declaration supporting the County Commission districts, Brace discussed his goal of creating districts with populations as nearly equal as possible. The proposed plan has a deviation of 0.2441%, representing just twelve people.[73]

### B. Compliance with the Voting Rights Act

Brace again asserted compliance with Section 2 of the Voting Rights Act, stating "[t]he County['s County Commission] Proposal provides all voters in San Juan County, including Native American voters, the opportunity to elect candidates of their choice from Districts that reflect the nearly equal division of the population in the County between non-Hispanic Whites and Native Americans."[74] He again stated the "make-up of these districts reflects the geographic distribution of people within San Juan County . . . and is not an attempt to draw district boundaries on racial or ethnic lines."[75] When discussing the County Commission plan, Brace reiterated that "proportionality is one of the very first things you look at in terms of drawing districts."[76]

### C. Traditional Redistricting Principles

In the County's submissions, Brace also discussed several traditional redistricting principles he considered while redrawing the County Commission districts.

---

[73] *Id.* at 4–5. These districts divide the County's 14,746 residence as follows: District 1 has 4,923 residents; District 2 has 4,911 residents; and District 3 has 4,912 residents. The ideal population of each district is 4,915 persons and the total deviation from this goal is 0.2441%, or twelve people. Dkt. 346-2 at 2.

[74] Dkt. 347 at 19.

[75] *Id.*

[76] Dkt. 366-1 at 141.

*i. Compactness*

In his declaration in response to Navajo Nation's plan, Brace provided additional information regarding the district's compactness in the County's plan.[77]

*ii. Limiting precinct splits & administrative burden*

In his initial declaration, Brace again discussed his efforts to limit precinct splits to curb the administrative burden of implementing the new election districts.[78]

*iii. Incumbent protection and communities of interests*

Brace briefly addressed incumbent protection and communities of interests, stating each incumbent Commissioner resides in a separate district, and "no municipality or census designated place within the County is split by the County's Proposal."[79] Commissioner Adams stated that it was important to him that the municipalities of Blanding and Monticello were not split.[80]

---

[77]

| District | Reock | Polsby-Popper | Perimeter |
|----------|-------|---------------|-----------|
| 1 | 0.1320 | 0.1516 | 563.99 |
| 2 | 0.3534 | 0.3775 | 229.58 |
| 3 | 0.2815 | 0.4270 | 237.76 |
| Mean Average | 0.2557 | 0.3187 | 1,031.33 |

Dkt. 363 at 6.

[78] Dkt. 347 at 6–14.

[79] *Id.* at 18.

[80] Dkt. 366-21 at 22.

### D. County Commission District Specific Information

In addition to the general information regarding the development of the County Commission plan, the record contains information specific to the development of Districts 1 and 2. The court first discusses District 2 to provide context for its discussion of District 1.

*i. County Commission District 2*

In his declaration responding to Navajo Nation's opposition to the County's plan, Brace elaborated on his use of race and proportionality in District 2. He stated, "when I drafted an initial plan based on traditional redistricting principles, the plan produced District 2 that was only 45% Indian. I continued to revise the plan so as to raise the Indian population above 50%. In the County's Plan, District 2 has an Indian population of 51.94%."[81] Brace further stated,

> this is not to say that race was the 'dominant and controlling consideration' in developing the County plan . . . . Because race is inherent in the analysis under the *Voting Rights Act* as a second-tier factor, race is an appropriate consideration in drawing a plan, so long as it is not the dominate and controlling consideration. It was not the dominant and controlling factor in the County's plan. A predominant factor was creating a plan allowing all County voters a reasonable opportunity to elect candidates of their choice while reflecting the demographics of the County.[82]

Brace also "included part of [precinct] 13, Oljato, into District 2 in order to bring up the population of Native American[s] in District 2."[83] He stated "precinct 13 was carefully divided in a manner consistent with one of the overall design criteria for the County's plan not to divide, if possible, incorporated municipalities or census-designated places. The Oljato-Monument Valley census-designated place was not divided in the division of precinct 13."[84] Brace opined

---

[81] Dkt. 373 at 4.

[82] *Id.* at 4–5.

[83] Dkt. 366-1 at 162.

[84] Dkt. 373 at 11.

that the Native American voters in District 2 would be able to elect a candidate of their choice based solely on the targeted racial quota.[85]

*ii. County Commission District 1*

Brace discussed in his deposition two of the communities included in District 1—Spanish Valley and Navajo Mountain. Spanish Valley is a mostly-White, fast-growing suburb of Moab.[86] Navajo Mountain is predominately Native American.[87] The drive from Spanish Valley to Navajo Mountain takes four and a half hours (nearly 250 miles) and crosses through Arizona.[88] These two communities share no common infrastructure;[89] and Brace did not recall considering if Spanish Valley and Navajo Mountain shared any common interests when drawing District 1.[90]

When asked why he placed Navajo Nation and Spanish Valley in the same district, Brace explained he created District 3 and District 2, "and the District 1 is what's left over."[91] Brace stated, "if I'm trying to create districts that have got minority populations, then this is what remains."[92] When asked whether it was possible to create a redistricting scheme that did not put completely disparate communities together, Brace responded, "it again goes back to what I had

---

[85] Dkt. 366-1 at 166 ("Q: Okay. So when you say that those numbers give Indians in Commission District 2 the ability to elect candidates of their choice, that is not based on anything other than an unsubstantiated opinion on your part; correct? A: It is based upon trying to make sure that there was a majority of Native Americans . . . . Q: [I]t's not based on any analysis that you've completed; correct? A: At this point in time, no, it was not based on any other analysis.").

[86] *See* dkt. 366-1 at 125, 138; dkt. 366-19 at 21 ("I believe it's the fastest growing community in San Juan County."); Dkt. 366-21 at 17–18.

[87] See dkt. 366-21 at 21.

[88] Dkt. 366-1 at 128; dkt. 366-21 at 18–19.

[89] *See* Dkt. 366-1 at 136; dkt. 366-21 at 20.

[90] Dkt. 366-1 at 138 ("Q: Did you look at whether they had any shared interests? A: I don't know if I did or not. I don't recall.").

[91] *Id.* at 138.

[92] *Id.*

testified [to previously] in terms of proportional representation."[93]  Further, when asked if he analyzed factors commonly associated with communities of interest—including shared local experience, shared resources, and compatible political interests—Brace responded, "[o]ne factor that you do take a look at is the racial mix.  That is a clue in terms of community of interest. And certainly that was taken into account in terms of the plan."[94]

## ANALYSIS

This case is now in its remedial phase.  Having previously found both the School Board and County Commission election districts unconstitutional, the law requires the court to oversee the implementation of legally sound election districts.  This is a sensitive undertaking.  The Supreme Court has cautioned, "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt."[95]  Consequently, when a court finds an existing voting scheme unconstitutional, it should first allow the legislature to draft new voting districts, instead of developing and imposing its own plan in the first instance.[96] But if the legislature's plan is invalid—because it violates the Constitution, the Voting Rights Act, or traditional redistricting principles—the court does not defer to the legislative plan and may adopt its own.[97]

Consistent with this guidance, the court previously made clear if "San Juan County's proposal remedies the identified Equal Protection violation, and is otherwise legally sound," the

---

[93] *Id.* at 139.

[94] *Id.* at 143.

[95] *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978).

[96] *Id.* at 540 (recognizing "when a federal court declares an existing apportionment scheme unconstitutional, it is appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan").

[97] *See Large v. Fremont*, 670 F.3d 1133 (10th Cir. 2012).

court likely would enter that plan.[98]  The court stated, however, if the County's proposal "does not remedy the Equal Protection violation, or suffers from some other constitutional or legal defect," then it would not enter the County's plan.[99]

The court must now decide if the legislative redistricting plans submitted by the County are valid—whether they comply with the Constitution, the Voting Rights Act, and traditional redistricting principles.[100]  As explained below, the court's analysis here starts and ends with the Constitution.  Navajo Nation argues the County's proposed remedial School Board and County Commission election districts violate the Equal Protection Clause because they are racially gerrymandered.

The Equal Protection Clause limits racial gerrymandering of legislative districts— "prevent[ing] a State, in the absence of sufficient justification from separating its citizens into different voting districts on the basis of race."[101]  The Supreme Court observed racial classifications used in the redistricting process, even when done for remedial purposes, "may balkanize us into competing racial factions," and such classifications "threaten to carry us further from the goal of a political system in which race no longer matters."[102]  These racial classifications, therefore, are subject to searching judicial review.[103]

In considering Navajo Nation's claim of racial gerrymandering, the court must first decide if San Juan County used race in a way that triggers strict scrutiny.  For strict scrutiny to

---

[98] Dkt. 281 at 3.

[99] *Id.*

[100] *See Sanchez v. Colorado*, 97 F.3d 1303, 1327 (10th Cir. 1996) ("[C]ompliance with the VRA falls second only to the one person, one vote requirement and precedes all traditional districting concerns.").

[101] *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017) (internal quotation marks omitted).

[102] *Shaw v. Reno*, 509 U.S. 630, 657 (1993).

[103] *Id.*; *see also Sanchez*, 97 F.3d at 1328 ("[R]edistricting in which racial concerns predominate, done even for remedial purposes, is subject to strict scrutiny.").

apply, Navajo Nation must show race predominated over traditional redistricting principles in the drawing of a specific district. If Navajo Nation makes this showing, then the court must decide if San Juan County's actions satisfy strict scrutiny and "the burden shifts to the [County] to 'demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest.'"[104]

The court finds, for the reasons discussed below, that race predominated in the formation of District 3 of the County's proposed School Board election districts and Districts 1 and 2 of the County's proposed County Commission election districts. The court further concludes the County's race-based districting decisions were not narrowly tailored to meet a compelling government interest, and thus fail strict scrutiny. Because these districts are racially gerrymandered in violation of the Equal Protection Clause, the court will not adopt the County's proposed plans. The court takes up each of these issues in turn.

### I. Race Predominated in School Board District 3 and County Commission Districts 1 and 2

Not all consideration of race in the redistricting process subjects the government's action to strict scrutiny. The Supreme Court has recognized "the sensitive nature of redistricting" and has instructed "courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race."[105] For strict scrutiny to apply, the plaintiff must show "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district."[106] In other words, the plaintiff must

---

[104] *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 801 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 920 (1995)).

[105] *Miller*, 515 U.S. at 916.

[106] *Id.*

establish "that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations."[107] This burden is a demanding one.[108]

Traditional race-neutral districting principles include contiguity, compactness, communities defined by actual shared interests, respect for political subdivisions, incumbency protection, and political affiliation, among others.[109] The government's attempt to comply with the Equal Protection Clause's one-person, one-vote requirement is not a traditional redistricting principle.[110] Instead, "it is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator's determination as to *how* equal population objectives will be met."[111]

A plaintiff may show race was a predominant factor "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose."[112] The plaintiff must make this showing at the district level, instead of at the State or county level, as "[a] racial gerrymandering claim . . . applies to the boundaries of individual districts."[113]

In several cases, some recent, the Supreme Court has considered the type of evidence a plaintiff must put forth to make this showing—consistently rejecting bright-line rules in favor of

---

[107] *Id.*

[108] *Cooper*, 137 S. Ct. at 1479.

[109] *See Miller*, 515 U.S. at 916; *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1270 (2015).

[110] *Alabama Legislative Black Caucus*, 135 S. Ct. at 1270 ("[A]n equal protection goal is not one factor among others to be weighed against the use of race to determine whether race 'predominates.'").

[111] *Id.*

[112] *Miller*, 515 U.S. at 916 (emphasis in original).

[113] *Alabama Legislative Black Caucus*, 135 S. Ct. at 1265; s*ee also Bethune-Hill*, 137 S. Ct. at 799 ("But even where a challenger alleges a conflict, or succeeds in showing one, the court should not confine its analysis to the conflicting portions of the lines. That is because the basic unit of analysis for racial gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district.").

a holistic approach.  In *Miller v. Johnson*, the Supreme Court rejected a rule requiring the plaintiffs to make "a threshold showing of bizarreness" regarding the shape of the challenged district, in order to show race predominated.[114]  Instead, the Court made "clear that parties alleging a State has assigned voters on the basis of race are [not] confined in their proof to evidence regarding the district's geometry and makeup."[115]

The Court has also held that a State's use of a racial quota or goal in the redistricting process—in and of itself—is not sufficient evidence to prove race predominated over traditional redistricting criteria in a specific district, even when the racial goal was prioritized over all traditional redistricting principles.  In *Bush v. Vera*, a plurality of the Court concluded race does not necessarily predominate merely because the State intended to create majority-minority districts.[116]  In *Alabama Legislative Black Caucus v. Alabama*, the Court concluded the State's "policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote)" was "evidence that race motivated the drawing of particular lines," but was not conclusive evidence that race predominated over traditional redistricting principles in any particular district.[117]

In *Bethune-Hill v. Virginia State Board of Elections*, the Supreme Court this year rejected a lower court's "threshold requirement" that the plaintiffs show "a conflict or inconsistency between the enacted plan and traditional redistricting criteria" before finding race predominated over traditional districting criteria.[118]  The Court clarified that a State's plan could comply with all traditional redistricting principles, but the plaintiff could still establish race predominated

---

[114] *Miller*, 515 U.S. at 915.

[115] *Id.*

[116] *Bush v. Vera*, 116 S. Ct. 1941, 1951 (1996).

[117] *Alabama Legislative Black Caucus*, 135 S. Ct. at 1267.

[118] *Bethune-Hill*, 137 S. Ct. at 799.

through "direct evidence of the legislative purpose and intent or other compelling circumstantial evidence."[119]  Still, the Court recognized "a conflict or inconsistency may be persuasive circumstantial evidence tending show racial predomination," and "[a]s a practical matter, in many cases, . . . challengers will be unable to prove an unconstitutional gerrymander without evidence that the enacted plan conflicts with traditional redistricting criteria."[120]  In sum, "[a] plaintiff's task . . . is simply to persuade the trial court—without any special evidentiary prerequisite—that race . . . was the 'predominant consideration in deciding to place a significant number of voters within or without a particular district.'"[121]

Applying these principles here, Navajo Nation must show through either direct or circumstantial evidence that San Juan County subordinated traditional race-neutral redistricting principles (that do not include compliance with one-person, one-vote) to racial considerations. In other words, Navajo Nation must show race was the predominant factor motivating the County to put a significant number of voters within or without a particular district.  Navajo Nation must make this showing at the district level and cannot rely solely on any County policy of prioritizing racial targets above all other districting criteria.  While bizarrely shaped districts and conflicts between race and traditional redistricting principles may be evidence that race predominated, they are not threshold requirements to such a showing.

The court now turns to the question of whether race was a predominant factor in the drawing of any specific districts in the School Board or County Commission plans.  The court first considers evidence of San Juan County's use of race generally in its redistricting processes

---

[119] *Id.*  "The Equal Protection Clause does not prohibit misshapen districts.  It prohibits unjustified racial classifications." *Id.* at 798.

[120] *Id.* at 799.

[121] *Cooper*, 137 S. Ct. at 1479 (quoting *Alabama Legislative Black Caucus*, 135 S. Ct. at 1265).

for the School Board and the County Commission—concluding the County set specific racial targets for its districts and prioritized these racial goals above traditional redistricting principles. The court next conducts a district-by-district analysis considering the impact of the County's overarching policy on specific districts, including careful examination of all the evidence submitted at the district level.

### A. *San Juan County Adopted a Countywide Policy of Racial Targets*

The court concludes San Juan County adopted a countywide policy of prioritizing racial targets above all other redistricting criteria—except one-person, one-vote—when redistricting both the School Board and County Commission election districts. The San Juan County Commission, the legislative body tasked with redistricting, delegated this work to its retained expert and deferred to his priorities and conclusions.[122] The court, therefore, imputes Brace's priorities and decisions to the Commission.

Brace described his approach to redistricting as follows. First, he considered the one-person, one-vote requirement and attempted to abide by the court's instruction to produce districts that were "as nearly of equal population as is practicable."[123] Next, he prioritized compliance with the Voting Rights Act, specifically Section 2. Third, he attempted to abide by traditional redistricting principles. Prioritizing goals in such a way is not unique.[124] But Brace improperly equated compliance with Section 2 of the Voting Rights Act with racial

---

[122] *See supra* note 37.

[123] Dkt. 281 at 1.

[124] *See Alabama Legislative Black Caucus v. Alabama*, No. 2:12-cv-10801, 2017 WL 378674, * 5 (M.D. Ala. January 20, 2017) (noting the Alabama redistricting guidelines instructed that "not all of the redistricting goals could be accomplished and provided that, in case of conflict, priority would be given to requirements of one person, one vote and the Voting Rights Act"); *Bethune-Hill*, 137 S. Ct. at 795 (noting that in establishing criteria for redistricting, the House Committee prioritized one-person, one-vote and compliance with the Voting Rights Act above traditional redistricting factors).

proportionality. This led him to set racial targets during the redistricting process instead of considering the totality of the circumstances as required by Section 2.

As discussed, Section 2 of the Voting Rights Act prohibits State and local governments from restricting the right to vote based on race.[125] The Supreme Court has applied Section 2 to redistricting.[126] In assessing whether a Section 2 violation exists, the Supreme Court has set forth a factually intensive analysis, which includes a threshold determination followed by a totality of the circumstances analysis.[127] Under the totality of the circumstances analysis, the court must determine if the protected minority group's members "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[128]

Brace's efforts to comply with Section 2 of the Voting Rights Act amounted to nothing more than setting racial targets for each district. He asserted both the County Commission and School Board plans complied with Section 2, stating, "the County Proposal provides all voters in San Juan County, including Native American voters, the opportunity to elect candidates of their choice from Districts that reflect the nearly equal division of the population in the County between non-Hispanic Whites and Native Americans."[129]

---

[125] Specifically, the government cannot impose or apply a "voting qualification or prerequisite to voting or standard, practice or procedure" that "results in the denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 103101 (a).

[126] *See Thornburg v. Gingles*, 478 U.S. 30 (1986); *Growe v. Emison*, 507 U.S. 25, 40–41 (1993).

[127] *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (internal quotation marks omitted).

[128] 52 U.S.C. § 10301(b) ("A violation . . . is established if, based on the totality of the circumstances, it is shown that the political process leading to the nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.").

[129] Dkt. 294 at 13 (regarding the proposed School Board districts); dkt. 347 at 19 (regarding the proposed county commission districts).

But Brace also explained he was not able to complete any analysis to support this assertion other than to set racial targets for the districts—specifically, his goal of proportionality.[130] As used by the County, proportionality entailed designing "the districts in a manner that reasonably approximated the nearly equal division of the County's population between Native Americans and non-Native Americans, with Native Americans hav[ing] a slim majority of both the total population (52.17%) and the voting-age population (50.33%)."[131]

As applied to the School Board election districts, Brace and the County maintain proportionality dictated two safe Native American districts, two safe non-Hispanic White districts, and one district that reflected the overall racial composition of the County with 52.17% total Native American population and 50.33% voting-age Native American population. Similarly, proportionality for the County Commission required one safe Native American district, one safe non-Hispanic White district, and one district that that reflected the overall racial composition of the County.

In its briefing, the County discussed proportionality, and used it as a proxy for compliance with Section 2 of the Voting Rights Act. The County stated:

> The focus in the design of the County's Plan was to create districts, consistent with other redistricting principles (including maintaining traditional communities of interest and precinct boundaries), that reflected the overall composition of the County's population, thereby affording both Native Americans and non-Hispanic whites the opportunity to have a reasonable opportunity to elect candidates of their choice, while leaving the final representational division to the political process, where the Supreme Court has indicated it should be, because neither the *Constitution* nor the *Voting Rights Act* establishes a guaranty of absolute proportional representation.[132]

---

[130] Brace attempted to conduct a Section 2 analysis, but was not able to obtain the data he claimed to need from Navajo Nation in order to do so. Dkt. 366-1 at 106–07 ("Q: So what you're saying is that you made some limited attempts to do the analysis but reached no conclusions. A: That would be fair to say, yes.").

[131] Dkt. 375 at 19–20.

[132] *Id.* at 19.

The County argued, "a plan that reflects the proportional racial characteristics of the entire jurisdiction is presumptively valid, absent a showing that the jurisdiction's re-districting was aimed at precluding a minority group from electing a proportionate number of representatives of their choice."[133]

Because the County's attempt at compliance with Section 2 of the Voting Rights Act entailed nothing more than proportionality (meaning the establishment of racial targets for the resulting districts); and because compliance with the Voting Rights Act was the County's highest priority, save one-person, one-vote; the court concludes San Juan County adopted a countywide policy of prioritizing racial targets above all other traditional redistricting criteria.

The County implemented this proportionality goal in both the School Board and County Commission plans. As discussed above, the County contends proportionality required two School Board districts with a safe majority of White voters, two School Board districts with a safe majority of Native American voters, and a swing district that had a slim Native American majority of both the total population (52.17%) and the voting-age population (50.33%). The resulting School Board Districts 1 and 2 have safe majorities of White voters—89.53% and 78.91% respectively.[134] School Board Districts 4 and 5 have safe majorities of Native American voters—97.42% and 85.33% respectively.[135] The swing district, District 3, has a Native American voting age population of 53.51% and a White voting age population of 43.36%.

Like the School Board remedial plan, the County succeeded in implementing its racial proportionality goal in the proposed remedial County Commission plan. District 1 has a safe

---

[133] *Id.* at 18.

[134] Ex. A.

[135] *Id.*

White majority of the total population and the voting-age population—71.25% and 73.25% respectively.[136] District 3 has a safe Native American majority of the total population and voting-age population—75.88% and 73.86% respectively. And, the swing district, District 2, has a slim Native American majority in both total population and voting age population—51.94% and 50.60% respectively.

Based on the direct evidence of the County's racial proportionality goal, and the circumstantial evidence clearly showing that the County achieved proportionality, the court concludes San Juan County adopted and implemented a countywide policy of prioritizing racial targets above all other redistricting criteria in creating the School Board and County Commission remedial plans.

### B. School Board Election Districts

Having concluded the County prioritized racial targets above all other redistricting criteria, the court must now analyze the impact of this policy on individual districts in each proposed plan. The court must also consider other direct and circumstantial evidence that race predominated.

*i. School Board District 3*

Navajo Nation met its burden to show race was the predominant factor motivating the drawing of School Board District 3, through both direct and circumstantial evidence. First, Navajo Nation points to the racial demographics of District 3, which approximate the County's racial target, as circumstantial evidence that race was predominant. In District 3, the County's racial target was very specific. The goal was to mirror the overall demographics of the County with Native Americans having a slim majority in both the total population (constituting 52.17%

---

[136] Ex. B.

of the total population of the County), and the voting-age population (constituting 50.33% of the voting-age population).[137] The County was successful in attaining its racial proportionality goal. In the resulting District 3, Native American's constitute 53.14% of the total population and 53.51% of the voting-age population.[138]

Second, Navajo Nation compellingly points to the circumstantial evidence of District 3's shape. Indeed, when one looks at the map of the County's proposed School Board districts, District 3 stands out as oddly-shaped and non-compact. The District has a horseshoe like appearance, wrapping completely around District 4. District 3's low compactness reflects this odd shape. This District is significantly less compact than the other districts, as measured by two tests experts use to measure compactness (with a Reock[139] score of 0.40 and a Polsby-Popper[140] score of 0.15).[141] The County offers no other explanation for District 3's odd shape and lack of compactness.

Third, the number of precinct splits related to District 3 provides additional circumstantial evidence that race predominated over the traditional districting criteria of maintaining precinct boundaries. Brace split a total of eight precincts or sub-precincts countywide in developing the remedial plan for the School Board districts. The map the County

---

[137] *See* Dkt. 375 at 20.

[138] Ex. A.

[139] "The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact." Dkt. 297-1 at 5 n.2 (citing *Maptitude For Redistricting* documentation).

[140] "The Polsby-Popper test computes the ratio of the district area to the area of a circle with the same perimeter. The measure is always between 0 and 1, with 1 being the most compact." Dkt. 297-1 at 5 n.3 (citing *Maptitude For Redistricting* documentation).

[141] Dkt. 308 at 15.

submitted shows at least four of those splits are along the boundaries of District 3. Again, the County has offered no other explanation for these precinct splits.

Based on the direct evidence of the County's stated racial target for District 3, along with the circumstantial evidence that the demographics of the District correlate closely to the County's racial goal, that the District was oddly shaped, relatively non-compact, and an outlier compared to other districts, and that the County's split precincts were focused around District 3, the court concludes that race was the predominant factor motivating the County to place a significant number of voters within or without School Board District 3.

*ii. School Board Districts 1, 2, 4, and 5*

Navajo Nation presented no evidence, outside the County's overarching proportionality goal, that race was the predominant factor motivating the County to place a significant number of people within or without School Board Districts 1, 2, 4, or 5. The Supreme Court has instructed that an express policy prioritizing mechanical racial targets above all other traditional districting criteria, such as the County's proportionality goal here, is not by itself enough to show race predominated in any specific district. Because Navajo Nation has submitted no additional evidence outside of the general policy, Navajo Nation has failed to meet its burden to show that race predominated in these districts.

### C. County Commission Election Districts

Having addressed the County's proposed School Board election districts, the court now addresses whether Navajo Nation has met its burden to show race was the predominant factor in any specific remedial County Commission election district. The court addresses District 2 first, as the discussion of District 2 informs that of Districts 1 and 3.

*i. County Commission District 2*

Navajo Nation met its burden to show race was the predominant factor motivating the County to include or exclude a significant number of voters from District 2. Navajo Nation submitted both direct and circumstantial evidence that race was the County's predominant consideration.

The sworn testimony of the County's expert provides perhaps the strongest evidence that race predominated over traditional redistricting criteria in the formation of District 2. Brace testified, "when I drafted an initial plan based on traditional redistricting principles, the plan produced District 2 that was only 45% Indian. I continued to revise the plan so as to raise the Indian population above 50%. In the County's Plan, District 2 has an Indian population of 51.94%."[142] He further explained he "included part of [precinct] 13, Oljato, into District 2 in order to bring up the population of Native Americans in District 2."[143] Brace thus subverted to race the County's own stated traditional redistricting principle of limiting precinct splits. He split precinct 13 specifically to increase the number of Native Americans in District 2. It is also clear from Brace's statements that he altered district lines, which were originally based on race-neutral districting criteria, to raise the percentage of Native Americans in District 2 from 45% to 51.94%—a 6.94% increase.

In addition to this direct evidence, there is the circumstantial evidence that the County got very close to its racial target of 52.17%, with 51.94% Native Americans in the resulting district. Although District 2 is not bizarrely shaped, the Supreme Court has said that bizarreness is not a threshold requirement to a finding that race predominated.[144] Here, the direct evidence strongly

---

[142] Dkt. 373 at 4.

[143] Dkt. 366-1 at 162.

[144] *Miller*, 515 U.S. at 915.

supports the conclusion that race predominated in the County's choice to put a significant number of voters within or without District 2 based on race.

*ii. County Commission District 1*

Navajo Nation also met its burden to show race predominated over traditional redistricting principles in District 1.  The evidence that race predominated in District 1 is tightly bound to decisions made in District 2.  First, Brace's race-based decision to split precinct 13 to increase the Native American population in District 2 had a direct effect on District 1, the bordering district.  When Brace chose to subvert traditional redistricting principles and split precinct 13 he not only placed a significant number of Native Americans in District 2, but also took those same people out of District 1—expressly based on race.

Second, Brace grouped disparate communities together in District 1 because these communities were in an area that was "left over" after he made his race-based decisions in District 2.  District 1 contains the communities of Spanish Valley and Navajo Mountain, which are hundreds of miles apart, share no common infrastructure, and share few common interests.  When asked why he put Navajo Nation and Spanish Valley in the same district, Brace stated he created District 3 and District 2, and District 1 "is what's left over."[145]  Brace stated, "if I'm trying to create districts that have got minority populations, then this is what remains."[146]  When asked if he analyzed factors commonly associated with communities of interest—including shared local experience, shared resources, compatible political interests—Brace responded, "[o]ne factor that you do take a look at is the racial mix . . . . [a]nd certainly that was taken into account in terms of the plan."[147]

---

[145] Dkt. 366-1 at 138.

[146] *Id.*

[147] *Id.* at 143.

Accepting that Brace's decision to group disparate communities together was based on race requires the court to accept that the race-based decisions made in District 2 had a significant impact on District 1.  While such an inference may not always be appropriate, it necessarily follows here.  Precinct 13 was split based on race and directly affected both adjoining districts; where the County espoused and successfully implemented a countywide policy setting racial targets for the County Commission districts and prioritized that policy over all traditional redistricting principles; and where the County offered no other explanation for grouping together communities hundreds of miles apart with no identified shared interests.

*iii. County Commission District 3*

Navajo Nation presents little evidence, outside the County's overarching proportionality goal, that race was the predominant factor motivating the County to place a significant number of voters within or without District 3.  The court concludes Navajo Nation failed to establish that race was a predominant factor in District 3.

## II.  San Juan County's Predominant Use of Race Fails Strict Scrutiny

Having concluded race was a predominant factor in the County's decision to allocate voters to District 3 of the School Board and Districts 1 and 2 of the County Commission, the court must now decide whether the County's race-based decisions survive strict scrutiny.  The burden shifts to the County in this step of the analysis to show it narrowly tailored its decision to achieve a compelling government interest.[148]  But the County attempted no such showing here—choosing instead to stand on its argument that its consideration of race in redistricting was permissible.  The County did not explicitly identify any governmental interest it contends it was trying to achieve, nor did it argue that its race-based considerations were narrowly tailored to

---

[148] *See Cooper*, 137 S. Ct. at 1464.

achieve any specific interest. Because law places the burden to make this showing on the County, its failure to address the issue necessarily means the County's redistricting fails strict scrutiny review.

And the same result yields even if the court reads the County's submissions to suggest that its race-based considerations were designed to ensure the resulting districts complied with Section 2 of the Voting Rights Act—an interest the Supreme Court has assumed is compelling.[149] The Supreme Court has announced a relaxed version of narrow tailoring in this context in recognition of the legal tension legislatures often confront when complying with both the Voting Rights Act—which requires the consideration of race to some extent —and the Equal Protection Clause—which disfavors such race-based classifications.[150] Under this relaxed standard, the State's actions need not be actually necessary to comply with the Voting Rights Act.[151] Instead, "[w]hen a State invokes the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that it had 'a strong basis in evidence' for concluding that the statute required its action."[152] The required strong basis in evidence "exists when the legislature has '*good reasons* to believe' it must use race in order to satisfy the Voting

---

[149] *See id.* at 1469 ("[W]e have long assumed that complying with the VRA is a compelling interest."); *Sanchez*, 97 F.3d at 1328 ("[C]ompliance with § 2 of the VRA constitutes a compelling governmental interest.").

[150] *See Alabama Legislative Black Caucus*, 135 S. Ct. at 1273–74 ("The law cannot lay a trap for an unwary legislature, condemning its redistricting plan as either (1) unconstitutional racial gerrymandering should the legislature place too many minorities in a district or (2) retrogressive under § 5 should the legislature place too few.").

[151] *Id.*

[152] *Cooper*, 137 S. Ct. at 1464; *see also Sanchez*, 97 F.3d at 1328 ("[T]he state must have a strong basis in evidence to conclude the *Gingles'* preconditions exist to justify the redistricting as reasonably necessary to comply with § 2.").

Rights Act."[153]  "Or said otherwise, the State must establish that it had 'good reasons' to think that it would transgress the Act if it did *not* draw race-based district lines."[154]

The County never argued it had good reasons to believe it would transgress the Voting Rights Act if it did not make these race-based decisions.  And the County provided no evidence that there was a potential Section 2 violation to remedy as to Native American voters.[155]  To the contrary, the County consistently argued that Navajo Nation had failed to establish the *Gingles* factors, a threshold requirement to establishing a Section 2 violation.[156]  Commissioner Lyman specifically rejected the notion that voting in the County was racially polarized, which is one of the threshold requirements for a Section 2 violation.[157]  The inescapable conclusion throughout this case is that the County vigorously denies the existence of any Section 2 issue in the County. The County thus failed to provide legally sufficient reasons to believe it must use race in order to satisfy the Voting Rights Act.

Ironically, there may well be good reasons to believe there is a potential Section 2 violation in San Juan County.  Navajo Nation has argued as much and presented the court with evidence of a potential violation, at least as to the County Commission election districts.[158]  The court, however, can only address the arguments the parties place before it.  And San Juan County did not argue the evidence presented by Navajo Nation, or any other evidence, provided it good

---

[153] *Bethune-Hill*, 137 S. Ct. at 801 (quoting *Alabama Legislature Black Caucus*, 135 S. Ct. at 1274).

[154] *Cooper*, 137 S. Ct. at 1464.

[155] *See id.* at 1472 ("In sum: Although States enjoy leeway to take race-based actions reasonably judged necessary under a proper interpretation of the VRA, that latitude cannot rescue District 1.  We by no means 'insist that a state legislature, when redistricting, determine precisely what percent minority population [§2 of the VRA] demands.' But neither will we approve a racial gerrymander whose necessity is supported by no evidence and whose *raison d'etre* is a legal mistake." (citation omitted)).

[156] *See supra* Background, § I.

[157] Dkt. 366-19 at 37–38.

[158] *See* dkt. 100.

reasons to believe it must act as it did, or risk violating the Voting Rights Act. This was the County's burden and it failed to meet it.

But even if the County had established it had good reasons to believe there was a Section 2 issue to remedy, its broad use of proportionality was not narrowly tailored to address a potential Section 2 violation. The County argued that proportionality was a safe harbor from Section 2 liability, and relied on *Johnson v. De Grandy*[159] for this proposition. In *De Grandy*, however, the Supreme Court explicitly rejected such an approach.[160]

In sum, the County never argued its race-based decisions were narrowly tailored to achieve a compelling government interest. The County also failed to establish that it had a strong basis in the evidence for concluding its actions were necessary to comply with the Voting Rights Act. The County's decision to allocate voters to District 3 of the School Board and Districts 1 and 2 of the County Commission based predominately on race thus fails strict scrutiny review.

## CONCLUSION

The record establishes that San Juan County predominated racial considerations over other traditional districting criteria when drawing its County Commission Districts 1 and 2 and School Board District 3, and it did so without providing any reason to think it would violate the Voting Rights Act if it simply drew districts based on race-neutral factors. To the contrary, it did so even while maintaining there was no Section 2 issue that required it to take race into account

---

[159] 512 U.S. 997 (1994).

[160] In *De Grandy*, the Supreme Court explained proportionality is not a safe harbor, and admonished its use where the governing body has no evidence of a potential Section 2 violation. In that case, the Court rejected a safe harbor approach advanced by the State of Florida, in part, because it would have a "tendency to promote and perpetuate efforts to devise majority-minority districts even in circumstances where they may not be necessary to achieve equal political and electoral opportunity." *Id.* at 1019–20. The Court went on to explain that "[b]ecause in its simplest form the State's rule would shield from § 2 challenge a districting scheme in which the number of majority-minority districts reflected the minority's share of the relevant population, the conclusiveness of the rule might be an irresistible inducement to create such districts." *Id.* at 1020.

in redistricting. This runs afoul of Supreme Court pronouncements against racial classifications in drawing voting districts. The court thus concludes School Board District 3 and County Commission Districts 1 and 2 in the County's proposed remedial plans are unconstitutional. For this reason, the court cannot accept the County's proposed plans.

The court must now consider how best to proceed to the adoption of remedial election districts. The court previously stated it would evaluate Navajo Nation's proposed redistricting plans if the County's plans failed.[161] The court indicated that if it reached the Navajo Nation's plans, and if they were legally sound, the court likely would enter its plans as a final order.[162] Having considered the issue more carefully in the time that has passed since its earlier Order, the court no longer believes such an approach would lead to a satisfactory result.

The Supreme Court has cautioned, "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt."[163] The Court also instructs district courts to "undertake an 'equitable weighing process' to select a fitting remedy for the legal violations it has identified, taking account of 'what is necessary, what is fair, and what is workable.'"[164] Heeding this guidance, the court here attempted to avoid a result in which voting districts were drawn by anyone other than the elected representatives in the County. That attempt failed and the court must now become involved.

Drawing new election districts in San Juan County is an especially sensitive task given the County's demographics; its residents' legitimate, competing, and important interests implicated by redistricting; and its complicated voting rights history. In view of this reality, the

---

[161] Dkt. 281.

[162] *Id.*

[163] *Wise*, 437 U.S. at 539.

[164] *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017) (*per curium*) (citations omitted).

court believes adopting Navajo Nation's proposed redistricting plans—the product of an adversarial, litigation-driven process—could jeopardize, and possibly undermine confidence in, the legitimacy of the County's new legislative districts. Taking account of "what is necessary, what is fair, and what is workable" given the circumstances of this case, the court concludes the new districts must be a product of an independent, neutral process, with ample opportunity for participation and feedback from the parties.

For these reasons, the court declines to evaluate the proposed remedial plans submitted by Navajo Nation. It will instead appoint a special master to assist the court in formulating lawful remedial districts. The court will schedule a status conference to solicit input from the parties regarding this process.

SO ORDERED this 14th day of July, 2017.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge

**SAN JUAN COUNTY'S PROPOSED SCHOOL BOARD DISTRICTS**



| District | Percent White_Race Alone | Percent Native American_Race Alone | VAP Percent White_Race Alone | VAP Percent Native American_Race Alone |
|---|---|---|---|---|
| 1 | 89.04% | 4.59% | 89.53% | 4.40% |
| 2 | 77.37% | 18.41% | 78.91% | 18.36% |
| 3 | 42.66% | 53.14% | 43.36% | 53.51% |
| 4 | 1.82% | 96.84% | 1.59% | 97.43% |
| 5 | 10.06% | 87.17%[165] | 13.17% | 85.33%[166] |

[165] Dkt. 286-2 at 5.

[166] Dkt. 286-2 at 11.

**EXHIBIT B**

**SAN JUAN COUNTY'S PROPOSED COUNTY COMMISSION DISTRICTS**



| District | Non-Native American | Native American | Voting Age Population, Non-Native American | Voting Age Population, Native American |
|----------|---------------------|-----------------|--------------------------------------------|---------------------------------------|
| 1 | 71.26% | 28.74% | 73.25% | 26.75% |
| 2 | 48.06% | 51.94% | 49.40% | 50.60% |
| 3 | 24.12% | 75.88% | 26.14% | 73.86%[167] |

---

[167] Dkt. 347 at 17–18.