**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| NAVAJO NATION, a federally recognized Indian tribe, et al.,<br><br>Plaintiff,<br><br>v.<br><br>SAN JUAN COUNTY, a Utah governmental subdivision,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:12-cv-00039<br><br>Judge Robert J. Shelby |

Before the court are Special Master Dr. Bernard Grofman's Final Report and Addendum,[1] recommending remedial election districts for the San Juan County Commission and School Board, together with the County's objections to these recommended election districts.[2] For reasons below, the court concludes the recommended remedial districts comply with the Constitution, the Voting Rights Act, and traditional redistricting principles to the extent possible. Having concluded the proposed districts are legally sound, the court adopts the Special Master's recommendations and orders the use of these remedial districts in the November 2018 election.

## BACKGROUND

Plaintiffs Navajo Nation and several individual Tribe members (collectively, Navajo Nation) challenged the County Commission and School Board election districts in San Juan County, Utah, under the Equal Protection Clause of the Fourteenth Amendment, the Fifteenth

[1] Dkt. 434, dkt. 437.
[2] Dkt. 432, dkt. 438.

Amendment, and Section 2 of the Voting Rights Act.[3] The court subsequently held both the County Commission and the School Board election districts unconstitutional.

This case then entered its remedial phase. The court requested and San Juan County provided proposed remedial districts for both the School Board and County Commission. The court intended to adopt these districts if legally sound. The court eventually determined, however, that San Juan County's proposed remedial districts were also unconstitutional.

The court then ordered the appointment of a neutral Special Master, Dr. Bernard Grofman, to propose redistricting plans. The court now considers the remedial County Commission and School Board districts recommended by the Special Master. The court first sets forth the background necessary to address the issue currently before it—whether to adopt the Special Master's proposed remedial plans—and provides context for its decision. A more detailed background of this long-running case is set forth in the court's three prior substantive written decisions.[4]

## I. Procedural History

### A. Liability Phase

In 1983, the United States Department of Justice sued San Juan County in this court, arguing the existing at-large election system in the County violated Section 2 of the Voting Rights Act.[5] That lawsuit resulted in a Consent Decree and a Settlement and Order. In 1984, the County adopted remedial County Commission election districts, comprised of three single-member districts, one of which (District 3) was majority Native American. These three single-

---

[3] Dkt. 75.
[4] *See Navajo Nation v. San Juan Cty.*, No. 2:12-cv-00039, 2017 WL 3016782 (D. Utah July 14, 2017) (also available at dkt. 397); *Navajo Nation v. San Juan Cty.*, 162 F. Supp. 3d 1162 (D. Utah 2016) (also available at dkt. 312); *Nation v. San Juan Cty.*, 150 F. Supp. 3d 1253 (D. Utah 2015) (also available at dkt. 280).
[5] *See* dkt. 272-1 at ¶ 31.

member County Commission districts remained in place unchanged for more than twenty-five years before they were adjusted in 2011 to address population equality issues. The County made only minor changes to its Commission districts in 2011, shifting two precincts from District 1 to District 2, and not touching the boundaries of District 3.[6] The County left unchanged the boundaries of District 3 because it believed it was legally required to leave the district lines in place to provide for a minority-majority district—thus using race as a predominant factor for its decision.[7]

Plaintiffs filed the original Complaint in this case in January 2012, nearly six years ago.[8] In their subsequently amended Complaint, they challenged the 2011 County Commission districts and the School Board districts, which had last been redrawn in 1992. Navajo Nation alleged San Juan County's election districts were legally deficient under three distinct legal theories: (1) that the County Commission election districts were illegally racially gerrymandered under the Equal Protection Clause;[9] (2) that both the County Commission and School Board election districts violated Section 2 of the Voting Rights Act;[10] and (3) that the School Board election districts violated the one-person, one-vote requirement of the Equal Protection Clause.[11]

In a previous Order, the court determined County Commission District 3 was racially gerrymandered in violation of the Equal Protection Clause.[12] The court found race was the predominant factor in the County's decision to freeze the boundaries of County Commission District 3—a majority Native American district—in place for over twenty-five years. Because

[6] Dkt. 272 at 13.
[7] Dkt. 312 at 31–32.
[8] Dkt. 2; dkt. 72; dkt. 260 at 25.
[9] Dkt. 75 at 4–7 (First Claim for Relief).
[10] *Id.* at 7–10 (Second Claim for Relief as to the County Commission election districts and Third Claim for Relief as to the School Board).
[11] *Id.* at 10 (Fourth Claim for Relief).
[12] Dkt. 312.

race was the predominant factor in the County's decision to freeze District 3, its actions were subject to strict scrutiny.

The County argued its actions were necessary under the Consent Decree and Settlement and Order. But the court concluded nothing in the Consent Decree or Settlement and Order required the County to freeze District 3's boundaries in place. The Consent Decree did not set the number of districts to be established. It provided only that the redistricting plans that were to be developed could involve either "three or five single-member county commissioner districts."[13] The Settlement and Order established neither district lines nor specific requirements for the contemplated districts, other than they be "fairly drawn single member districts as authorized by state law."[14] The County's actions thus failed strict scrutiny review.

In a separate Order, the court concluded the School Board election districts violated the one-person, one-vote requirement of the Equal Protection Clause.[15] The County's five single-member School Board election districts were established in 1992, and had not been redrawn despite Utah law requiring reapportionment at least once every ten years.[16] These districts had a population deviation of around 38%, substantially higher than the 10% "safe harbor" courts have read Supreme Court precedent to provide.[17] The court concluded Navajo Nation had established a prima facie violation of the Equal Protection Clause as to the School Board election districts,

[13] Dkt. 210-3 at 3.
[14] Dkt. 312 at 7.
[15] Dkt. 280.
[16] Dkt. 260 at 25; Utah Code Ann. § 20A-14-201(2)(a)(i). Utah law also required that the school board consist of five-members, *id.* § 20A-14-202(1)(a),(h), and be substantially equal in population, among other requirements, *id.* § 20A-14-201(1)(b).
[17] *See* dkt. 221 at 31, 32 (Navajo Nation's expert found a deviation of 37.69%, while San Juan County's expert found a deviation of 38.22%.); dkt. 280 at 10–11 (discussing the one-person, one-vote standard).

and San Juan County had failed to carry its burden to demonstrate this unequal distribution served a legitimate governmental interest.[18]

**B. Remedial Phase**

Having held both the County Commission and the School Board districts unconstitutional, the court then outlined a remedial process.[19] As part of this process, both sides submitted proposed remedial County Commission and School Board plans. Following the opportunity for discovery, Navajo Nation and the County filed objections to each other's proposed plans. The court announced it intended to adopt the County's proposed remedial districts if it concluded they were legally sound.[20]

But in its July 2017 Memorandum Decision and Order, the court concluded the County's proposed remedial plans were legally infirm and could not be adopted.[21] The court concluded District 3 of the proposed School Board plan and Districts 1 and 2 of the proposed County Commission plan were racially gerrymandered in violation of the Equal Protection Clause.[22] For reasons explained in the Order, the court concluded race was a predominant factor in the drawing of these districts and the County had failed to meet its burden to show it narrowly tailored its race-based decisions to achieve a compelling government interest.

In its Order outlining the remedial process, the court initially stated it would evaluate Navajo Nation's proposed remedial plans if the County failed to submit legally sound plans. And the court indicated it likely would then adopt Navajo Nation's plans if they were legally

---

[18] Dkt. 280 at 28.
[19] Dkt. 321; dkt. 281; dkt. 343. The court also mooted Navajo Nation's pending summary judgment motions, which argued that the County's voting districts violated Section 2 of the Voting Rights Act. Dkt. 182; dkt. 202; dkt. 234; dkt. 298.
[20] Dkt. 281 at 3.
[21] Dkt. 397.
[22] *Id.* at 38–39.

sound. But the court ultimately declined to evaluate Navajo Nation's proposed plans and instead appointed a neutral Special Master to recommend remedial plans for the County. As explained in the July 2017 Order, the court "believ[ed] adopting Navajo Nation's proposed redistricting plans—the product of an adversarial, litigation-driven process—could jeopardize, and possibly undermine confidence in, the legitimacy of the County's new legislative districts."[23]

On September 29, 2017, the court appointed Dr. Bernard Grofman to serve as Special Master.[24] In the Order Appointing a Special Master, the court instructed Dr. Grofman to submit a report and recommendation proposing remedial districts that complied with the Constitution, the Voting Rights, and traditional redistricting principles to the extent possible.[25] The court also instructed that the proposed districts divide the County into three single-member County Commission districts and five single-member School Board districts.[26] The court set an expedited schedule to enable it to adopt or reject final plans by December 15, 2017.[27] Though the court provided time for objection, neither party objected to the Order Appointing a Special Master.[28]

After Dr. Grofman developed an initial series of conceptual remedial plans, the court decided to solicit input from the parties and the public with the goal of improving the final proposed plans by identifying any mistakes early and addressing any concerns to the extent possible. Dr. Grofman provided a detailed Preliminary Report that set forth three conceptual plans for the County Commission districts (CC_A, CC_B, and CC_C) and two conceptual plans

---

[23] *Id.* at 40.
[24] Dkt. 414. The court worked closely with the parties to appoint the special master and to draft the Order Appointing the Special Master. The court shared a preliminary draft of the Order with the parties, received feedback, and modified the Order in response. *See* dkt. 410.
[25] Dkt. 414 at 2–3.
[26] *Id.* at 3.
[27] *Id.* at 6–7.
[28] *Id.* at 7 (allowing for objection to the Order within three days of its entry).

for the School Board districts (SB1 and SB2).[29] The Preliminary Report detailed the process Dr. Grofman used to develop his conceptual plans.

The court provided the Preliminary Report and the supporting technical files to the parties on November 9, 2017, and San Juan County made the materials publicly available on its website. The court then scheduled public meetings to gather feedback on the preliminary plans.[30] On November 15, 2017, the court held a hearing with the parties at the federal courthouse to hear any objections to or comments on Dr. Grofman's proposed conceptual plans.[31] On November 16, 2017, the court held two public meetings in San Juan County—a morning meeting in Monticello and an afternoon meeting in Bluff. The parties assisted the court in providing information to the public regarding the meetings and securing the venues.[32]

The meetings were well attended. The court received feedback in several ways. Many speakers at the public hearings provided feedback on the proposed plans to the entire group. Other attendees provided oral or written comments directly to court staff after the large group portion of each meeting ended. The court received several written resolutions from local elected officials and interested organizations. The court also established an email address to allow the public to provide written comments, and received around sixty emails providing feedback on the conceptual plans. All comments were compiled and sent to Dr. Grofman.

---

[29] Dkt. 433.

[30] The court also released a Public Meeting Announcement detailing the type of feedback that would be most useful to the court and Dr. Grofman: "Because of the constitutional and statutory requirements, the Special Master is constrained in the types of feedback he can incorporate into his final recommendation. It would be most useful to the court for the public to focus their comments on the following issues: (1) Do you notice any inaccuracies in the proposed maps, e.g., in city or place boundaries? (2) Do you prefer one proposed preliminary County Commission map over another? If so, why? (3) Do you prefer one proposed preliminary School Board plan over another? If so, why? Comments that will be most useful to the court will focus on if and how these plans meet good governance criteria, or how the plans could be improved to better meet good governance standards."

[31] The parties also filed written responses. *See* dkt. 423; dkt. 424; dkt. 426.

[32] The court is grateful for the assistance of the parties in facilitating the logistics of these meetings.

On November 29, 2017, Dr. Grofman provided his Final Report, which was sent to the parties along with the technical files that provided details of the recommended plans—County Commission plan D (CC_D) and School Board plan 3 (SB3). The County objected to the proposed plans and submitted a declaration from its expert, Kimball W. Brace, identifying claimed deficiencies.[33]

Dr. Grofman incorporated feedback from the County and its expert by making technical revisions to his recommended plans and supplying an Addendum to the Final Report.[34] In the Addendum, Dr. Grofman explained the modifications he made in his plans, including correcting mistakes and attempting to better address the County's concerns about the administrative burden of the recommended plans. Dr. Grofman submitted updated maps, CC_D with technical corrections and SB3 with technical corrections.

The court provided the updated plans to the parties and provided time for them to file any comments on or objections to these final revised plans.[35] Navajo Nation did not file any comments or objections to the revised plans. The County filed an Objection with a declaration from Mr. Brace.[36] In his declaration, Mr. Brace stated that the census block files provided by Dr. Grofman still paired two sitting County Commissioners. Dr. Grofman addressed this issue and filed corrected maps with the court. These maps were sent to the parities. Navajo Nation's expert confirmed that Dr. Grofman had fixed the inadvertent pairing issue.

---

[33] Dkt. 432.
[34] Dkt. 437.
[35] Dkt. 436.
[36] Dkt. 438.

## II. Special Master's Report and Recommendation

Having provided an overview of the procedural history of the case and the remedial process, the court will now discuss Dr. Grofman's recommended plans and the process he employed to develop them.

### A. General Approach to Redistricting

Several background principles guided Dr. Grofman's redistricting efforts. First, Dr. Grofman's districting decisions were shaped by the constitutional requirement under the Equal Protection Clause that the new districts yield nearly equal population in each.[37] For instance, Dr. Grofman decided to use census block data (instead of precinct level data) to develop his plans because he was required to ensure nearly equally populated districts.[38] He acknowledged the County's consistent position that precincts, and not census blocks, should be used when redistricting. In his view, however, "redistricting must be based on census units since these are the only units of geography for which we have reliable population estimates."[39] As he explained, precincts "are merely units of administrative convenience" and "can readily be redrawn on the basis of census geography and should be so drawn in the County in the future in order to improve the population accuracy of the redistricting process."[40]

Second, Dr. Grofman gave little deference to the plans drawn by the County and undertook his line drawing de novo. He stated that based on the constitutional infirmities the court identified, and his review of the record,[41] he needed to make substantial changes from the

[37] *See, e.g.*, dkt. 433 at 18.
[38] *Id.* at 49.
[39] *Id.*
[40] *Id.*
[41] *Id.* at 29 ("The court found that race was the preponderant motive in line drawing in some districts (School Board District 3 and County Commission Districts 1 and 2). However, in examining the proposed County maps, because of the effects of race conscious line drawing in one district on the boundaries of adjacent districts, it became clear that race had affected the configurations of the entire

County's proposed districts in order to "create maps that do not violate the equal protection standard of *Shaw v. Reno.*"[42]

Third, Dr. Grofman approached his redistricting work with the goal of avoiding the use of race as a predominant factor. He stated that because "the finding of a constitutional infirmity in both past and present County plans hinged on the use of race as a preponderant factor," he was especially careful how he considered race.[43]

With these background principles in mind, Dr. Grofman next focused on "good government criteria" and on the unique geographic and demographic conditions of the County.[44] Specifically, he focused on keeping all census places and cities in the County[45] whole to the extent possible (while addressing the need for near de minimis population deviation). Dr. Grofman asserted that all of the various plans were contiguous[46] and compact.[47] He did not consider partisanship when constructing his proposed plans.[48]

Further, Dr. Grofman worked to unpair incumbents, but did not prioritize this goal. In discussing his treatment of incumbents, he stated he "did not assign any priority to protecting

---

three-district map in the case of the County (including the district contiguous to the two unconstitutional districts); and strongly affected four districts of five districts in the case of the School Board (the three contiguous to the unconstitutional district, along with that district itself), and also affected the fifth district (District 1) to a lesser degree in so far as irregularities in the borders of the other districts triggered by race conscious line drawing had implications for this district.").

[42] *Id.*

[43] *See, e.g., id.* at 19.

[44] *See, e.g., id.* at 3 ("These maps all reflect as their dominant motivation good government criteria and are drawn based on the geography and population demography of the County . . . ."); dkt. 434 at 4 ("Initial line drawing was on the basis of population and preservation of city and census geography.").

[45] Grofman identified twelve census places and two cities, Monticello and Blanding. Dkt. 433 at 10.

[46] *Id.* at 27.

[47] *Id.* at 28–29 (stating that "it is visually apparent that the districts in the conceptual maps proposed here are at least as compact on average as those offered by the County").

[48] Dkt. 434 at 21 ("[P]artisan considerations played absolutely no role in my line drawing. Since I was using only census data for map drawing purposes, no information about election outcomes or about voter partisanship registrations was contained in the data of which I made use. I would also point out that the School Board elections are non-partisan.").

incumbents in [his] initial line drawing," but at the court's request, he prepared an alternate version of the County Commission that unpaired present incumbents.[49] And he further explained that "incumbency considerations in the form of avoiding pairing two incumbents in the same district entered only as the final stage, and was done in a fashion that did not affect the plan's fundamental reliance on good government standards and the overriding importance of constitutional standards such as one person, one vote."[50]

After drawing districts based on race-neutral redistricting principles, Dr. Grofman considered whether the racial composition of the resulting districts presented any potential Section 2 issues. Dr. Grofman stated that "[w]hile Section 2 issues re previous plans, have not yet been resolved by the Court, . . . it is my view that courts are under an obligation to avoid Section 2 violations in crafting court-drawn plans or evaluating proposed alternatives. I also believe that egregious packing of minority populations is a *prima facie* indicator of a potential Section 2 violation."[51]

Dr. Grofman therefore considered race, but "only at the next to last stage, and only in a minimal fashion so as to avoid a potential constitutional violation of the Equal Protection clause or a violation of Section 2 of the Voting Rights Act . . . in terms of packing."[52] Dr. Grofman specified that "racial considerations entered only in the form of adjusting boundaries in initial [School Board] conceptual maps by moving population between two contiguous districts each of which already had a majority Navajo citizen voting age population in such a fashion as to insure that neither of these districts exceeded a 90% Navajo American voting age majority."[53]

---

[49] Dkt. 433 at 30–31.
[50] Dkt. 434 at 5.
[51] Dkt. 433 at 32.
[52] Dkt. 434 at 4–5.
[53] *Id.* at 5.

Dr. Grofman also opined that "were the Court to now wish to issue a ruling on the question of whether the conditions necessary for a Section 2 finding has been met, that the present evidentiary record is clearly sufficient for such purposes."[54] Dr. Grofman further provided his expert opinion that the swing districts in his recommended School Board and County Commission plans (which were both around 65% percent Native American) are not safe Native American seats. Rather, based on the data available to him these districts are too close to call.[55]

Having provided an overview of Dr. Grofman's general approach, the court will describe the development of his recommended remedial districts.

## B. Development of the Recommended County Commission Plan

Dr. Grofman's final recommended plan for the County Commission, CC_D with technical corrections, is a variant on the conceptual CC_C contained in his preliminary report. The court now discusses the evolution of the final recommended County Commission plan.

### *1. Development of County Commission Plan C*

In drawing CC_C, as with all conceptual county commission plans, Dr. Grofman "rel[ied] on good government criteria above all, e.g., keeping the city of Monticello whole, . . . not splitting the city of Blanding into more than two pieces, and not splitting Navajo Nation into more than two pieces."[56] After developing Conceptual County Commission Plan B (CC_B) using good government criteria, Dr. Grofman shifted the boundaries of CC_B slightly, "with minimum disruption of the overall features of the plan,"[57] to unpair incumbents and create

---

[54] Dkt. 433 at 47. *See id.* at 47–49 (discussing the findings required for a Section 2 violation and discussing evidence in the record).
[55] Dkt. 434 at 22–27.
[56] Dkt. 433 at 20.
[57] *Id.* at 31.

CC_C. This created a set of districts that were slightly less packed than those presented in CC_B.[58] In CC_C, the Native American population percentages by district were 11.8%, 64.7%, and 79.9%, respectively.[59]

*2. Development of County Commission Plan D*

In CC_D, Dr. Grofman again kept whole the City of Monticello and kept whole all census places within the county. He also kept the City of Blanding split into only two pieces, and kept Navajo Nation split into only two pieces.[60] In creating CC_D from CC_C, Dr. Grofman tried where possible to keep Navajo Chapters whole.[61] This change was the result of input from the parties and the public. He noted that "[t]aking Chapter boundaries into account to the extent feasible required only trivial population shifts."[62]

In his Final Report, Dr. Grofman also explained why certain changes requested by the parties and the public were not made in his final County Commission plans. For instance, the County strongly opposed any County Commission plan that split the City of Blanding. Dr. Grofman explained that he was required to split the City of Blanding to avoid splitting Navajo Nation three ways (instead of two), to avoid creating an "ungainly district stretching diagonally between one corner of the County and another opposite corner," and to avoid splitting Monticello into two pieces.[63]

*3. Development of County Commission D with Technical Corrections*

In response to the Final Report, the County filed its Objection and the declaration of Mr. Brace. Dr. Grofman made several changes in response to Mr. Brace's critiques of the

---

[58] *Id.* at 21.
[59] *Id.* at 22.
[60] Dkt. 434 at 12.
[61] *Id.* at 13.
[62] *Id.*
[63] *Id.* at 14–15.

recommended plans. These alterations are detailed in Dr. Grofman's Addendum.[64] Specifically, he shifted a small number of census blocks that had been included in the wrong district and had inadvertently created a minor three-way split of Blanding.[65] Dr. Grofman made some modest shifts between County Commission Districts 2 and 3 to use a portion of Route 191 as the boundary between the two districts.[66] He also shifted a small number of people into District 3 to reduce the number of unique precincts.[67] Finally, Dr. Grofman slightly reconfigured the School Board and County Commission districts in Blanding to reduce the administrative burden on the County.[68]

A map reflecting the Special Master's final recommended plan is attached as Exhibit B. Exhibit A includes a table with population totals for each district as well and the Native American and Native American voting age population percentages for each district.

**C. Development of Recommended School Board Plan**

*1. Development of School Board 2*

School Board Plan SB2 is a variation of SB1. Thus, the court first discusses the development of SB1. Dr. Grofman developed conceptual School Board Plan SB1 based on good government criteria. Specifically, SB1 split Blanding into only the two segments mathematically required for population equality purposes;[69] it split Navajo Nation into only the three pieces

---

[64] Dkt. 437.
[65] *Id.* at 2.
[66] *Id.*
[67] *Id.*
[68] *Id.* at 3.
[69] Dr. Grofman explains that "[o]ne-person, one vote considerations also directly impacted the plans that I have drawn. In particular, for the School Board plans, given the population size of the City of Blanding (3375) and population of an ideal School Board district (2582) it is mathematically necessary to divided the City of Blanding into two segments, while the population size of the Navajo Nation (6068) is larger than twice the population of an ideal School Board district (5164), and so it is mathematically necessary to divide the Navajo Nation into three segments for purposes of School Board districting." Dkt. 433 at 18–19.

mathematically required for population equality purposes; it kept Monticello and all census places whole; it placed all incumbents in separate districts; and it produced compact districts.[70]

When developing the conceptual School Board plans, Dr. Grofman also focused on location of schools, with the goal of distributing schools across the School Board districts.[71] He identified and mapped the County's twelve schools[72] and examined bus routes that transported students to these schools. In SB1, each district contains at least one school, with Districts 2, 3, and 4 containing two schools and Districts 1 and 5 containing three schools.[73] Further, "SB1 [was] drawn with attention to both the geographic locations of schools and to populations from surrounding areas that may attend those schools, with other features of the map largely reflecting population balancing concerns . . . ."[74]

After drawing SB1 and looking at the Native American population percentages that resulted in each of the districts, Dr. Grofman determined SB1 suffered from a likely Section 2 issue. Specifically, the plan had "a severe problem of racial packing in two of its five districts."[75] Thus, he altered SB1, creating SB 2 in order to reduce the packing issue. This alteration included moving Bluff into the western district.[76] Dr. Grofman said of SB2 that it "appears to be the best available plan for mitigating racial packing . . . , while it continues to have the desirable good government features of SB1, with the relatively minor exception of now having a School Board district with only one school in it . . . ."[77]

---

[70] *Id.* at 23.
[71] *Id.* at 5.
[72] *Id.* at 11.
[73] *Id.* at 24.
[74] *Id.*
[75] *Id.* at 26.
[76] *Id.*
[77] *Id.* at 27.

*2. Development of School Board 3*

In SB3, Dr. Grofman again kept the City of Monticello whole; kept all census places in the County whole; divided the City of Blanding into only the two pieces that are mathematically required "by the fact that the city's population exceeds that of an ideally sized School Board district"; and divided "Navajo Nation in only the three pieces that are mathematically required given the fact that Navajo Nation's population exceeds that of two ideally sized School districts."[78]

Dr. Grofman made several changes to SB2 based on feedback from the parties and the public to create SB3. First, as with the County Commission plans, Dr. Grofman worked to keep Navajo Chapters whole. In the School Board plan, he had to split the Aneth Chapter because its population and geographic features "made it impossible to place whole within [a] single School Board district."[79] Second, Dr. Grofman revised his earlier conceptual maps to increase the coterminality of School Board and County Commission lines in order to address the County's administrative concerns. To accomplish this he "redr[ew] SB2 lines so as to place SB3 District 1 entirely within CC_D District 1 and SB3 District 4 entirely within CC_D District 3."[80] Third, Dr. Grofman sought to improve the fit of School Board districts with pupil catchment areas.[81] Finally, Dr. Grofman unpaired two incumbents in SB2 who had been inadvertently paired because of imprecise address information.[82]

[78] Dkt. 434 at 12.
[79] *Id.* at 13.
[80] *Id.* at 19.
[81] *Id.* at 20.
[82] *Id.* at 33.

*3. Development of School Board 3 with Technical Corrections*

As previously discussed, Dr. Grofman made changes to the districts in his Final Report in response to additional feedback from the County. These changes were minor and included small shifts to better align School Board districts and County Commission districts in Blanding.[83]

A map reflecting the Special Master's final recommended School Board plan is attached as Exhibit C. Exhibit A includes a table providing the population totals for each district as well and the Native American and Native American voting age population percentages.

## ANALYSIS

The court must now decide if the Special Master's recommended plans are constitutional, comply with the Voting Rights Act, and abide by traditional redistricting principles to the extent possible. The court stated in its Order Appointing a Special Master that it would "review all factual findings made or recommended by the Special Master for clear error, all legal conclusions made or recommended by the Special Master *de novo*, and review all procedural matters for an abuse of discretion."[84]

## I. Constitutional Requirements

### A. One-person, one-vote

As the court discussed in its prior decision, the Equal Protection Clause requires that election districts afford voters equal weight in their representation.[85] The Supreme Court's decision in *Reynolds v. Sims*, 377 U.S. 533, 558 (1964) has been read to require that election districts be of substantially equal population to avoid over-representing members of one district (whose votes count proportionally more) or under-representing members of another (whose votes

[83] Dkt. 437 at 3.
[84] Dkt. 414 at 6.
[85] For a more in-depth discussion of this doctrine see the court's previous Memorandum Decision and Order, dkt. 280 at 10–11.

count proportionally less). Legislatively-drawn districts—those created by state or local governments—enjoy some flexibility under one-person, one-vote principles to allow these entities to balance policy concerns with population equality issues.[86] But court-drawn election districts do not enjoy the same flexibility. Instead, "[u]nless there are persuasive justifications, a court-ordered reapportionment plan . . . must ordinarily achieve the goal of population equality with little more than de minimis variation."[87]

Dr. Grofman's recommended plans present only minimal variation. The recommended County Commission plan, CC_D with technical corrections, has a total population deviation of 0.69%.[88] The recommended School Board plan, SB3 with technical corrections, has a total population deviation of 1.54%. These minor variations resulted from Dr. Grofman's attempts to unpair incumbents and to align, where possible, School Board and County Commission district lines to ease the County's administrative burden. The court concludes the recommended plans, with under 1% and 2% total population deviation respectively, comply with the Equal Protection Clause's one-person, one-vote mandate. Neither party disputes this compliance.

**B. Racial Gerrymandering**

As the court discussed in its prior decision, the Equal Protection Clause limits racial gerrymandering of legislative districts—"prevent[ing] a State, in the absence of sufficient

---

[86] *See Connor v. Finch*, 431 U.S. 407, 414 (1977). Further, as the court noted in its previous MDO, Supreme Court precedent has been read to provide a constitutional "safe harbor" at the 10% mark. Population deviations below that amount require plaintiffs to provide additional evidence to prevail on one-person, one-vote claims, while deviations above that amount establish prima facie case of a violation. *See Brown v. Thomson*, 462 U.S. 835, 842–43 (1983); *Daly v. Hunt*, 93 F.3d 1212, 1217–18 (4th Cir. 1996).

[87] *Finch*, 431 U.S. at 414 (quoting *Chapman v. Meier*, 420 U.S. 1, 26–27 (1975)).

[88] The population numbers for the final recommended districts can be found in Exhibit A.

justification, from separating its citizens into different voting districts on the basis of race."[89] But not all consideration of race in redistricting subjects government action to strict scrutiny.

For strict scrutiny to apply, a plaintiff must show "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district."[90] In other words, the plaintiff must establish "that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations."[91] Traditional race-neutral districting principles include contiguity, compactness, communities defined by actual shared interests, respect for political subdivisions, incumbency protection, and political affiliation, among others.[92] A government's attempt to comply with the Equal Protection Clause's one-person, one-vote requirement, however, is not a traditional redistricting principle.[93] A plaintiff may show race was a predominant factor "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose."[94] The plaintiff must make this showing at the district level, instead of at the state or county level, as "[a] racial gerrymandering claim . . . applies to the boundaries of individual districts."[95]

Dr. Grofman's remedial plans were drawn to cure the County's impermissible use of race in its previous redistricting attempts (in addition to the one-person, one-vote violation present in the School Board districts). As such, he was especially sensitive to avoid the use of race as a

---

[89] *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017).
[90] *Miller v. Johnson*, 515 U.S. 900, 916 (1995).
[91] *Id.*
[92] *Id.*; *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1270 (2015).
[93] *Alabama Legislative Black Caucus*, 135 S. Ct. at 1270.
[94] *Miller*, 515 U.S. at 916.
[95] *Alabama Legislative Black Caucus*, 135 S. Ct. at 1265; *see also Bethune-Hill v. Va. State Bd. Of Elections*, 137 S. Ct. 788, 799 (2017).

predominant factor in his redistricting process. Race entered into Dr. Grofman's line drawing calculation only at the final stage and only with respect to the School Board districts.

In objections to both Dr. Grofman's conceptual and final plans, the County nevertheless argues race was a predominant factor in his redistricting.[96] The County asserts "it is not possible to prepare 5 plans, 3 County plans and 2 School District plans, with all-five containing controlling supermajority Navajo/Democratic Districts without having improperly considered race in the drawing of those plans."[97] Further, in his declaration in support of the County's Opposition, Mr. Brace asserts that "the Special Master repeatedly states that he did not improperly consider race in formulating the Redistricting Plans. But those assertions by the Special Master are simply not credible."[98] Mr. Brace continues:

> Altogether the Special Master has submitted to the Court four County Commission plans and three School Board plans, and in each of these plans Navajo/Democrat voters are given a super majority of voters in two-thirds of the election districts. That could only happened[sic] by the Special Master consciously drawing district lines to achieve that result, which he acknowledges in his Final Report when he states he adjusted the boundaries for Commission District Two and Three in his initial conceptual maps to mitigate packing of minority populations "in such a fashion as to insure that neither of these districts exceeded 90% Navajo citizen voting age majority."[99]

These troubling allegations that Dr. Grofman lied to the court, to the parties, and to the public about his consideration of race are conclusory and entirely unsubstantiated. The court asked the County at oral argument for any factual support for the serious and deeply concerning assertion that Dr. Grofman intentionally misled the court about his use of race, or any other

[96] Dkt. 424 at 16 n.41; dkt. 432 at 4.
[97] Dkt. 424 at 16 n.41.
[98] Dkt. 432-1 at 7.
[99] *Id.* at 7–8 (quoting dkt. 434 at 13).

matter. The County pointed only to the racial outcomes of the districts in the proposed plans and to some minor irregularities in the districts Mr. Brace identified. Dr. Grofman addresses these irregularities in his Addendum, correcting admitted mistakes and further refining his plans.[100] The court is aware of no factual basis whatsoever for Mr. Brace's provocative allegations. Nor does the court find any reason to believe that the irregularities presented by Mr. Brace and addressed by Dr. Grofman support a finding of intent to mislead instead of inadvertent error inherent in line drawing work like that undertaken here by Dr. Grofman.

Further, Mr. Brace states that Dr. Grofman acknowledges in his Final Report that he used race-conscious line drawing to prepare plans that would result in two-thirds of the districts in both the County Commission and the School Board having Native American super majorities. Dr. Grofman acknowledged no such purpose. To the contrary, such a goal would directly contradict numerous statements in Dr. Grofman's submissions to the court. Instead, in his Final Report, Dr. Grofman explained that he adjusted the boundary between two School Board districts in order to avoid a potential Section 2 violation resulting from extreme packing. Overall, the County has failed to provide the type of direct or circumstantial evidence necessary to prove that race was the predominant factor in Dr. Grofman's redistricting decisions.

While the court relies on the adversarial process to highlight deficiencies in the Special Master's plans, it has an independent duty to ensure that any plans it adopts are legally sound. After carefully considering the record before it, the court concludes that race was not a predominant factor in Dr. Grofman's redistricting decisions.

First, as to the recommended County Commission districts, Dr. Grofman never used race to alter any of the district lines, let alone as a predominant factor. Instead, he started with the

[100] Of course, a central purpose of circulating draft plans with data was to enlist the parties and their experts to help the court identify the kind of technical errors and irregularities Mr. Brace noted.

goal of keeping census places whole and limiting splits of cities and communities of interest. He then continued to refine his plans to address incumbency concerns and other issues presented by the County in response to his drafts.

Second, as to the School Board districts, Dr. Grofman did alter a district line based on race. As detailed in his Preliminary Report, Dr. Grofman shifted Bluff from District 5 to District 3 to reduce what he concluded was extreme packing in District 5. In SB1, District 5 had a Native American population of 96.1% and District 3 had a Native American population of 58.5%.[101] Dr. Grofman shifted Bluff to District 3 in order to reduce the packing in District 5, creating SB2. In SB2, District 5 has a Native American population of 89.3% and District 3 has a Native American population of 65.2%.[102]

Regarding his development of SB2, Dr. Grofman explained that "[a]s in all my line drawing for the Court, race was not used as a preponderant criterion in SB2, but rather concern for geography and preservation of city and census place boundaries dominated. Race was only taken into account in redrawing the boundaries between two districts that were both already majority minority districts in SB1, and race was taken into account only so as to mitigate extreme racial packing."[103]

The court concludes that race was not the predominant factor in any district in Dr. Grofman's recommended School Board plan. While race clearly resulted in the shifting of Bluff to reduce the extreme packing of District 5, race did not subordinate any traditional race-neutral districting principles. To the contrary, it appears this was necessary to avoid a plan that presented a potential prima facie Section 2 violation.

---

[101] Dkt. 433 at 43.
[102] *Id.*
[103] *Id.* at 27.

For this reason, even if race did predominate in District 3 and District 5 of the School Board districts, the court concludes that the race-based decision to shift Bluff to unpack School Board District 5 and avoid a violation of Section 2 of the Voting Rights Act would satisfy strict scrutiny review—meaning it was narrowly tailored to address a compelling government interest. Under strict scrutiny review, "[w]hen a State invokes the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that it had a 'strong basis in evidence' for concluding that the statute required its action."[104] The required strong basis in evidence "exists when the legislature has 'good reasons to believe' it must use race in order to satisfy the Voting Rights Act."[105] "Or said otherwise, the State must establish that it had 'good reasons' to think that it would transgress the Act if it did *not* draw race-based district lines."[106]

Dr. Grofman had compelling reasons to believe[107] that his proposed School Board plan would violate Section 2 of the Voting Rights Act if he did not address the excessive packing of District 5 that initially resulted from his race neutral redistricting approach. Dr. Grofman cited to substantial evidence of a potential Section 2 issue in San Juan County as to the County's Native American residents. He recounted record evidence he believed easily satisfies the *Gingles* and Senate factors, establishing a violation under the totality of the circumstances test. He stated that if the court wished to make a Section 2 finding the "present evidentiary record is clearly

---

[104] *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017); *see also Sanchez v. Colorado*, 97 F.3d 1303, 1328 (10th Cir. 1996) ("[T]he state must have a strong basis in evidence to conclude the *Gingles*' preconditions exist to justify the redistricting as reasonably necessary to comply with §2.").
[105] *Bethune-Hill v. Va. State Bd. Of Elections*, 137 S. Ct. 788, 801 (2017) (quoting *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1274 (2015)).
[106] *Cooper*, 137 S. Ct. at 1464.
[107] While neither party address this issue, the court assumes for purposes of this opinion that a court appointed special master would not receive the same lenient "good reasons to believe" standard that has been articulated for legislative bodies.

sufficient for such purposes."[108] He then narrowly tailored his race-based line drawing to reduce packing in only one extremely packed district—a district with a 96% minority population.

The County also appears to assert a second type of vote-dilution objection grounded in the Equal Protection Clause—asserting that Dr. Grofman's plans so impair non-Native Americans' right to vote that they raise constitutional issues. As discussed in the court's previous Order, this type of vote dilution claim would require the County to prove discriminatory purpose.[109] The County has failed to provide, and the court is unaware of, any evidence that Dr. Grofman intentionally discriminated against the County's non-Native American population in performing his redistricting work.

Finally, the County argued in a conclusory manner that the Special Master's conceptual County Commission districts were unconstitutionally politically gerrymandered, minimizing Republican voting strength.[110] The County does not provide the legal standards that govern the court's analysis of this objection, nor does it provide evidence that Dr. Grofman improperly considered political affiliation. In his Final Report, Dr. Grofman made clear he did not consider political affiliation when drawing his districts, and he did not have access to this information when formulating his plans. The County has inadequately presented and failed to support its political gerrymandering objection. The court concludes this objection is not well taken.

In sum, the court concludes Dr. Grofman's recommended plans comply with the Constitution. The recommended remedial plans meet the one-person, one-vote requirement and are not racially gerrymandered. Race was not the predominant factor in any of Dr. Grofman's

---

[108] Dkt. 433 at 47. *See id.* 47–49 (discussing the findings required for a Section 2 violation and discussing evidence in the record).
[109] See dkt. 312 at 15–16 (explaining the difference between a one-person, one-vote vote dilution claim and this early form of vote dilution claim requiring discriminatory intent).
[110] Dkt. 424 at 12–13.

recommended County Commission or School Board districts. And even if race was the predominant factor in School Board District 5 and District 3, Dr. Grofman's race based decisions were narrowly tailored to address a potential violation of Section 2 of the Voting Rights Act. Finally, the County's additional constitutional objections, based on vote dilution and political gerrymandering, are not well taken.

**II. Section 2 of the Voting Rights Act**

Any redistricting plan the court adopts must also comply with Section 2 of the Voting Rights Act, which prohibits State and local governments from restricting the right to vote based on race.[111] To prove a Section 2 violation, a plaintiff must establish three necessary preconditions, known as the *Gingles* factors: "(1) The minority group [is] sufficiently large and geographically compact to constitute a majority in a single-member district, (2) the minority group [is] politically cohesive, and (3) the majority . . . vote[s] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."[112] If a plaintiff successfully establishes the *Gingles* factors, the court analyzes whether a Section 2 violation has occurred under a totality of the circumstances test, determining whether the protected voters have less opportunity to elect a representative of their choice than other members of the electorate.[113] When assessing the totality of the circumstances, courts look to the factors set forth in the Senate

---

[111] Specifically, the government cannot impose or apply a "voting qualification or prerequisite to voting or standard, practice or procedure" that "results in the denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). The Supreme Court has applied Section 2 to redistricting. *See Thornburg v. Gingles*, 478 U.S. 30 (1986); *Growe v. Emison*, 507 U.S. 25, 40–14 (1993).

[112] *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (internal quotation marks omitted).

[113] *Id.* at 11–12; 52 U.S.C. § 10301(b) ("A violation . . . is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.").

Report that accompanied the 1982 amendments to the Voting Rights Act—the "Senate Factors." Many of these factors address historic discrimination against minorities in the state or political subdivision.[114]

In the recommended County Commission plan, District 1 has a 10.2% Native American Voting Age Population (VAP), District 2 has a 63.7% Native American VAP, and District 3 has a 78.5% Native American VAP.[115] In the recommended School Board districts, District 1 has a 5.5% Native American VAP, District 2 has a 26.1% Native American VAP, District 3 has a 62.6% Native American VAP, District 4 has a 84.0% Native American VAP, and District 5 has a 84.9% Native American VAP.[116]

Based on the evidence in the record, and for the reasons explained by Dr. Grofman, neither the recommended County Commission nor the School Board plans present any apparent Section 2 issues. The court concludes the recommended plans will allow Native Americans

---

[114] The Senate Factors include: "(1) The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority voting requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction. Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are: whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group. Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. While these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution. The cases demonstrate, and the committee intends that there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." S. Rep. No. 97-417, at 206–07 (1982).
[115] Dkt. 437 at 4.
[116] *Id.*

equal opportunity to participate in the political process and to elect representatives of their choice. In the recommended County Commission plan, District 3 appears to be a safe seat for the Native Americans' candidate of choice. In the recommended School Board plan, District 4 and District 5 appear to be safe seats for the Native Americans' candidate of choice.

Both the County Commission and School Board plans include a more racially-mixed swing district: County Commission District 2 and School Board District 3. Based on his analysis of the record evidence, Dr. Grofman observed that the election contests in the swing districts are likely to be competitive and are too close for him to call. Specifically, he stated he "conclude[d] that the Native American community is certainly not guaranteed to elect a candidate of choice in the 64.4% Native American voting age population district (District 3) in [the] proposed SB3 School Board plan (a non-partisan election); and similarly, the Native American community is certainly not guaranteed to elect a candidate of choice in the 63.4% Native American voting age population district (District 2) in [the] proposed County Commission plan D (an election for partisan office). Rather, [he] regard[s] elections in both districts as competitive ones, and ones in which [he] would regard the outcomes as too close to call."[117]

Navajo Nation does not argue that Dr. Grofman's proposed districts present any Section 2 issues. The County does. It argues "the Voting Rights Act is race neutral," and the court "must give due consideration to white voters being the minority entitled to protection."[118] The County contends "[t]he Special Master's creation of supermajority Navajo/Democratic districts appears designed to maximize (even guarantee) the likelihood that Navajo/Democratic voters will choose two of the three County Commissioners,"[119] and that "[s]uch packing of non-Navajo/Republican

---

[117] Dkt. 434 at 26–27 (footnotes omitted).
[118] Dkt. 424 at 5.
[119] *Id.* at 11.

voters violates the non-discrimination requirements of both the Equal Protection Clause and the Voting Rights Act, by impermissibly diluting the representation of non-Navajo/Republicans in the County and interfering with their ability to elect candidates of their choice."[120]

The court has previously addressed the County's argument that Dr. Grofman's proposed plans violate the Equal Protection Clause, concluding that race did not predominate in Dr. Grofman's redistricting efforts and that the County has not provided any evidence of discriminatory intent. And the County's Voting Rights Act argument is based on a faulty factual premise—that Dr. Grofman sought to maximize Native American voting strength and created a County Commission plan that guarantees two Native American commissioners, thus diluting the voting strength of the County's white voters. As just discussed, Dr. Grofman concluded the racially mixed district in the County Commission plan was too close to call and definitely not a guaranteed seat for the Native American candidate of choice. The County has submitted no evidence to the contrary.

The court now turns to the legal soundness of the County's argument. The County cites *United States v. Brown*[121] for the proposition that Section 2 of the Voting Rights Act protects the County's white voters.[122] In that case, the district court concluded Section 2 protected white voters when they were a minority in the political subdivision at issue. The court went on to find a Section 2 violation based on intentional discrimination by an African American chairman of the Democratic Party against the party's white members. As the court notes in *Brown*, the so-called "intent" cases—those in which intentional discrimination in violation of Section 2 is alleged—have been rare since the 1982 amendment of the Voting Rights Act allowing for a

---

[120] *Id.* at 11–12.
[121] *United States v. Brown*, 494 F. Supp. 2d 440 (S.D. Miss. 2007).
[122] Dkt. 424 at 12 n.33.

violation based on the results of the government action—the so-called "results" cases.[123] In *Brown*, the court relied mainly on its finding of intentional discrimination to support its Section 2 finding, citing to ample evidence in the record to support the United States' assertion of intent.[124] The court also analyzed the Senate Factors but questioned their relevance to an intentional discrimination case.[125]

The court accepts for purposes of this Order that Section 2 can operate to protect the County's white citizens in the context of both an intent case and a results case, although there is no binding precedent to that effect, and *Brown* stands most strongly for applying Section 2 to white voters in cases of intentional discrimination. The County, however, has failed to provide any evidence of intentional discrimination of the Special Master against the County's white citizens—other than that already discussed and dismissed by the court. Because there is no evidence of intentional discrimination, the court concludes that Dr. Grofman's recommended plans are not subject to an intent based Section 2 claim.

The County has also failed to provide any evidence that Dr. Grofman's recommended districts are susceptible to a results-based Section 2 challenge on behalf of the County's white citizens—that is, evidence that based on the totality of the circumstances, the districts proposed by Dr. Grofman would provide white voters less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice. At oral argument, the court specifically addressed with the County the *Gingles* factors and several of the Senate Factors to assess whether there was any evidence to support a potential Section 2 challenge to the recommended districts. The County could cite to no specific evidence

---

[123] *Brown*, 494 F. Supp. 2d at 446.
[124] *Id.* at 482.
[125] *Id.* at 483.

supporting a finding that Native Americans vote sufficiently as a bloc to enable them to defeat the white citizens' preferred candidate—one of the three *Gingles* factors. The County mentioned Navajo Nation's bloc voting analysis but did not discuss how it might apply in this posture. The County also acknowledged there was no evidence of several of the Senate Factors.[126]

The County argued that the *Gingles* and Senate factors should not apply here because the court is considering whether Dr. Grofman's recommended maps present a *prospective* Section 2 issue—not whether there is a historic Section 2 issue in the County. But the County provided no legal authority for this proposition. The County is correct that the court's analysis is forward looking, asking whether these recommended districts comply with Section 2. But that forward looking analysis is inextricably linked to the totality of the circumstances test for a Section 2 violation—which requires a history of discrimination.[127]

While there is ample evidence in the record of historic discrimination against Native Americans in the county, coupled with the Special Master's expert opinion that this history of discrimination likely is sufficient to establish a historic Section 2 violation, the record is devoid of any such evidence concerning the County's white population. It would have been inappropriate for Dr. Grofman to make race-based modifications to his districts to address a potential Section 2 issue as to the County's white population where there is no evidence any such issue exists.

[126] Specifically, at oral argument, the court asked counsel for the County if there was any evidence that white citizens bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process; whether white citizens have failed to be elected to public office historically; and whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the County's white citizens.

[127] The court notes that this history of discrimination is clearly necessary when the plaintiff is asserting a results-based Section 2 claim, but possibly less relevant when the plaintiff is asserting intentional discrimination. *Brown*, 494 F. Supp. 2d at 448.

Further, even if there was evidence of a potential Section 2 issue relating to the County's white citizens, it is not clear how the recommended maps should be modified to address this issue. The County offers no guidance other than to suggest the court should order Dr. Grofman to draw new plans that "do not run afoul of these principles."[128] As discussed above, however, the only Section 2-based action Dr. Grofman took was to unpack districts with Native American populations over 90%. It is unclear to the court whether there are any proposed districts with white populations above 90%; in the recommended County Commission districts, no district has a white population above 90%,[129] and in the recommended School Board districts, it appears a single district (District 1), could possibly have a white population above 90%. But because the court has only the percentage Native American population for that district, it cannot discern whether the remaining percentage of the population is white or contains other racial groups.

The County also argues that Dr. Grofman's recommended plans "violate the principle of proportionality in the apportionment of election districts,"[130] stating "all of the Special Master's plans create supermajority Navajo/Democratic districts in San Juan County, the very type of representational guarantee that has been rejected by the Supreme Court."[131] As discussed earlier, the County produced no evidence that Dr. Grofman created districts that guarantee Native Americans unproportioned representation. Instead, Dr. Grofman concluded the swing district in each plan is competitive.

This argument also appears to be in tension with the County's argument that its white citizens, as the protected minority group under Section 2, require greater than proportional representation. The County seems to claim that the court must create swing districts that exactly

---

[128] Dkt. 432 at 6.
[129] Dkt. 437 at 4.
[130] Dkt. 424 at 13.
[131] *Id.* at 14.

mirror the County's population demographics through the setting of racial goals or benchmarks, as Mr. Brace did when crafting the County's proposed remedial plans.[132] And the County asserts these precisely-balanced districts are the "proportional" districts Supreme Court case law requires.

But creating districts this way would require the court to set a racial quota for the swing districts and guarantee that race was a dominant consideration—if not the predominant factor in the development of these districts. The County's argument also conflates proportional population with proportional representation. It would seem that proportional representation in this instance would call for the creation of competitive swing districts, which is what Dr. Grofman asserts the recommended plans ultimately provide. Competitive swing districts are not necessarily those in which the respective populations equal that of the County's overall population—52% Native American and 48% non-Native American. Instead, it appears that a district that is 52% Native American and 48% non-Native American likely would be a safe seat for a white candidate in San Juan County. If the swing districts were so drawn, the resulting plans could arguably create districts that maximize white voters' ability to elect representatives of their choice. In sum, the court concludes the proposed redistricting plans comply with Section 2 of the Voting Rights Act.

## III. Traditional Redistricting Principles

The court also concludes that Dr. Grofman's recommended County Commission and School Board plans abide by traditional redistricting principles to the extent possible given the constitutional and statutory constraints. Below, the court discusses Dr. Grofman's treatment of several traditional redistricting principles. A more complete discussion of these concepts is

[132] Dkt. 424 at 14 ("This problem can be remedied by formulating a plan that more clearly reflects the nearly equal proportions of the population who are Navajo/Democrats and non-Navajo/Republicans.").

found in Dr. Grofman's Preliminary Report, his Final Report, and his Addendum to the Final Report.

Preliminarily, the court observes that Dr. Grofman concluded he was required to make substantial changes from the County's proposed remedial districts. He therefore did not attempt to make minor changes to the districts, but instead performed his line drawing de novo. The County did not timely and meaningfully object to Dr. Grofman's de novo line drawing.[133] And the court agrees that de novo line drawing was appropriate here where the County's race-based decisions impacted most, if not all, of the districts in its proposed remedial plans.[134]

Dr. Grofman also minimized unnecessary splits of longstanding political units to the extent possible given the unique demographic and geographic constraints present in San Juan County. As discussed, his recommended County Commission plan keeps Monticello whole, splits the City of Blanding in only two parts, splits Navajo Nation in only two parts, and keeps all census places whole. Dr. Grofman's recommended School Board plan keeps Monticello whole, splits the City of Blanding into only the two mathematically required parts, splits Navajo Nation into only the three mathematically required parts, and keeps all census places whole. Dr.

---

[133] *See infra* note 153.

[134] *Upham v. Seamon*, 456 U.S. 37, 39 (1982) ("Although a court must defer to legislative judgments on reapportionment as much as possible, it is forbidden to do so when the legislative plan would not meet the special standards of population equality and racial fairness that are applicable to court-ordered plans."); *Smith v. Cobb County Bd. of Elections and Registrations*, 314 F. Supp. 2d 1274, 1292 (N.D. Georgia 2002) (declining to provide deference under *Upham* when the legislative plan before the court was "fraught with unconstitutionality"); *cf. Perry v. Perez,* 565 US 388, 394 (2012) (recognizing that a district court must use a state's plan as a "starting point" because "it provides important guidance that helps ensure that the district court appropriately confines itself to drawing . . . maps that comply with the Constitution and the Voting Rights Act, without displacing legitimate state policy judgments with the court's own preferences," but also stating that "[a] district court making use of a State's plan must, of course, take care not to incorporate into the [court] plan any legal defects in the state plan"); *Favors v. Cuomo,* 2012 WL 928216, at *14 (E.D.N.Y. March 12, 2012) (discussing *Perry* deference and declining to provide deference "where constitutional infirmities infect the entire Existing Plan").

Grofman's final recommended plans also minimize splits to Navajo Chapters, in response to public comments on his preliminary plans.

Further, in his Final Report Dr. Grofman addresses the strong sentiment expressed that Blanding should not be split, and discusses his reasons for dividing that community. Recognizing that splitting Blanding represents a shift from how this community was historically treated in previous County Commission plans, the court is satisfied that Dr. Grofman took all reasonable steps to minimize the divisions of Blanding. The County objected to Dr. Grofman's recommended County Commission plan because it divided Blanding into three parts. Dr. Grofman addressed this objection in his Addendum, explaining that he had inadvertently included a handful of low population census blocks (totaling approximately 16 residents) in the wrong district in a way as to inadvertently create a three-way split of Blanding.[135] He fixed this mistake and submitted updated maps to the court and the parties.

Dr. Grofman also unpaired incumbents. This is a traditional redistricting principle that legislatures often stress, but one that redistricting courts consider only minimally if at all.[136] Dr. Grofman unpaired incumbents only after considering other higher order priorities, and did so only when unpairing incumbents did not alter the good government foundations of his proposed plans.[137] Navajo Nation did not object to Dr. Grofman's efforts to unpair incumbents. The court finds Dr. Grofman's consideration of incumbency appropriate.[138]

---

135 Dkt. 437 at 2.

136 *See, e.g.*, *Wyche v. Madison Parish Policy Jury*, 769 F.2d 265, 268 (5th Cir. 1985) (per curiam) ("Many factors, such as protection of incumbents, that are appropriate in the legislative development of an apportionment plan have no place in a plan formulated by the courts.").

137 The court notes that the County also objected to the plans contained in the Final Report because the block equivalency files showed paired incumbents. As Dr. Grofman explained in his Addendum, this was a technical error that has been rectified and the currently proposed districts do not pair incumbents. Dkt. 437 at 2.

138 *See, e.g.*, *Dillard v. City of Greensboro*, 956 F. Supp. 1567, 1580–82 (M.D. Ala. 1997) (concurring with the Special Master's analysis of the use of incumbency in court redistricting plans, where Special

Additionally, Dr. Grofman sought to limit administrative burdens. The County objected to both the conceptual plans and the plans contained in the Final Report because of the administrative burden they would place on the County. The County argues new districts must be drawn on precinct lines because the County does not know the physical address of a large portion of its residents. Therefore, determining what districts these voters are in when new districts lines are drawn on census lines will be extremely burdensome.

The court is mindful of the administrative burden the use of census blocks will place on the County. The court is required, however, to ensure that population variation under one-person, one-vote is de minimus, a constitutional requirement the court cannot satisfy if it adopts districts drawn on the basis of precinct lines. Census blocks must be used instead. Dr. Grofman addressed this issue extensively in his filings with the court.

While using census lines, Dr. Grofman modified his plans to attempt to reduce the administrative burden on the County, working to better align the County Commission district lines with the School Board lines.[139] He also provided the County with a set of sample precincts for its consideration.[140] The court concludes Dr. Grofman appropriately attempted to address the County's administrative burden within the constitutional constraints imposed by the need to create plans with nearly de minimus population deviation. Finally, Dr. Grofman created districts that were compact and contiguous. Overall, the court concludes the recommended plans comply with traditional redistricting principles to the extent possible.

---

Master "found that incumbency protection is a legitimate factor, however one that is subordinated to other traditional factors he was required to consider"); *Larios v. Cox,* 314 F. Supp. 2d 1357, 1372 (2004) (adopting plans where the Special Master unpaired incumbents but "rejected any change if it would cause a departure from the primary considerations of compliance with the one person, one vote principle and the Voting Rights Act and adherence to other traditional redistricting principles").

[139] Dkt. 434 at 19; dkt. 437 at 2–3.

[140] Dkt. 437 at 5.

## IV. Special Elections

The County utilizes a staggered election scheme where a subset of the seats on the County Commission and School Board come up for election every two years, with each elected member serving a four-year term. Based on the court's review of the County's publicly posted voting results, it appears the staggered seats up for election in 2018 would include only existing County Commission Districts 2 and 3 and School Board Districts 4 and 5.[141] In his Final Report, however, Dr. Grofman recommends elections in 2018 include all seats for the newly redrawn County Commission and School Board, thus calling for special elections in County Commission District 1 and School Board Districts 1, 2, and 3. [142] This would shorten the current terms of those presently serving in those districts to two years instead of four.

Dr. Grofman recommends elections in all districts because the boundaries of the present districts and recommended districts overlap. Therefore, if an election was not held in all districts it "would create confusion as to which representative represented which voters."[143] Dr. Grofman also recommends the County retain its staggered election scheme, which, as explained, would truncate certain officials' terms for one election cycle.[144]

The court is mindful that "[r]elief in redistricting cases is 'fashioned in the light of well-known principles of equity.'"[145] District courts are required to "undertake an 'equitable weighing process to select a fitting remedy for the legal violations it has identified, taking account of what is necessary, what is fair, and what is workable."[146] Recently, the Supreme

---

[141] Voting results for San Juan County are available at https://sanjuancounty.org/index.php/electionsvoting/.
[142] Dkt. 434 at 31–32.
[143] *Id.*
[144] *Id.*
[145] *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017) (quoting *Reynolds v. Sims*, 377 U.S. 533, 533 (1964)).
[146] *Id.* (internal citations and quotations omitted).

Court stated that "in the context of deciding whether to truncate existing legislators' terms and order a special election, there is much for a court to weigh."[147] The Court outlined three factors it viewed as "obvious considerations" when ordering a special elections. These factors include: (1) "the severity and nature of the particular constitutional violation"; (2) "the extent of the likely disruption to the ordinary processes of governance if early elections are imposed"; and, (3) "the need to act with proper judicial restraint when intruding on state sovereignty."[148] The Court "did not suggest anything about the relative weight of these factors (or others)."[149]

The court concludes that ordering special elections in this case is necessary, workable, and fair. It is necessary to order special elections where the remedial districts vary so much from the constitutionally infirm districts they replace. To do otherwise would create an unworkable result—leaving citizens in the County confused about who represents them. Further, this result is fair as it ensures all citizens are represented by officials elected pursuant to legally sound districts.

Turning to the factors outlined by the Supreme Court, first, the constitutional violations these remedial districts remedy are severe and longstanding—as detailed in the court's previous Orders.[150] Second, the court is not aware of any significant disruption to the ordinary process of governance posed by these recommended special elections. The special elections will proceed under the regularly scheduled 2018 election deadlines and processes, thus minimizing their impact. Further, the County did not object to the special elections recommendation in its Objection to Dr. Grofman's Final Report.

---

[147] *Id.*
[148] *Id.* at 1626.
[149] *Id.*
[150] *See, e.g.*, Dkt. 280 at 3–4 (discussing how the School Board districts were adopted in 1992, remained unchanged until this litigation, and have been of unequal population since their adoption); dkt. 312 at 31–32 (discussing the County's decision to maintain the boundaries of District 3 for decades).

In its Opposition to Plaintiffs' recently filed Motion for Entry of Judgment, the County for the first time "opposes the entry of Judgment that would order that all incumbents stand for election on 2018."[151] The County cites Seventh Circuit case law discussing factors courts should consider when imposing special elections.[152] The County does not, however, discuss how these factors should apply or be weighed in this case. The County's objection to Dr. Grofman's recommendation to hold special elections as proposed in his Final Report is untimely. Further, the County provides no information to the court that would otherwise change its analysis.[153]

Finally, the court understands it must act with proper judicial restraint and respect state sovereignty. The court does so here where it acts to remedy serious constitutional violations, and the County did not meaningfully object. The special elections are specifically aimed at remedying constitutional violations that have affected the County's voters for decades. It is critically important that the officials representing the citizens of San Juan County are elected under constitutional districts—not districts that have been racially gerrymandered. The County's objections do not explain how such elections would burden the County, nor does the County address the rights of its citizens to have officials elected from constitutional districts. The court adopts Dr. Grofman's recommendation that elections be held in all districts in 2018, with the current staggering to continue thereafter.

---

[151] Dkt. 439 at 3.

[152] *Id.* at 4.

[153] The County appears to recognize that special elections will be necessary here where the new districts vary significantly from the prior districts. Dkt. 439 at 4. The County then faults Dr. Grofman for deciding to draw his districts de novo, but fails to cite to the appropriate legal standards or explain why Dr. Grofman should have deferred to County plans that had been ruled unconstitutional. As discussed earlier, the court concluded Dr. Grofman's decision to draw his lines de novo was appropriate in this case.

## CONCLUSION

In sum, the court concludes Dr. Grofman's recommended remedial districts comply with the Constitution, the Voting Rights Act, and traditional redistricting principles to the extent possible. The court therefore adopts these districts and orders their use in the upcoming elections in November 2018. The court also adopts Dr. Grofman's recommendation that elections be held for all the districts in both the County Commission and School Board in 2018.

SO ORDERED this 21st day of December, 2017.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

## APPENDIX

Exhibit A – Population Tables
Exhibit B – County Commission Plan Maps
Exhibit C – School Board Plan Maps